IN THE UNITED STATES DISTRICT OF NEW MEXICO
FOR THE DISTRICT OF NEW MEXICO

ADAM LOWTHER and JESSICA
LOWTHER on behalf of themselves and
as next friends to their minor children,
W.L. and A.L.,

      Plaintiffs,

vs.                                                                                   No. 1:18-cv-00868-MV/JFR

CHILDREN YOUTH  AND FAMILIES
DEPARTMENT, BERNALILLO
COUNTY SHERIFF'S DEPARTMENT,
MARIA MORALES,   in her personal
capacity acting under color of state law,
JACOB WOOTTON,  in his personal
capacity acting under color of state law,
CATHERINE SMALLS, in her personal
capacity acting under color of state law,
BRIAN THORNTON, in his personal
capacity acting under color of state law,
and MARTIN LOZANO, in his personal
capacity acting under color of state law,

      Defendants.

## DEFENDANTS CHILDREN YOUTH AND FAMILIES DEPARTMENT AND MARIA MORALES' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY

      **COME NOW,**  Defendants Children Youth and Families Department and Maria Morales

(hereinafter "CYFD Defendants"), by and through their counsel of record, Butt Thornton & Baehr,

P.C. (Jane A. Laflin and Jessica L. Nixon) and, pursuant to Fed. R. Civ. P. Rule 56, hereby present

their Motion for Summary Judgment on Qualified Immunity.[1] Based upon the nature of the relief

sought herein, Plaintiffs' opposition is presumed. In support of their Motion, the CYFD Defendants

state:

---

[1] Pursuant to *CYFD Defendants' Motion to File Redacted Public Version of Motions for Summary Judgment and to File Non-Redacted Copies of Motions for Summary Judgment Under Sea*l [Doc. 94], portions of this Motion have been redacted for purposes of confidentiality and the protections set forth by the New Mexico Children's Code. When permitted by the Court, a non-redacted version of this Motion will be submitted under seal.

## I.    INTRODUCTION

This case arises out of very serious allegations of sexual abuse, physical abuse and emotional abuse by a father, Adam Lowther, against his then four-year old daughter A.L. and his then seven-year old son W.L. On August 30, 2017, the Children Youth and Families Department ("CYFD") received a call from the teacher of A.L. who reported serious allegations of (sexual) abuse by Adam Lowther.  After receiving the emergency report, on the same day, a CYFD senior investigator, Maria Morales, contacted A.L's. teacher who confirmed the statements of A.L. regarding sexual abuse by her father. As mandated by statute, Ms. Morales contacted the Bernalillo County Sheriff's Office ("BCSO") to conduct a welfare check at the Lowther home in an effort to protect the young children from suspected abuse, primarily inflicted at the hands of their father, Adam Lowther, from which their mother, Jessica Lowther, failed to protect them.

On August 30, 2017, BCSO Detective Johnathon Wooten made the decision to place the children on a 48-hour hold and the specifics of which were explained by Ms. Morales. Subsequently, during the investigation of the allegations reported to CYFD, physical and emotional abuse of the children was disclosed. The CYFD Defendants worked with Plaintiffs to develop a safety plan and, ultimately, it was agreed that the children's maternal grandparents would serve as safety monitors to live with Jessica Lowther and the children while the investigation was completed. On September 1, 2017, the maternal grandfather erupted angrily toward CYFD following a criminal proceeding related to Adam Lowther's release from jail while criminal charges arising from the allegations reported to CYFD remained pending. Thereafter, with review by CYFD supervisors and caseworkers involved in the case of A.L. and W.L., it was concluded that the safety plan developed with the family had been disrupted as the safety monitors no longer could ensure a safe environment for the children. Ms. Morales contacted Detective Wooten who, based upon  the concerns identified regarding the safety of A.L. and W.L., then placed the second 48-hour hold on the children on

September 6, 2017. During the Children's Court proceedings which followed, the judge found—on three occasions—that probable cause existed to support CYFD's continued custody of A.L. and W.L.

By statute, CYFD is charged with investigating child abuse and protecting and safeguarding the health, safety, and lives of children. As is all too familiar in our community today, if allegations of child abuse are not investigated, the results are unthinkable and tragic. Nonetheless, Plaintiffs allege that they have been deprived of their constitutional rights of familial association and, therefore, seek damages pursuant to § 1983 from the CYFD Defendants. However, Plaintiffs' cannot carry their heavy burden to prove that their clearly established Constitutional rights have been violated in this matter. Rather, the totality of the circumstances, ***at the time of the incidents at issue***, establish that the CYFD Defendants had reasonable suspicion that A.L. and W.L. had suffered abuse or were at immediate risk of harm such that removal from the Lowther home prior to a hearing did not violate the right to familial association. In this case, efforts undertaken by the CYFD Defendants to protect A.L. and W.L. from the abuse and neglect by their parents was not only in accordance with state policy, statutes, and regulations, but also within the bounds of the United States Constitution. As a matter of law, the CYFD Defendants are entitled to qualified immunity and summary judgment is the proper disposition of Counts V and VI of Plaintiffs' Complaint.

## II.    UNDISPUTED MATERIAL FACTS[2]

For purposes of this Motion only, the following facts are undisputed:

1. At or about 2:00 p.m. on August 30, 2017, CYFD received a report alleging sexual abuse of A.L. and W.L. by their father. *See* CPS Intake Report No. 1742584, attached hereto as Exhibit A; *see also* Amended Affidavit for Ex Parte Custody Order attached hereto as Exhibit B at ¶ 3.

---

[2] Copies of the CYFD Defendants Exhibit A through Exhibit FF are the subject of *CYFD Defendants' Motion to Seal* [Doc.91] and *CYFD Defendants' Motion to Exceed Page Limits* [Doc. 88]. The cited materials identified as Exhibit A through Exhibit FF will be filed under separate cover when permitted by the Court.

2. The source reported:
   - On August 25, 2017, source and Adam Lowther discussed ████████████ ████████████████████████████████
   - On August 29, 2017, source and Jessica Lowther also spoke about ████████ ████████████████████████████████████████████ ████████████████
   - On August 30, 2017, A.L. told ████████████████████████████████ ████████████████████████████████████████████
   - A.L. also told the source that ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████
   - A.L. told the source that ████████████████████████████████████ ████████████████████████████████████████████

   ████████

   Exhibit A at p. 2.

3. After gathering information from the source, the CYFD intake worker assigned a priority to the report at 2:32 p.m. on August 30, 2017. *See Id.*

4. Upon review by a supervisor, the intake report assigned an "Emergency" priority and noted that "Mother is allegedly unaware." *Id.* at p. 3.

5. Maria Morales, a senior investigator for CYFD, received the emergency report alleging sexual abuse by Adam Lowther against his minor children, A.L. and W.L. *See* Exhibit B at ¶¶ 1, 3.

6. Ms. Morales contacted and spoke with Ms. DuBoise prior to the arrival of law enforcement officers at the Lowther's home. During this contact, Ms. DuBoise corroborated the information documented in the emergency CPS Intake Report. *See* Exhibit B at ¶ 4.

7. Approximately an hour after receiving the emergency report, Ms. Morales cross-reported the reported abuse to the Bernalillo County Sheriff's Office ("BCSO"). *See Id.* at ¶ 4; *see also* Computer Aided Dispatch Report, attached hereto as Exhibit C.

8. Upon arrival at the Lowther residence, despite instruction that she was committing a crime, Jessica Lowther obstructed efforts by the CYFD Defendants to ensure the safety of her children. *See* Transcript of Thornton Belt Tape 1, attached hereto as Exhibit D 3:7-25, 4:5-7[3]; Audio of Thornton Belt Tape 1, attached hereto as Exhibit E 02:03 – 3:41; *see also* Transcript of Small Belt Tape, attached hereto as Exhibit F, 3:3-25; Audio of Small Belt Tape, attached hereto as Exhibit G,

---

[3] The Transcript of Thornton Belt Tape 1 has been attached for convenience but misidentifies Deputy Catherine Smalls as Maria Morales. The transcript also contains numerous inaccuracies and therefore the belt tape audio is also being provided with transcript.

9.  Jessica Lowther also lied to the officials seeking to ensure the safety of her children when she told the officials that there were no guns in the home. *See* Exhibit F at 16:17-25, 17:1-12; Exhibit G at 39:08 and 41:15- 41:38.

10. When the officials arrived at the Lowther residence and requested a child welfare check, Jessica Lowther expressed her concern about missing a taekwondo lesson. *See* Exhibit F at 6:24-7:5; Exhibit G at 16:40.

11. Upon learning that a welfare check was required due to statements A.L. made at school, Jessica Lowther responded that it was "ridiculous" and inquired if there was "going to be, like, an investigation into something a four-year-old said?" *See* Exhibit F at 6:24-8:12; Exhibit G at 20:00.

12. Ms. Morales, with the assistance of BCSO deputies, made face to face contact with the children at approximately 5:20 p.m. to initiate her investigation. *See* Maria Morales Case Notes, attached hereto as Exhibit H at p. 1.

13. After meeting A.L. and W.L. they were each examined by emergency medical personnel while Jessica Lowther continued to refuse to be interviewed before being told her husband was in a patrol vehicle. *see* Transcript of Thornton Belt Tape 4, attached hereto as Exhibit I at 3:16-25, 4:1-17; see also Audio of Thornton Belt Tape 4, attached hereto as Exhibit J at 01:10 -01:51.

14. BCSO Detective Wootton then decided to place the children on a 48 hour hold and Ms. Morales explained the 48 hold to both parents separately and provided Jessica Lowther with the formal notice of custody. *See* Exhibit B at ¶ 10; Exhibit I at 10:4-21; Exhibit J at 06:28; *see also* Declaration of Detective Wootton, attached hereto as Exhibit K at ¶ 26.

15. In support of his decision to place A.L. and W.L. on a 48-hour hold, Detective Wooten executed a statement of reasonable grounds for temporary custody on August 30, 2017. *See* Exhibit L.

16. Ms. Morales understood that due to the seriousness of the allegations, Detective Wootton arranged emergency SAFE House interviews for both children. *See* Exhibit B at ¶ 11.

17. Ms. Morales transported the children to their SAFE House interviews. *See* Exhibit B at ¶ 12; *see* Exhibit K at ¶ 28.

18. On their way to the SAFE House, ███████████████████████████████████████ ████████ *See* Exhibit H at p.2.

19. Both A.L. and W.L. were interviewed at the SAFE House on August 30, 2017.  *Id.*

20. Ms. Morales watched the interview of A.L. which, according to Ms. Morales' notes, A.L. ███████ ███████████████████████████████████████████████████████████████████████████████████████. *See* Exhibit B at ¶ 12; *see also* Transcript of A.L. Safehouse Interview, attached hereto as Exhibit M, at 13: 17- 24, 14:1-15, 16: 21-25, 17:1-6, 20: 5-25, 21:1-3, 26:1- 27: 1-2. 29:3-20, 33:2-25, 34:1-11; *see also* Video of A.L. Safehouse Interview Part 1, attached hereto as Exhibit N.

21. During the SAFE House interview, A.L. also included disclosures that ████████ ████████████████████████████████████████████████████████ *See* <u>Exhibit M</u> at 58:6-25; *see* Video A.L. Safehouse interview Part 2, attached hereto as <u>Exhibit O</u>.

22. Ms. Morales likewise observed the interview of W.L. which, her notes indicate he explained p████████████████████████████████████████████. *See* <u>Exhibit. B</u> at ¶ 13; *See* also Transcript of W.L. Safehouse Interview, attached hereto as <u>Exhibit P</u>, at 6:1-25, 7:1-5, 12-25, 8:1, 8:11-23, 9:1-14; *see* Video of W.L. Safehouse Interview, hereto attached as <u>Exhibit Q</u>.

23. The following day, Jessica Lowther told Ms. Morales that she did not believe the statements her children made during the SAFE House interviews were true and she wanted A.L. "to go to a psychiatrist to help her heal." *See* <u>Exhibit B</u> at ¶16.

24. In response to Ms. Morales' report that W.L. was blaming A.L. for the separation from their parents, Jessica Lowther stated, "I knew he was going to do that[,]" explaining that W.L. understood the disclosures by A.L. were the reason for removal. *Id.*

25. Mr. Lowther similarly stated to Ms. Morales that W.L. "knows what is going on." *Id.* at ¶ 17.

26. On August 31, 2017, A.L. disclosed ████████████████████████████████████ ████████████████████████. *See* Albuquerque SANE Collaborative, Child Sexual Abuse Exam, dated 08/31/2017, *see* <u>Exhibit R</u>.

27. The physical assessment by the SANE nurse revealed redness to A.L.'s genitals and a 2 mm anal fissure was noted. *Id.*

28. On August 31, 2017, Ms. Morales completed her investigation regarding the Lowther children, concluding that children were, at the time, unsafe because more than one safety threat existed which put the children in immediate danger of serious harm and no sufficient protective capacities were present to mitigate such threat. *See* New Mexico Child Safety Assessment, dated 08/31/2017, *see* <u>Exhibit S</u>.

29. Ms. Morales explained to both parents the necessity of a family safety meeting and a safety monitor for the children during the remainder of the investigation. *See* <u>Exhibit B</u> at ¶¶ 16-17.

30. On September 1, 2017 an evaluation at Para Los Ninos corroborated the findings of the SANE examination, ██████████████████████████████████████████████████████ ██████████████████████████ *See* Para Los Ninos Medical Evaluation, dated 09/01/2017, attached hereto as <u>Exhibit T</u>.

31. Evaluation at Para Los Ninos also indicated that W.L. disclosed ████████████████ ████████████████████████████████████████████████████████ *Id.*

32. At a follow-up examination, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ Also, A.L. disclosed ████ ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████ *See* Para Los Ninos Medical Evaluation, dated 12/18/2017, attached hereto as Exhibit U (emphasis added).

33. On September 1, 2017, a safety plan was developed for the Lowther children to be released from protective custody to a safety monitor, in this case, the maternal grandparents. *See* Family Centered Meeting, dated 09/01/2017, attached hereto as Exhibit V.

34. Both parents agreed to the maternal grandparents of A.L. and W.L. to act as a safety monitors and the safety plan to release the children to the safety monitors. *See* Exhibit B at ¶¶ 20-21.

35. Thereafter, on September 1, 2017, the children were released from protective custody to their mother with their grandparents living in the home as safety monitors. *See* CYFD Protective Services Notice to Parent of Return of Custody of Children, attached hereto as Exhibit W; *see* Exhibit V at p.4; see also Exhibit H at p.4.

36. However, the referral for in-home services was disrupted a day later following a Preventative Detention Hearing regarding the charges filed against Adam Lowther based on the reported allegations made by A.L. *See* Exhibit B at ¶ 22; *see also* Narrative Case Notes by Andrea Miles on 09/05/2017, attached hereto as Exhibit X.

37. The maternal grandfather responded to conditions of release placed on Adam Lowther in anger directed toward the In-Home Services caseworker. *See Id.*

38. Concerns about the safety monitors' ability ████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████. *See* Narrative Case Notes by R. Yoder on 09/06/2017, attached hereto as Exhibit Y.

39. During a meeting with the In-Home Services caseworker and supervisor, along with Ms. Morales and her supervisor, CYFD determined that the safety plan was no longer effective to protect the children from abuse and/or neglect. *Id.*

40. Detective Wootton was contacted regarding the concerns and Detective Wootton decided to take the children into custody. *See* Statement of Reasonable Grounds for Temporary Custody, dated 09/06/2017, attached hereto as Exhibit Z.

41. On September 8, 2017, the Abuse/Neglect Petition was filed regarding the allegations of neglect and/or abuse of A.L. and W.L. by Adam Lowther and Jessica Lowther. Exhibit AA.[4]

42. In ruling on the Amended Neglect/Abuse Petition filed by CYFD regarding the Lowther children, the Honorable William Parnall, held that ████████████████████████████
████████████████████████████████████████████████ *See* Exhibit Parte Custody Order, entered on September 13, 2017, attached hereto as Exhibit CC, at ¶ B.

---

[4] On September 12, 2017, an Amended Abuse/Neglect Petition was filed with the Amended Affidavit for Exhibit Parte Custody Order. *See* Exhibit BB.

43. The Children's Court found that ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████ *Id.* at ¶ C (emphasis added).

44. The Children's Court further reasoned that ████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████ *Id.* at ¶ D.

45. During the custody hearing from September 18, 27-29, 2019, counsel for Adam Lowther and Jessica Lowther challenged and had the opportunity to present evidence against the Amended Affidavit for Ex Parte Custody Order.

46. Ms. Morales repeatedly testified that ████ ████████ ████████ ████████ ██ ████████
████████████████ *See In the Matter of A[.]L[.] and W[.]L[.]*, Transcript of Proceedings, attached hereto as <u>Exhibit DD</u>, at 71:8-18; 72:21-73:2; 75:1-7; 94:21-95:1; 145:7-146:15; 171:16-23; 172:16-19.

47. Ms. Morales testified that ████████████████████████████████████████
████████████████████████████████████ *See* <u>Exhibit DD</u>, 138:14-23; 139:6-10

48. Ms. Morales explained that she understood A.L.'s statement ████████████████████
████████████████████████████████████████████████████████████████ *See* <u>Exhibit DD</u> at 153:6-15, 18-21; 154: 5-9; 154:25-155:6.

49. The transcript of A.L.'s interview shows that A.L. reported ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████ *See* <u>Exhibit DD</u> at 143:25-146:3; 159:9-160:8; 161:14-162:2; 164:19-22; 165:19-166:4; 166:22-167:1; 215:7-17.

50. Approximately a month after the second protective custody, Judge Parnall found ████████████
████████████████████████████████████████████████████████. *See* Custody Hearing Order, entered 10/06/2019, attached hereto as <u>Exhibit EE</u>.

51. Judge Parnall ordered, for a third time, that ████████████████████████████████████
████████████████████████████████ *See* Order Sustaining Custody Order in Part, entered November 7, 2017, attached hereto as <u>Exhibit FF</u>.

### III.    LEGAL STANDARDS

#### a.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Bacchus Indus., Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; he may not rest on mere allegations or denials in his own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986). "An issue is material only when the controversy is over the facts that might affect the outcome of the suit under governing law." *Burgess v. West*, 817 F.Supp. 1520, 1523 (D. Kan. 1993) (internal quotation and citation omitted).

#### b.    Section 1983 Standard

Section 1983 of Title 42 of the United States Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

42 U.S.C. § 1983.

"To state a claim under § 1983, a Plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *Pierre-Louis v. Schake*, 2014 WL 1954783, at *18 (D.N.M. Apr. 30, 2014)(Browning J.), citing to,  *West v. Atkins*, 487 U.S. 42, 48 (1988). Under §1983 a Plaintiff may seek money damages from government officials who have violated his

constitutional or statutory rights. *Pierre-Louis*, 2014 WL 1954783, at *23. However, qualified immunity protects governmental officials not only from Section 1983 liability for the performance of their discretionary functions but also from participation in litigation. *Id.* (citing *Roybal v. City of Albuquerque*, No. CIV 08–0181, 2009 WL 1329834, at *10 (D.N.M. Apr.28, 2009), quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

### c.  Qualified Immunity Standard

Based on the foregoing authority, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 808, 818 (1982). Qualified immunity is designed to prevent the "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S., at 816. The purpose of qualified immunity is to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated. *Butz v. Economou*, 438 U.S. 478 (1978).

Typically, the Rule 56 summary judgment standard requires a court to review the evidence in the light most favorable to the non-moving party. *See Brisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994). However, summary judgment premised upon qualified immunity is viewed differently. *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990). When a defendant raises the defense of qualified immunity on a motion for summary judgment, the burden shifts to the plaintiff to rebut the presumption of qualified immunity. *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000); *see also Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001). The presumption

in favor of finding qualified immunity is necessarily high, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity also gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law. *Messerschmidt v. Millender,* 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012). Where government officials "of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley*, 475 U.S. at 341 (1986). Simply stated, qualified immunity ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

In order to overcome the presumption of qualified immunity, a plaintiff has the heavy burden of showing both that (1) the officer in question violated a constitutional right and (2) the allegedly infringed upon right was clearly established at the time of the allegedly unlawful activity such that "every reasonable official would have understood that what he [was] doing violated that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Failure to establish either of the qualified immunity elements is fatal to Plaintiffs' causes of action. Courts have discretion as to which of the two prongs of the qualified-immunity analysis should be decided first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Once it has been determined that a governmental official is entitled to qualified immunity, dismissal of the claims against that governmental official is required. *See generally Pearson*, 555 U.S. 223. Dismissal of claims to which the doctrine applies is "necessary both because qualified immunity is 'important to society as a whole,' [ ], and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S.Ct. 548, 551 (2017).

## IV.    LEGAL ARGUMENT

To determine whether a governmental official is entitled to qualified immunity, Plaintiffs bear the burden to show that that the conduct violated a clearly established constitutional right. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). "A necessary concomitant to the determination of whether the constitutional right is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). The clearly established inquiry is more specific than whether the officer's conduct violated a constitutional right: the question is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the circumstances which he or she confronted. *Saucier*, 553 U.S. at 202. "The ultimate question is whether the officers' actions [were] reasonable in light of the facts and circumstances confronting them." *See Davis v. Clifford*, 825 F.3d, 1135, (10th Cir. 2016). Accordingly, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 606, 615 (1999).

For a right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right (*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) because the salient question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional (*Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The purpose of the qualified immunity analysis is to ensure government officials have the ability to reasonably anticipate when their conduct may give rise to liability for damages. *See Hope*, 536 U.S. at 741. It is inappropriate for a court to define a law as being clearly established at a high level of generality. *See Brosseau v. Haugen,* 543 U.S. 194, 198-99 (2004). Rather, "[f]or a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d

1198, 1208 (10th Cir. 2011). The Supreme Court of the United States has required that "existing precedent must have placed the statutory or constitutional question beyond debate. . . the dispositive question is whether the violative nature of *particular* conduct is clearly established." *See Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). In short, "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.

> **a. Not Every Act Which May Interfere with the Due Process Right to Familial Association Amounts to a Constitutional Violation.**

In this case, Plaintiffs claim that their Fourth and Fourteenth Amendment rights were violated by the CYFD Defendants because the children were seized "without a warrant or reasonable suspicion that the children were in imminent danger" on August 30, 2017, and on September 7, 2017. *See* Complaint, ¶¶ 289, 293. Put differently, Plaintiffs allege that the CYFD Defendants violated their Fourteenth Amendment due process right[5] to familial association by seizing the Lowther children "without a warrant or reasonable suspicion that the children were in imminent danger." *Id.* The claims asserted in Counts V and VI are properly brought under the Fourteenth Amendment due process clause; the allegations therein do not properly assert Fourth Amendment claims. *See Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993); *see also J.B. v. Washington County,* 127 F.3d 919, 927 (10th Cir. 1997). While familial association is recognized as a fundamental right, not every act that results in an interference with such right is actionable. *See Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006); *see also Griffin*, 983 F.2d at 1548. Rather,

---

[5] Plaintiffs do not make clear whether their claims against the CYFD Defendants arise from alleged violations of substantive or procedural due process guaranteed by the Fourteenth Amendment. Because Counts V and VI allege that Plaintiffs' rights were violated when the Lowther children were removed from the home "without a warrant or reasonable suspicion. . .," the CYFD Defendants presume that Plaintiffs claim their procedural due process rights were violated.

Plaintiffs' right to familial association has been infringed is balanced against the state's reason for restraint thereof. *See J.B.*, 127 F. 3d at 927.

     *i.* ***Removal of Children Without Prior Notice or Hearing Does Not Violate the Fourteenth Amendment When There is Reasonable Suspicion of an Immediate Risk to the Safety of the Children.***

     In order to balance the interests of the parents, the child[ren], and the state, the Tenth Circuit has held that "state officials may remove a child from the home without prior notice and a hearing when they have reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there." *Gomes*, 451 F.3d at 1130. This standard strikes an appropriate balance between the interests of the parents, the children, and the state. *Id.* While there are "[f]ew decisions by state officials that are as wrenching as the decision to remove a child from a home based on parental abuse. . . [t]he state's failure to act on reasonable suspicion of abuse can have unthinkable consequences for the children." *Arredondo v. Locklear,* 462 F. 3d 1292, 1293-94 (10th Cir. 2006). Such "unthinkable consequences"—which are all too familiar in present-day New Mexico—include "physical injury, emotional scarring, a lifetime of recovery, disease, dysfunction, or death" to the children *Id.* Police and CYFD case workers must choose between difficult alternatives when allegations of child abuse arise and "it is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it." *Gomes*, 451 F.3d at 1137-38. Accordingly, qualified immunity applies if a case worker places children "in temporary custody when [she] has evidence of reasonable and articulable suspicion that the child[ren have] been abused or were in imminent peril of abuse." *Id.* at 1129.

     In New Mexico, state law confirms that the right to familial association at issue is a fundamental right in which an individual liberty interest rests and, therefore, that the balancing test is the proper procedure to evaluate qualified immunity in this case. New Mexico recognizes that

right to parent-child relationship is constitutionally-protected. *In the Matter of Pamela A.G.*, 2006-NMSC-019, ¶11, 139 N.M. 459, 463 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *see also State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 39, 137 N.M. 687, 699. This fundamental right to familial integrity is, according to the New Mexico Supreme Court, embodied in the Fourteenth Amendment. *Oldfield v. Benavidez*, 1994-NMSC-006, ¶ 14, 116 N.M. 785, 790 However, this interest is balanced against the state's compelling interest in protecting children. *Oldfield* at 1994-NMSC-006, ¶ 15. "The Fourteenth Amendment right to familial integrity, therefore, involve[s] a weighing of the parents' rights against the interests of the child and the state. Whether a plaintiff's constitutional rights are violated, then, 'would depend on a balancing of these two conflicting interests." *Id.*, ¶ 15 (internal quotation and citation omitted). Accordingly, if the state's interest in protecting minor children outweighs the individual parental liberty interest, there has been no constitutional violation. *Id.* Where it is objectively reasonable for a child-welfare worker to conclude reasonable suspicion of emergency circumstances justify removal of a child from the home, the child-welfare worker—in this case, Maria Morales—is entitled to qualified immunity. *Id.* at ¶ 17. Such application of qualified immunity is necessary to ensure that an effective child-abuse investigation system exists. *Id.* at ¶ 12.

This balancing between the interests of the parents' right to familial integrity against the state's "transcendent interest" in protecting children from abuse is to be conducted "'in the context of circumstances with which [Defendants were] confronted." *Oldfield*, 1994-NMSC-006 at ¶ 17 (quoting *Anderson*, 483 U.S. at 638). There is no precise definition of "emergency circumstances which pose an immediate threat to the safety of a child" *See Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). However, "emergency circumstances" has been defined to include "instances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision,

or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *W.K. on behalf of A.K. v. Albuquerque Police Dept.*, No. 15-CV-00416-WJ/GBW, *6 (D.N.M. June 1, 2016). District courts are, therefore, instructed that "in determining whether state officials have a reasonable suspicion of an immediate threat to the safety of the child, we must consider '*all relevant circumstances*,' including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child.'" *Gomes*, 451 F.3d at 1132 (quoting *Doe v. Kearney*, 239 F.3d 1286, 1295 (11th Cir. 2003)). This "analysis is not undertaken in hindsight but is determined by examining the defendants' actions in the context of the circumstances with which they were confronted." *W.K. on behalf of A.K.*, at *7 (internal citations omitted).

### ii. *Relevant State Statutes and Regulations are Circumstances to be Considered in Evaluating the Constitutionality of Removal of the Children.*

Account for any relevant state statutes, regulations or official policy which have explicitly sanctioned the conduct at issue is necessary in the analysis of whether the CYFD Defendants actions were objectively reasonable. *See Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003). Pursuant to the New Mexico Abuse and Neglect Act, NMSA 1978 § 32A-4-1 *et seq.*,

> [e]very person, including. . . a school teacher; a school official; a social worker acting in an official capacity. . .who knows or has a reasonable suspicion that a child is an abused or neglected child *shall* report the matter *immediately* to: (1) a local law enforcement agency; (2) the department. . .The recipient of a . . . *shall* take *immediate* steps to ensure prompt investigation of the report. The investigation *shall* ensure that *immediate* steps are taken to protect the health or welfare of the alleged abused or neglected child, as well as that of any other child under the same care who may be in danger of abuse or neglect.

NMSA 1978, § 32A-4-3(A), (C) (emphasis added). The purpose of an investigation by CYFD is to determine the best interests of the child[ren] and, after completion thereof, the department must recommend or refuse to recommend the filing of a petition. *See generally* NMSA 1978, § 32A-4-4.

The Abuse and Neglect Act provides that a child may be taken into protective custody,

> by a law enforcement officer when the officer has evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety; provided that the law enforcement officer contacts the department to enable the department to conduct an on-site safety assessment to determine whether it is appropriate to take the child into immediate custody, except that a child may be taken into custody by a law enforcement officer without a protective services assessment being conducted if:(a) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm to the child or great bodily harm or death to the child's sibling; [or] (f) the child is in imminent risk of abuse[.]

NMSA 1978, § 32A-4-6(A). The statute further provides that when an alleged abused or neglected child is taken into custody, a CYFD caseworker "shall review the need for placing the child in custody[.]" NMSA 1978, § 32A-4-7(A). The "need" for a child to be removed from the custody of the parent or guardian is similar in nature to the "reasonable suspicion" standard adopted in *Gomes*, 451 F.2d at 1129. *See W.K. on behalf of A.K.*, at *8.

Pursuant to the duty to review the need for placing the Lowther children in custody, the applicable regulations and procedures sanctioned the actions undertaken by the CYFD Defendants in this matter. When CYFD receives reports of alleged child abuse or neglect, child protective services intake determines if the situation constitutes abuse or neglect as defined by the Abuse and Neglect Act and determines if an investigation by the protective services division is warranted. *See* N.M. Admin. Code § 8.10.2.8. The protective services intake worker collects information from the party reporting abuse and assigns a priority to the report, which is then reviewed by a supervisor before assignment to a caseworker for investigation.   *See* N.M. Admin. Code § 8.10.2.10. Additionally, all reports of abuse or neglect ***shall*** be cross-reported to the appropriate law enforcement agency. *See* N.M. Admin. Code § 8.10.2.14(A). The investigation priority of the report determines the time period in which an investigation shall be initiated by "face-to-face contact by a

[protective services division] worker with the alleged victim." N.M. Admin. Code § 8.10.3.7(S). A report of abuse or neglect prioritized as Emergency "*requires* that an investigation be initiated within three hours of the SCI supervisor's screening decision." *Id.* (emphasis added). "When a law enforcement agency seeks to place a child in the custody of [protective services division], then the [protective services division] worker shall obtain a statement of reasonable grounds for temporary protective services division custody from the law enforcement officer making the request." N.M. Admin. Code § 8.10.3.16(G).  In performing a protective services investigation, "[t]he safety of the child is the *overriding* concern. . . If the safety of the child is ever in conflict with the preservation of a family unit, *the child's need for protection always takes precedence*." N.M. Admin. Code § 8.10.3.10(A) (emphasis added). Upon completion of an investigation, "[d]isposition options may include. . . referring the case to [protective services division] legal for possible legal action." N.M. Admin. Code § 8.10.3.19(C).

### b. The CYFD Defendants had Reasonable Suspicion of Abuse or Immediate Threat, Thus Did Not Violate Plaintiffs' Right to Familial Association.

In this case, the question at issue is *not* whether A.L. and W.L. were in fact at risk for immediate abuse but whether the facts leading up to each period of protective custody justify the decision to place the children in protective custody. As set forth below, the totality of the circumstances demonstrated by the undisputed material facts in this case establish that emergency circumstances existed on August 30, 2017, and on September 6, 2017, such that the need for the children's protection took precedence over the interest in familial association. The reasonable and articulable suspicion that A.L. and W.L. had been abused or were at immediate risk of abuse is fatal to Plaintiffs' claims that their Fourteenth Amendment rights were violated.  Accordingly, the CYFD Defendants are entitled to qualified immunity and, therefore, summary judgment is the proper disposition of Count V and VI of Plaintiffs' Complaint.

*i.*    *Articulable Facts Leading to Reasonable Suspicion of Abuse or Immediate Threat Supporting Protective Custody of A.L. and W.L. on August 30, 2017*

The undisputed material facts in this matter establish that there was evidence of reasonable suspicion to conclude that A.L. and W.L. had been abused and/or neglected such that they would face an immediate threat to their safety and, thus, decision to place the children in protective custody on August 30, 2017 was constitutionally sound. At or about 2:00 p.m. on August 30, 2017, CYFD received a report alleging sexual abuse of A.L. by their father. *See* Undisputed Material Fact ("UMF") No. 1. The reporting source described a conversation with each Adam and Jessica Lowther regarding A.L. ███████████████████████████ five days prior to the incident at issue. Neither parent disputed the direct reports about their daughter; rather in seeming agreement with the report about her daughter's behavior, Jessica Lowther agreed to speak with A.L. about the inappropriateness of the behavior. *See* UMF No. 2. As required by the relevant regulations, after gathering information from the source, the CYFD intake worker assigned a priority to the report at 2:32 p.m. on August 30, 2017. *See* UMF No. 3; N.M. Admin. Code § 8.10.2.10. Upon review by a supervisor, the report was prioritized as an "Emergency report" and noted that "Mother is allegedly unaware." *See* UMF No. 4.

Based upon the prioritization of the report as an "Emergency," CYFD was required to make face-to-face contact with A.L. and W.L. within three (3) hours or by 5:32 p.m. on August 30, 2017. *See* N.M. Admin. Code § 8.10.3.7(S). Defendant Maria Morales, a senior investigator for CYFD, received the emergency report alleging sexual abuse by Adam Lowther against his minor children, A.L. and W.L. *See* UMF No. 5. Ms. Morales contacted the source, who wished to remain anonymous but has been repeatedly publicly identified by Plaintiffs as Betty DuBoise, A.L.'s school teacher. Ms. DuBoise corroborated the CPS Intake Report documentation of the allegations she reported. *See* UMF No. 6. Approximately an hour after receiving the emergency report,

Ms. Morales cross-reported the reported abuse to the Bernalillo County Sheriff's Office ("BCSO"). *See* UMF No. 7. Ms. Morales' action in contacting BCSO regarding the reported abuse was in accordance with the statutory and regulatory duties imposed in New Mexico. *See* N.M. Admin. Code § 8.10.2.14(A). Despite several instructions by uniformed police officers, Jessica Lowther obstructed efforts by both BCSO and CYFD to ensure the safety of her children thereby committing an arrestable offense. *See* UMF No. 8. Likewise, Jessica Lowther lied to officials regarding her knowledge that firearms were present in the home. *See* UMF No. 9. When the officials arrived at the Lowther residence and requested a child welfare check, Jessica Lowther expressed her concern about missing a taekwondo lesson. *See* UMF No. 10. At no time prior had Jessica Lowther inquired if either of her children were safe or had been harmed or were otherwise at risk. Rather, when advised that the investigation needed to be initiated based on statements A.L. made at school, Jessica Lowther responded that it was "ridiculous" and inquired if there was "going to be, like, an investigation into something a four-year-old said?" *See* UMF No. 11. In other words, without even inquiring about the allegations by her daughter or the safety of her children, Jessica Lowther was more concerned about money spent on a taekwondo lesson and was willing to engage in criminal acts and lie to officers regarding potential safety hazards in order to protect her husband and herself.

Ms. Morales, with the assistance of BCSO deputies, made face to face contact with the children at approximately 5:20 p.m. to initiate her investigation. *See* UMF No. 12. After meeting A.L. and W.L., they were each examined by emergency medical personnel while Jessica Lowther continued to refuse to be interviewed before being told her husband was in a patrol vehicle. *See* UMF No. 13. Detective Wooten—not Ms. Morales— then decided to place the children on a 48-hour hold, followed by Ms. Morales' explanation of the 48-hour hold to both parents separately and provided Jessica Lowther with the formal notice of custody. *See* UMF No. 14. In support of his decision to place A.L. and W.L. on a 48-hour hold, Detective Wooten executed a statement of

reasonable grounds for temporary custody on August 30, 2017. *See* UMF No. 15. Ms. Morales understood that due to the seriousness of the allegations, Detective Wooten had arranged emergency SAFE House interviews for both children. *See* UMF No. 16.

ii.    ***Articulable Facts Leading to Reasonable Suspicion of Abuse or Immediate Threat Supporting Protective Custody of A.L. and W.L. September 6, 2017***

Based upon the reasonable suspicion described above and in accordance with NMSA 1978, § 32A-4-7(A), in implementing Detective Wooten's decision to place the children on a 48-hour hold, Ms. Morales transported the children to the SAFE House interviews. *See* UMF No. 17. On their way to the SAFE House, W.L. told A.L. ███████████████████████████████ ███████████t. *See* UMF No. 18. Both A.L. and W.L. were interviewed at the SAFE House on August 30, 2017. *See* UMF No. 198.  Ms. Morales watched the interview of A.L. which, according to Ms. Morales' notes, ████████████████████████████████████████ ███████████████████████. *See* UMF No. 20. During the SAFE House interview, A.L. also included disclosures  that ███████████████████████████████████████████ ███████████████. *See* UMF No. 21. Ms. Morales likewise observed the interview of W.L. which, her notes indicate he explained ████████████████████████ *See* UMF No. 22. The following day, Jessica Lowther told Ms. Morales that she did not believe the statements her children made during the SAFE House interviews were true and she wanted A.L. "to go to a psychiatrist to help her heal." *See* UMF No. 23. In response to Ms. Morales' report that W.L. was blaming A.L. for the separation from their parents, Jessica Lowther stated "I knew he was going to do that[,]" explaining that W.L. understood the disclosures by A.L. were the reason for removal. *See* UMF No. 24. Adam Lowther similarly stated to Ms. Morales that W.L. "knows what is going on." *See* UMF No. 25. On August 31, 2017, A.L. was examined by a SANE nurse who documented that A.L. disclosed ████████████████████████

21

████████████████████████. *See* UMF No. 26. The physical assessment by the SANE nurse revealed ███████████████████████████████████. *See* UMF No. 27.

On August 31, 2017, Ms. Morales completed her investigation regarding the Lowther children, concluding that children were, at the time, unsafe because more than one safety threat existed which put the children in immediate danger of serious harm and no sufficient protective capacities were present to mitigate such threat. *See* UMF No. 28. Ms. Morales explained to both parents the necessity of a family safety meeting and a safety monitor for the children during the investigation. *See* UMF No. 29. The following day, on September 1, 2017, an evaluation at Para Los Ninos ██████████████████████████████████████████████████████████████████████████████████. *See* UMF No. 30. From the initial evaluation of A.L., Para Los Ninos also documented that W.L. disclosed ██████████ ████████████████████████████████████████████████████████████████ ████ *See* UMF No. 31. Notably, at a follow-up examination at Para Los Ninos, ████████████ ██████████████████████████████ *See* UMF No. 32.

On September 1, 2017, a safety plan was developed for the Lowther children to be released from protective custody to a safety monitor, in this case, the maternal grandparents. *See* UMF No. 33. Both parents agreed to the paternal grandparents of A.L. and W.L. to act as a safety monitors and the safety plan to release the children to the safety monitors. *See* UMF No. 34. Thereafter, on September 4, 2017, the children were released from protective custody to their mother with their grandparents living in the home as safety monitors. *See* UMF No. 35. However, the referral for in-home services was disrupted a day later, on September 5, 2017, following a Preventative Detention Hearing regarding the charges filed against Adam Lowther for criminal sexual penetration of a minor. *See* UMF No. 36. The maternal grandfather responded to conditions of release placed on Adam Lowther in anger directed toward the In-Home Services caseworker. *See*

UMF No. 37. The concerns about the safety monitor's ability to protect A.L. and W.L., about the safety monitor's disbelief of A.L.'s disclosures, and about the safety-monitor's allowance for Adam Lowther to have access to the children were then addressed with a In-Home Services supervisor, Robin Yoder. *See* UMF No. 38. Thereafter, during a meeting with the In-Home Services caseworker and supervisor and Ms. Morales and her supervisor, the CYFD Defendants determined the safety plan was no longer effective to protect the children from abuse and/or neglect. *See* UMF No. 39. Accordingly, Detective Wootton was contacted regarding the safety concerns and Detective Wootton decided to take the children into custody. *See* UMF No. 40.

### c. Protective Custody of A.L. and W.L. was Not a Clearly Established Violation of Plaintiffs' Constitutional Rights.

Based upon the totality of the circumstances—illustrated by the undisputed material facts in this matter--which Ms. Morales confronted on August 30, 2017 and on September 6, 2017, the protection of A.L. and W.L. was paramount to the individual interest in familial association. In short, Plaintiffs were not deprived of a Constitutional right. Nonetheless, even if the right to familial association was violated, it was not clearly established at the time of the incident at issue that the CYFD Defendants' actions would amount to a deprivation of rights secured by the United States Constitution. The steps undertaken by the CYFD Defendants upon receipt of the reported abuse and the investigation that ensued were objectively reasonable, within the bounds of the Constitution of the United States, and compliant with the state statutes and regulations. As required by law, Ms. Morales filed a Neglect/Abuse Petition on September 8, 2017, following the completion of her investigation regarding allegations that Adam Lowther had abused his children and Jessica Lowther had failed to protect them from such abuse. *See* UMF No. 41. In three different orders and upon review of evidence presented and cross-examined by Adam and Jessica Lowther, a neutral judge found ███████████████████████████████████████████████████████████. *See* UMF

Nos. 42-45, 50-51. Based upon such ratification, the investigatory measures undertaken by the CYFD Defendants in this matter were objectively reasonable. Accordingly, the CYFD Defendants did not deprive Plaintiffs of any clearly established constitutional rights and are, as a matter of law, entitled qualified immunity.

        *i.*     ***The Children's Court Findings that Probable Cause Existed for Custody Clearly Establish that the CYFD Defendants Acted Objectively Reasonable.***

The clearly established law proves that the CYFD Defendants conducted a constitutionally sound investigation and acted objectively reasonable upon evidence of reasonable suspicion that an imminent risk to the safety of A.L. and W.L. existed. In the context of proper Fourth Amendment claims, the Supreme Court of the United States has held that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012); *see also St. John v. Justman*, 771 F.2d 445 (10th Cir. 1985); *see c.f. Valdez v. City & County of Denver,* 878 F.2d 85, 286 (10th Cir. 1989)("[A]n official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order."). In ruling on the Neglect/Abuse Petition filed by CYFD regarding the Lowther children, the Honorable William Parnall, held █████

███████████████████████████████████████████████████████

██████████████████ *See* UMF No. 42-45.  In giving all due deference to the neutral Children's Court Division judge, the Ex Parte Custody Order is clear indication that Maria Morales and the CYFD Defendants acted objectively reasonable. Judge Parnall again found that █████████████

███████████████████████████████████ *See* UMF No. 50. Judge Parnall ordered, for a third time, that ███████████████████████████████████████████

████████████████ *See* UMF No. 51. The reasonable suspicion standard applicable to this

matter is a lower standard than probable cause. If there was probable cause that custody of A.L. and W.L. was necessary to ensure the safety of A.L. and W.L., it follows that there must have been reasonable suspicion for protective custody without prior notice or hearing.

### ii.    *Investigation by the CYFD Defendants was Constitutionally Sound.*

During the custody hearing from September 27-29, 2019, counsel for Adam Lowther and Jessica Lowther challenged and had the opportunity to present evidence against the Affidavit for Ex Parte Custody Order. *See* UMF No. 45. Importantly, Ms. Morales offered lengthy testimony in response to cross-examination regarding the veracity of her affidavit. Ms. Morales repeatedly testified that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ *See* UMF No. 46. Ms. Morales testified that ████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████ *See* UMF No. 47. In accordance with NMSA 1978, § 32A-4-7(A), Ms. Morales did review the need for A.L. and W.L. to be removed from the custody of their parents based on the allegations reported by Ms. DuBoise. In exercise of this statutory duty, Ms. Morales contacted with Ms. DuBoise prior to the arrival of law enforcement officers at the Lowther's home. During this contact, Ms. Duboise corroborated the information documented in the emergency CPS Intake Report. *See* UMF No. 6.

Nonetheless, Plaintiffs conclude that the allegations described to Ms. DuBoise. and subsequently to CYFD, were not investigated before Ms. Morales contacted the appropriate law enforcement agency. However, Ms. Morales did not have a duty to conduct her investigation before cross-reporting to the appropriate law enforcement agency. Rather, the New Mexico Abuse and Neglect Act requires that all reports of abuse or neglect ***shall*** be cross-reported to the appropriate law enforcement agency, though investigation cannot be initiated until the protective services

worker—here, Ms. Morales—can make face-to-face contact with the alleged victim. *See* N.M. Admin. Code § 8.10.2.14(A); § 8.10.3.7(S). Furthermore, in evaluating the extent the constitution requires investigation, the Tenth Circuit Court of Appeals has long maintained that a law enforcement officer is not required to seek out evidence to negate probable cause. *See Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995). In other words, after probable cause has been established an officer is not required to investigate for exculpatory evidence in order to effectuate a constitutional arrest without a warrant. *See Payne v. Wilder*, No. CIV 16-0312 JB/GJF, 2017 WL 3600454, *32 (D.N.M. August 18, 2017). Likewise, once probable cause has been established, an officer is not required to await the results of forensic testing to effectuate the arrest, even when the testing exonerates the plaintiff. *See e.g. Braden v. Davis*, No. 15-15046, 645 Fed.App. 635 (10th Cir. April 12, 2016).

Here, Ms. Morales was prevented by Jessica Lowther from making contact with A.L. and W.L., thus could not initiate her investigation until approximately 5:20 p.m. on August 30, 2017. *See* UMF Nos. 8-12. Contrary to the Abuse and Neglect Act, Jessica and Adam Lowther interfered with Ms. Morales' efforts to initiate an investigation by face-to-face contact with their children. Detective Wooten informed Jessica Lowther of his decision to place the children on a 48-hour hold prior to the time that Mr. and Mrs. Lowther permitted the investigation. After initiating her investigation, the children were examined by emergency medical personnel and Ms. Morales promptly transported them for SAFE House interviews which she observed and took notes. *See* UMF Nos. 13-22. As is reasonably expected for statements provided in the totality of the circumstances at issue, statements by A.L. required interpretation and, therefore, Ms. Morales testified regarding her objectively reasonable interpretation when she was cross-examined by counsel for the parents during the custody hearing in this case. For instance, when asked what Ms. Morales interpreted ██████████████████████████ to mean, counsel for

Adam Lowther asked suggested that A.L. meant █████████████████████████████

███████████ However, Ms. Morales explained that she understood this to mean that ███████████████

█████████████████████████ *See* UMF No. 48. The transcript of A.L.'s interview shows that A.L.

reported, █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████. *See* UMF No. 49. Under such circumstances, Ms. Morales' interpretation of

A.L.'s statements cannot be viewed as objectively unreasonable nor does her interpretation vitiate

the reasonable suspicion to place A.L. and W.L. into protective custody. Based on the clearly

established law, the undisputed material facts establish that Ms. Morales exercised her discretion

within the bounds of the Constitution. The CYFD Defendants are entitled to qualified immunity in

this matter and Plaintiffs Complaint should be dismissed.

## V.    CONCLUSION

**WHEREFORE,** for the foregoing reasons, Defendants Children Youth and Families

Department and Maria Morales respectfully request that this Court grant the CYFD Defendants

qualified immunity and dismiss Count V and VI of Plaintiffs' Complaint with prejudice and for

such other relief as the Court deems just and proper.

Respectfully submitted,

BUTT THORNTON & BAEHR PC

*/s/ Jessica L. Nixon*
Jane A. Laflin
Jessica L. Nixon
jalaflin@btblw.com
jlnixon@btblaw.com
*Attorneys for Defendants Children Youth and Families Department and Maria Morales*

I HEREBY CERTIFY that on the 13th day
of November 2019, I filed the foregoing
electronically through the CM/ECF system,
which caused the following parties or counsel
to be served by electronic means, as more fully
reflected on the Notice of Electronic Filing:

Vincent J. Ward
vjw@fbdlaw.com

H. Jesse Jacobus, III
hjj@fbdlaw.com

Rachel Higgins, Esq.
Rachel@rachelhigginslaw.com

Frank T. Apodaca
fapodaca@saucedochavez.com

Brian Griesmeyer
bgriesmeyer@saucendochavez.com

*/s/ Jessica L. Nixon*
Jessica L. Nixon