## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

**ADAM LOWTHER and JESSICA
LOWTHER on behalf of themselves
and as next friends to their minor children,
W.L. and A.L.,**
     **Plaintiffs,**

**v.**                                                                                    **No. 1:18-cv-00868-KWR-JFR**

**CHILDREN YOUTH AND FAMILIES DEPARTMENT,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
MARIA MORALES, in her personal capacity acting under
color of state law, ANDREA MILES, in her personal
capacity acting under color of state law, JACOB WOOTTON,
in his personal capacity acting under color of state law,
CATHERINE SMALL, in her personal capacity acting
under color of state law, BRIAN THORNTON, in his
personal capacity acting under color of state law, and
MARTIN LOZANO, in his personal capacity acting under
color of state law,**
     **Defendants.**

**-consolidated with-**

**JESSICA LOWTHER,
and KELLY STOUT SANCHEZ,
Rule 1-017 Guardian ad Litem for A.L. and W.L.,**
     **Plaintiffs,**

**v.**                                                                                    **No. 1:19-cv-01205-KWR-JFR**

**JACOB WOOTTON and BOARD OF
COUNTY COMMISSIONERS OF
COUNTY OF BERNALILLO,**
     **Defendants.**

### <u>MEMORANDUM OPINION AND ORDER</u>

     **THIS MATTER** comes before the Court upon Defendants' Motion for Partial Summary

Judgment based on qualified immunity, filed on August 20, 2019 (**Doc. 59**) and Plaintiffs' Cross

Motion for Partial Summary Judgment, filed on October 22, 2019 (**Doc. 81**).

Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken in part and, therefore, is **GRANTED** in part and **DENIED** in part. Plaintiffs' Cross Motion is **DENIED.**

## BACKGROUND

This case arises from an investigation of alleged child abuse at Plaintiffs' home. Plaintiffs claim that Defendants violated their First, Fourth, and Fourteenth Amendment rights, and the New Mexico Tort Claims Act (NMTCA), by *inter alia*, unlawfully arresting or detaining Dr. Adam Lowther (Dr. Lowther); entering the Lowther residence without a warrant; detaining Jessica Lowther (Mrs. Lowther); and removing the Lowther children (A.L. and W.L.).

Plaintiffs filed this case under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following claims against the Defendants[1]:

Count I:  Fourth Amendment (Unlawful Seizure and Arrest of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count II:  Fourth Amendment (in the alternative to Count I) (Unlawful Detention of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count III:  Fourth Amendment (Unlawful Detention of Mrs. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count IV:  Fourth Amendment (Unlawful Entry into the Lowther Home) (Defendants CYFD, Morales, Wootton, Small, Thornton, and Lozano);

Count V: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Wootton);

Count VI:  Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Miles);

Count VII: Fourth and Fourteenth Amendments (Illegal Arrest, Entry, and Seizures) (Defendant BSCO);

Count VIII: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendant CYFD);

---

[1] The following reflects the claims as provided in Plaintiffs' Amended Complaint, Doc. 166, filed April 22, 2020.

Count IX: First Amendment (Retaliation against Mrs. Lowther) (Defendant Wootton);

Count X: NMTCA (False Arrest and Imprisonment of Dr. Lowther) (Defendant BSCO);

Count XI: NMTCA (False Arrest and Imprisonment of Mrs. Lowther) (Defendant BSCO);

Count XII: NMTCA (False Arrest and Imprisonment of the Lowther children) (Defendant BSCO);

Count XIII: NMTCA (Defamation of Dr. Lowther) (Defendant BSCO).


This Memorandum addresses Defendants' Bernalillo County Sheriff's Department (BCSO), Detective Jacob Wootton (Wootton), Deputies Catherine Small (Small)[2], Brian Thornton (Thornton), and Martin Lozano (Lozano) (collectively "County Defendants") motion for partial summary judgment on Plaintiffs' claims under Counts III, IV, V, VI, VII, IX, X, XI, XII, XIII as well as Plaintiffs' cross-motion for summary judgment with respect to Counts I, II, III, IV, V, and VII.[3] Doc. 81.  Preliminarily, the Court notes that Count VI does not raise claims against County Defendants and is not briefed by the parties. The Court presumes this was mistakenly included and will not address the arguments within that claim. Although an Amended Complaint has been filed, the claims related to this Memorandum remain unchanged with respect to County Defendants and therefore the Court may appropriately render a decision with respect to this subject matter.

## LEGAL STANDARD

County Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[2] The Caption appears to incorrectly name Detective Catherine Small as Catherine Smalls.
[3] Counts I and II have already been addressed in a separate Memorandum and Opinion. *See* Doc. 159.

known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id*. If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendants qualified immunity. *Id*. If the plaintiff meets his or her burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat its claim of qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992). In determining whether summary judgment is appropriate, the Court considers the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Hollander v. Sandoz Pharmaceuticals Corp*., 289 F.3d 1193, 1214 (10th Cir. 2002).

## UNDISPUTED MATERIAL FACTS[4]

To the extent a party's statement of facts do not contain citations to the record, the Court disregards them. *See* Fed. R. Civ. P. 56(c)(3) ("*Materials not cited.* The Court need consider only the cited materials, but it may consider other materials in the record."). Additionally, the Court may disregard a party's version of the facts which are clearly unsupported by the record.[5] As held by the Supreme Court in *Scott v. Harris* (550 U.S. 372, 380 (2007)):

---

[4] The facts set forth in this section are undisputed unless otherwise noted. Also, references to supporting exhibits are included in the briefs and for ease of reading, are omitted here.

[5] Some facts have been alleged which are clearly contradicted by the audio upon which both parties expressly rely. The Court does not adopt these facts in the Memorandum and has omitted those which are irrelevant.

> "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Here, both parties rely almost exclusively on the belt tape audio content recorded by County Defendants' officers. Notably, Plaintiffs' cross motion for summary judgment states that "The core constitutional claims may be resolved by summary judgment because the material facts can be derived from the belt tape recordings and from the sworn and recorded statements of the lead investigators on the case, defendants Jacob Wootton and Maria Morales. Those facts are incontrovertible …" (Doc. 81 Page 3).

Plaintiffs do not dispute the majority of County Defendants' facts so much as characterize or qualify them differently. The Court has reviewed the record and the relevant audio tapes, which by Plaintiffs' own attestation represents the requisite material facts, and incorporates general findings given the competing characterization of portions of the parties' factual presentations.

### Factual Background

In 2017, the Lowther household had two children, A.L. and W.L., ages four and seven respectively. In August 2017, A.L. enrolled in Calvary Christian Academy. A.L.'s kindergarten teacher was Betty DuBoise (DuBoise). A.L. attended the school for approximately two weeks. On different occasions, DuBoise informed A.L.'s parents, Dr. and Mrs. Lowther, of inappropriate behavior A.L. had exhibited at school, including touching her private parts and hiking up her dress. Both parents acknowledged that A.L. was having issues which they were trying to address.

On August 30, 2017, at approximately 2:28 p.m., DuBoise anonymously called The New Mexico Children, Youth and Families Department (CYFD) and informed CYFD of her suspicion

that A.L. was being sexually abused by Dr. Lowther. CYFD's intake report highlighted the

information DuBoise disclosed regarding A.L.'s behavior and what she had told DuBoise, which

formed the basis of DuBoise's concerns. In the pertinent part, the report states:

> On 8.25.2017 Source spoke with Adam about behaviors that [A.L.] had been
> displaying in class. [A.L.] has been touching her private area and hiking up her
> dress. Adam stated that they have been working with her and that she gets it from
> watching her 7 year old brother touch himself while sucking his thumb.
> On 8.29.2017 Source spoke with Jessica about the behaviors [A.L.] has been
> displaying. Jessica stated that [A.L.] has been having a hard time and that she would
> talk with her….
> On 8.30.2017 [A.L.] told a male student that he had a penis. Source redirected the
> children. Source asked [A.L.] how she knew the word. [A.L.] says Adam puts her
> on his lap when he goes to the bathroom and likes to move her up and down like a
> horsey. Adam sleeps with her and kisses her on the lips with tongue. Adam touches
> her on her bottom and puts his finger inside of her. She was able to demonstrate the
> movement with her hands and fingers. [A.L.] relayed that her brother kisses her
> with tongue and that her brother touches her as well. [A.L.] said Adam also touches
> her brother but did not give any detail. [A.L.] stated that this happens all the time.
> Source asked [A.L.] if she had told Jessica. [A.L.] said Adam told her not to and
> that it was their secret. Adam told her that Jessica would get mad. Source tried to
> encourage [A.L.] to speak with Jessica and [A.L.] said Jessica would yell. [A.L]
> has been demonstrating some behaviors in class since the start of school. She is not
> listening, talking back, she spit at another girl and has been aggressive toward other
> children.

At 3:45 p.m. on the same day, CYFD investigator Maria Morales (Morales)

contacted DuBoise to confirm the contents of the intake report. Plaintiffs dispute this fact,

claiming that due to the Court ordered stay on discovery they lack sufficient knowledge to

admit or deny this statement.  However, the Court finds this well supported by the record,

including portions of which Plaintiffs stated are "incontrovertible" for the purposes of their

summary judgment cross motion[6].

### County Defendants' Initial Contact with the Lowther Household

---

[6] Plaintiffs have stated that for their summary judgment motion, material facts which are incontrovertible include the sworn statements of Detective Jacob Wootton and CYFD investigator Morales. Morales' sworn statement includes that she spoke with DuBoise over the phone after receiving the report.

On August 30, 2017, at approximately 3:41 p.m., Morales contacted BSCO to request assistance in conducting a welfare check of the Lowther children.  Around 3:50 p.m., BSCO dispatched Deputies Small, Thornton, and Lozano to the Lowther residence, with Small as the lead field deputy.  The officers arrived at the Lowther home around 4:05 p.m., where they met Morales and were provided with more detail regarding the nature of the allegations[7].

The deputies knocked on the door and initiated contact with Mrs. Lowther at approximately 4:19 p.m.  Mrs. Lowther was already on the phone with Dr. Lowther when the police arrived and contemporaneously relayed to him the information she was receiving from the officers.[8]  The officers informed her that they were there to conduct a welfare check on the Lowther children because "somebody called and wanted to remain anonymous that they were worried [about the children]."

Mrs. Lowther told the deputies they were not allowed in the house until her husband arrived.  In response, Thornton told her, "So in State of New Mexico, and we're conducting a check on children, if you deny us access you can be arrested."  Mrs. Lowther continued to relay this information to her husband, stating "I don't know what to do here…I don't understand what is going on." She then informed the officers that her husband was on his way and that they would need to remain outside the house until he arrived. Mrs. Lowther also instructed the children to go to their rooms. The deputies acknowledged that waiting for Dr. Lowther was "fine" but instructed her that she could not close the door, which she again relayed to her husband.

---

[7] Plaintiffs again claim the discovery stay has prohibited determining whether Morales briefed the officers and to what extent. The Court finds this fact well supported by the record for the same reasons advanced previously.
[8] The interaction is captured by the officer's various belt tapes. What follows describes Mrs. Lowther's interactions with the officers prior to her husband's arrival.

Thornton offered to explain in detail to Mrs. Lowther "what is going on" if she would hang up the phone, but she declined to do so.  Thornton responded that in that case he would wait for Dr. Lowther to arrive, but nevertheless did explain in general terms that CYFD received a call from school and had come to the home with the deputies.

**Dr. Lowther's Arrival at the Residence**

At approximately 4:41 p.m. Detective Wootton was dispatched to the Lowther residence to lead the investigation.  Before arriving, Wootton instructed the officers to detain Dr. Lowther when he reached the home.  Dr. Lowther arrived at the residence at 4:42 p.m., where he was met outside the house by Thornton who explained that the deputies were responding to an anonymous call regarding concern for the welfare of the Lowther children. Dr. Lowther was not permitted to enter the residence.

After some discussion between Thornton and Dr. Lowther, Morales spoke with Dr. Lowther, briefly explained that there were allegations of child abuse without indicating against whom, provided him with a Parents' Guide detailing, among other things, the process if the children were to be taken into CYFD custody, Dr. Lowther's rights to file a complaint against her, and told him she would provide more detail once the Detective (Wootton) arrived.

Dr. Lowther informed Thornton that he was "not going to let anybody into the house." Thornton responded, "ok so if that is your choice that is fine, I will have to detain you at that point," explaining that refusing to allow access was obstruction of a child welfare investigation. Thornton indicated he would show Dr. Lowther the relevant law and then placed Dr. Lowther in the back of his patrol car. Thornton then told Dr. Lowther that the complaint was against him specifically. He also took Dr. Lowther's phones due to

8

concerns that there could be evidence on them and went on to explain that NMSA 1978 §
30-6-4 permitted officers to check on children welfare.  He later asked Dr. Lowther whether
there were any firearms in the home and told him that he appreciated that Dr. Lowther was
cooperating.

### The Deputies' Continuing Interaction with Mrs. Lowther

While Dr. Lowther was outside, Small and other deputies continued to speak with
Mrs. Lowther at the front door.  They explained to her that they were at the home because
of "very descriptive" statements A.L. had made to someone at school.  They also told Mrs.
Lowther that a detective was on the way to the residence.  Mrs. Lowther expressed
incredulity that this could be happening based on something a four-year-old had said.

Upon Mrs. Lowther's inquiry as to what was happening with her husband, she was
told that Dr. Lowther was being detained but was not under arrest.  Mrs. Lowther asked
what A.L. had said, and one deputy told her that even he did not know.  Mrs. Lowther
asked, "at what point is the information was going to flow?" The deputies explained that
more information would be forthcoming once a child therapist had spoken with A.L.  In
the ensuing discussion, Mrs. Lowther expressed that A.L. "was not unsafe" at which time
a deputy told her that if it was his investigation, she would already be in handcuffs in the
back of a police car because she was obstructing the officers' duty to check on the welfare
of a child and that she "might want to consider [her] actions."  Mrs. Lowther responded
that her "duty was to her husband..."[9]

Following this interaction, Small informed Mrs. Lowther twice that medical
personnel would check on the children and that she could either allow them access or be

---

[9] The Court notes that Mrs. Lowther was cut off by the officer prior to finishing her statement.

detained.  Mrs. Lowther asked whether the child therapist had arrived. Thornton explained

that A.L. would be transported to a safehouse to be interviewed. Mrs. Lowther questioned

whether that meant the deputies were going to take A.L., to which an officer replied that

no decisions had been made, but that eventually A.L. would be interviewed in a safehouse.

At approximately 4:44 p.m., Mrs. Lowther allowed the deputies to enter the home and

initiate contact with the children[10].  Medical personnel then conducted a medical check of

the children at approximately 5:13 p.m. While the officers were inside with Mrs. Lowther

and the children, Mrs. Lowther lied to the officers regarding her knowledge of whether

there were any weapons or firearms in the home. She subsequently acknowledged the

location of the firearms and agreed not to go near them. Doc. 106-1 Ex. F. Plaintiffs dispute

this characterization in their Response Brief (Doc. 122 at 7) to CYFD's Motion for

Summary Judgment (Doc. 106), however, the Court finds this blatantly contradicted by the

record.[11]

### **Handcuffing of Dr. Lowther**

While the deputies were speaking with Mrs. Lowther leading up to their entry into

the home, Dr. Lowther remained in the patrol car speaking with an officer. He asked why

he was not permitted into his own home and was told this was due to the complaint being

---

[10] Plaintiffs dispute this fact (UMF 22) claiming Mrs. Lowther's permission was involuntary due to threat of arrest and fear of "being run over" by the officers. Plaintiffs assert Thornton can be heard in the audio tapes, "aggressively and forcefully walking through the open door past Mrs. Lowther before Mrs. Lowther could respond, verbally or nonverbally..." The Court has reviewed the related audio and determined this is not well supported by the record; while it is true that Mrs. Lowther did not verbalize assent or dissent, all that can be heard is a creaking door and the rustling sound of individuals filing through.

[11] In response to the question of whether there were firearms in the home, Mrs. Lowther initially stated that she "did not know" and then confirmed that there were no weapons "to her knowledge."  However, while outside, Dr. Lowther informed an officer that there were firearms in the home and that Mrs. Lowther knew where they were located, which she subsequently acknowledged as discussed in the body of the Memorandum above. *See* Doc. 127-10, Ex. H at 39:07-39:17; 41:13-41:37. Mrs. Lowther also expressed her regret for lying about her knowledge of weapons in her Second Declaration. *See* Doc. 122-2 Ex. 2 ¶ 2(d).

alleged against him specifically, and because the children were in the home.  He was also told that CYFD was investigating whether the allegations "were true or false."  At that time, Small came outside, asked Dr. Lowther to step out of the patrol car, handcuffed him, and placed him back in the vehicle.

### Detective Wootton's Arrival and Interview of Mrs. Lowther

Detective Wootton arrived at the home around 4:50 p.m.  Upon arrival, he conferred with Morales[12].  A deputy apprised Mrs. Lowther of the detective's arrival and his conferral with Morales, at which time Mrs. Lowther was inside aiding in collecting the children.

Sometime thereafter, Wootton interviewed Mrs. Lowther in the presence of Morales[13]. Wootton first gave her Miranda warnings and asked whether she would be willing to answer his questions. There is a dispute as to whether Mrs. Lowther requested an attorney[14]. She eventually agreed to listen to his questions. He asked her why she had not allowed the officers to enter the home.  Mrs. Lowther told him that she denied the officers entry because she was alone with the children and her husband said "not to let you in." Ex. F Thornton Belt Tape Audio Track 4. Wootton stated that it was his understanding that Mrs. Lowther had been advised that it was a criminal offense to interfere with an investigation regarding child abuse. Ex. F Thornton Belt Tape Audio Track 4.  Mrs. Lowther initially stated she "would not have known" or could not recall, but one of the officers present affirmed that they had told her it was an arrestable offense. Mrs. Lowther responded that she had been waiting to hear from her husband.

---

[12] Wootton's Declaration states that Morales forwarded an email to him with the contents of the CYFD report, and that he was informed by deputies that both Mr. and Mrs. Lowther had been uncooperative.

[13] Officer Thornton was present for at least some of the conversation. It is unclear whether he was there for the duration.

[14] No such request is captured on the belt audio tapes, however, the Court notes that both Morales' affidavit and Mrs. Lowther's First Declaration indicate that an attorney was requested.  Mrs. Lowther's Second Declaration (Doc. 122 Ex. 2 ¶ d) claims that she recalls asking about obtaining attorney advice at some point while BSCO was inside the home, prior to receiving the 48 hour hold document, and that the audio tapes do not reflect this statement.

11

Morales next provided Mrs. Lowther with details relating to the alleged abuse of A.L., which included allegations of sexual molestation, sexual abuse, and lack of supervision. She asked Mrs. Lowther if she had any knowledge why someone might make such an allegation from A.L.'s school. Mrs. Lowther eventually recalled that A.L.'s teacher had mentioned that A.L. had been "messing with herself" at school, but that she and her husband had tried to get her to stop. Wootton then informed Mrs. Lowther that because of the nature of the allegations he was removing the children on a 48-hour hold, which would include interviews of both A.L. and W.L. at a safehouse[15]. Deputies also told Mrs. Lowther than a warrant would be served upon her house that night, and that she could not return to the home pending the search. Small remained onsite to ensure nothing inside was tampered with.

**Wootton's Interaction with Dr. Lowther**

After speaking with Mrs. Lowther, Wootton communicated with Dr. Lowther, informing him of the specific nature of the allegations. He reiterated that Dr. Lowther was being detained but not under arrest. Dr. Lowther questioned why he was in handcuffs. Wootton replied, "I have no idea" and upon Dr. Lowther's request directed Thornton to remove them[16]. Dr. Lowther was informed that he would need to remain detained in the back of the patrol car.

**Substance of A.L. and W.L. Safehouse Interviews**

---

[15] There is some dispute as to whether this was the first time Mrs. Lowther was informed that the children were going to be taken.

[16] Plaintiffs dispute that the handcuffs were removed and claim Dr. Lowther remained handcuffed in the car for three or four hours. The Court finds this unsupported by the record, having reviewed Wootton's Declaration and the relevant belt tape audio, which clearly contradicts this assertion.

Having determined to remove the children on a 48-hour hold, A.L. and W.L. were transported to a Safehouse.  A.L. was forensically interviewed from 6:58 p.m.-7:34 p.m., and again from 7:46 p.m.-8:04 p.m. W.L. was interviewed from 8:10 p.m.-8:50 p.m.[17]

During her interview, A.L. stated, among other things, that she got into trouble for touching her privates at school; she sits on her father's lap while he is defecating; her father touches her "pee-pee" and "gina" in the bathroom, which she repeatedly stated was their "secret"; her father kisses her "butt-cheeks"; and takes photographs and videos of her "butt and gina," with his phone, sometimes while she is saying "fuck."

W.L. stated that he and his sister are spanked on the bottom with a wooden spoon; sometimes, mostly by his father, they are slapped across the face; he feels nervous around his mother; he does not feel safe around his father; his father "is real mean and I don't like to be around him a lot…because he hurts me a lot;" and that his father sometimes pushes him "hard down on the ground" which causes him to hit the back of his head.

At 8:52 p.m., having viewed the interviews, Wootton directed the deputies to transport Dr. Lowther and Mrs. Lowther to the BSCO station.[18]  Ultimately, Wootton charged Dr. Lowther with criminal sexual penetration of a minor and criminal sexual contact of a minor.  Mrs. Lowther was told she was free to go.

## DISCUSSION

### I.     Constitutional Claims against County Defendants.

#### A.     Qualified Immunity Standard.

---

[17] The Court has reviewed the contents of the Safehouse Interviews of A.L. and W.L. What follows is a brief recitation of some of the noteworthy portions of the children's interviews.

[18] Plaintiffs claim the Lowthers were not transported to the police station until approximately 10:30 p.m. This is blatantly contradicted by the record, including a video recording of Dr. Lowther waiting in the police station with a timestamp of 21:27:58 (9:27 p.m.).

County Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. 223 at 231; *Romero*, 672 F.3d at 880.

Plaintiffs carry a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).

For a violation to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quoting *Morris v. Noe,* 672 F.3d 1185, 1196 (10th Cir.2012)). A case need not be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, ––– U.S. ––––, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs,* 475 U.S. 335 (1986)).

The Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. 223 at 236. "In determining whether the plaintiff meets the requisite burden, [the Court] ordinarily accept[s] the plaintiff's version of the facts—

that is, the facts alleged." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation marks omitted).  Therefore, we first consider whether, viewed in the light most favorable to the Lowthers, County Defendants' conduct violated the Lowthers' constitutional rights.

**B.      Count IV: Plaintiffs' Claim of Unlawful Entry into the Lowther Home**

Plaintiffs claim that County Defendants, Morales, and CYFD unlawfully entered the Lowther residence without consent. Specifically, Plaintiffs allege that County Defendants and CYFD coerced their way into the home by intimidation and threatening to detain or arrest Mrs. Lowther, which they claim negates County Defendants and CYFD's argument that Mrs. Lowther voluntarily consented to the entry and granted them access.

**The Law Regarding Searches of a Home**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Generally, "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) (quoting *Payton v. New York,* 445 U.S. 573, 586 (1980)).  A common exception to this general principle arises in "situations in which voluntary consent has been obtained, either from the individual whose property is searched, see *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

**Plaintiffs' Cross Motion for Summary Judgment**

Plaintiffs cross move for summary judgment[19] on Count IV, insisting that Mrs. Lowther did not voluntarily consent to County Defendants' warrantless entry into the home, arguing that

---

[19] Plaintiffs cross move for summary judgment with respect  to Counts I, II, III, IV, V, and VII.

she was coerced in the face of their repeated threats to arrest or detain her in supposed violation of New Mexico Statute 30-6-4.[20] County Defendants counter that Mrs. Lowther impliedly consented to the entry; that such entry does not violate a clearly established right; that the law is not clearly established with respect to the Fourth Amendment in the context of warrantless entry into a residence to conduct child welfare checks; and that it was not clearly established that the CYFD report and information provided by Morales did not support reasonable suspicion that the children were abused or were in "imminent risk of further abuse to justify entry." Doc. 59 at 2.

Both parties rely upon the content of the officers' belt tape audio. Plaintiffs claim that following the officers' final threat to Mrs. Lowther of detainment, Officer Thornton can be heard "aggressively and forcefully walking through the open door past Mrs. Lowther before [she] could respond, verbally or non-verbally…," followed by the other officers. On the other hand, County Defendants claim the door can be heard creaking open as Mrs. Lowther voluntarily stepped aside; that the audio does not render any sound of Thornton pushing aggressively past Mrs. Lowther; and that one can merely hear the sound of people shuffling through the door. County Defendants also state that Mrs. Lowther testified in a prior Children's Court hearing that she "allowed" the officers to enter the home, thereby contradicting herself in the instant action.

In its prior ruling (Doc. 159) pursuant to both parties' reliance upon the audio tapes, the Court concluded that Mrs. Lowther did not verbally respond to Small's final question prior to entry as to whether Mrs. Lowther would permit entry or be detained, and also that Plaintiffs' claim as to Thornton's forceful manner of entry was without support in the record.

### The Law Regarding Warrantless Entry

---

[20] In the relevant part, NMSA 30-6-4 (b) states that it is a misdemeanor for "knowingly obstructing, delaying, interfering with or denying access to a law enforcement officer or child protective services social worker in the investigation of a report of child abuse or sexual abuse."

Generally, "[T]he warrantless entry of the home is 'the chief evil against which ... the Fourth Amendment is directed,' " and   "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent." *Payne v. Wilder*, 2017 WL 2257390, at *36 (D.N.M. Jan. 3, 2017) (internal citations omitted). Determining whether a consent-based search is valid is based upon the totality of the circumstances as to "whether the consent was the product of an essentially free and unconstrained choice by the maker or whether it was the product of duress or coercion, express or implied." *Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) (quoting *United States v. Sawyer,* 441 F.3d 890, 895 (10th Cir.)). "Relevant circumstances include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons." *Eidson*, 515 F.3d at 1146.

The law regarding warrantless entries differs when exigent circumstances are present. As explained by the Tenth Circuit in *Armijo ex rel. Armijo Sanchez v. Peterson* (601 F.3d 1065, 1070 (10th Cir. 2010)):

> "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (citations omitted). The officers bear the burden of establishing that the threats posed exigent circumstances justifying the warrantless entry. *United States v. Reeves,* 524 F.3d 1161, 1169 (10th Cir.2008).

### It is Unclear Whether Mrs. Lowther Consented to the Entry

County Defendants contend that Mrs. Lowther' alleged non-verbal action, silently stepping aside so the officers could enter, demonstrated implied, voluntary consent. " 'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given. *See Florida v. Royer,* 460 U.S.

17

491, 497 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.")." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012). "Consent is voluntary if there is no indication of either force or intimidation." *United States v. White*, 508 Fed. Appx. 837, 841 (10th Cir. 2013).

In *Schneckloth v. Bustamonte* (412 U.S. 218, 229 (1973)), the Court highlighted the difficulty in determining whether consent was voluntary:

> The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches.

Mrs. Lowther, at home alone with her children, was confronted at her door by multiple officers (and Morales) requesting entry in order to conduct a child welfare check. She was immediately and repeatedly informed that she could be arrested or detained for denying access to the children. During the ensuing discussion, when Mrs. Lowther expressed that her daughter was not unsafe, one officer interjected that if this was his investigation Mrs. Lowther would already be handcuffed in the back of a police car, and that "she might want to consider her actions."[21] Immediately prior to the entry, twice in succession, Small informed Mrs. Lowther that medical

---

[21] There is a dispute as to whether this statement, and the interactions between Mrs. Lowther and the officers in general, was conveyed in an aggressive or irate tone and manner.

personnel was coming to check the children and that she could either let them in or be detained. The Court also notes, while not dispositive, during Wootton's questioning of Mrs. Lowther, Thornton acknowledged to Mrs. Lowther that she could have interpreted the officers' interactions as a "scare tactic," but that it was not the officers' intention that their statements be received as such. *See* Ex. F at 11:11-29; Doc. 127 Ex. 7 at 14:8-18.

The Court finds County Defendants' argument unavailing that repeatedly informing Mrs. Lowther than she could be arrested detained or was merely a recitation of the law to Mrs. Lowther for violation of NMSA 1978 § 30-6-4. Here, based on the totality of the circumstances, the Court concludes that coercive elements were present in the interaction leading up to the entry into the Lowther residence. Viewing the facts in the light most favorable to Plaintiffs, a constitutional violation has been adequately demonstrated such that qualified immunity should be denied.

### Whether The Law is Clearly Established with Respect to Warrantless Entry

County Defendants argue that regardless of whether Mrs. Lowther's consent was voluntary, it was not clearly established that the search of the house was unreasonable under the circumstances, particularly with respect to investigations of child abuse. The Court disagrees.

### The Law Regarding a Clearly Established Constitutional Violation

"The law is clearly established if there is a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, that has found the law to be as the plaintiff maintains." *Gadd v. Campbell*, 2017 WL 4857429, at *4 (10th Cir. 2017). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). "Clearly established law should not be defined at a high level of generality." *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 552 (2017) (internal quotation marks

omitted).  Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* "While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *Eidson*, 515 F.3d at 1148 (internal citation omitted).

Plaintiffs bear the burden of citing to case law and articulating the clearly established right they claim has been violated.  *See Thomas v. Durastanti,* 607 F.3d 655, 669 (10th Cir. 2010); *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (internal quotation marks omitted)).  In analyzing clearly established law, the Court looks at the cases cited by Plaintiffs to determine whether those cases can serve as clearly established law.  *See, e.g., A.M. v. Holmes*, 830 F.3d 1123, 1154 (10th Cir. 2016) (granting qualified immunity where "neither of Plaintiff's cited sources can serve as the clearly established law governing this First Amendment retaliation claim.").

To satisfy their burden of citing to clearly established law, Plaintiffs cite to *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003); and *Payne v. Wilder*, 2017 WL 2257390 (D.N.M. Jan. 3, 2017).  Plaintiffs assert that the law is clearly established that "… to enter a home law enforcement must have a warrant, voluntary consent, or exigent circumstances must exist, even where child abuse is alleged." Doc. 81 at 47.  Plaintiffs rely upon now Justice Gorsuch's reasoning in *Cortez*, a case which set forth principles applicable to Fourth Amendment issues relating to unlawful seizures in the context of child welfare investigations, stating that "any good officer knows, after all, that he or she may not . . . enter the sanctum of a person's home to effect a seizure without a warrant or probable cause and the presence of exigent circumstances." *Cortez*, 478 F.3d at 1144 (Gorsuch, J., concurring and

20

dissenting).   Plaintiffs also note that in *Payne*, a case in which NMSA 1978 § 30-6-4 was challenged as facially unconstitutional, the Court held that "law enforcement officers still have to comply with the federal and state Constitutions and must conduct a search pursuant to a warrant unless the search falls within one of the narrow exceptions for a warrantless search" and that "On its face, § 30–6–4 does not allow any search at all, and certainly does not authorize a warrantless search, or one that does not fall within the narrow exceptions for a warrantless search." *Payne v. Wilder*, 2017 WL 2257390 at \*41.

County Defendants initially respond by acknowledging that the New Mexico Court of Appeals has previously held that the law is clearly established when it stated:

> We conclude that in light of the pre-existing law, it was clearly established in October 1995 that, in cases of suspected child abuse or neglect, a law enforcement officer could not enter a home without a warrant unless the officer had reasonable grounds to believe that a child within was in immediate need of aid or assistance and that immediate entry was required to render that aid.

*Chavez v. Bd. of County Com'rs of Curry County*, 2001-NMCA-065, ¶ 20, 130 N.M. 753, 761. Nevertheless, in support of their contention that the law was not clearly established, County Defendants posit that *Gomes v. Wood* (451 F.3d 1122 (10th Cir. 2006)) and *Arredondo v. Locklear* (462 F.3d 1292 (10th Cir. 2006)), decided after *Chavez*, interjected uncertainty as to whether the law was well-settled under similar circumstances to the instant action. Doc. 59 at 8. The Court disagrees.

While the *Gomes* and *Arredondo* cases dealt with officer investigations of child abuse, they addressed the implications of constitutional violations in the context of warrantless seizures of the children and did not reach the issue of warrantless entry. Thus, they are neither relevant in terms

of distinguishing New Mexico's *Chavez* case nor in resolving the instant matter with respect to Count IV.[22]

County Defendants also rely largely upon *Roska* in support of the contention that the law is not well settled in the Tenth Circuit regarding warrantless entries during a child abuse investigation. That reliance is misplaced, however, upon a careful reading of the Tenth Circuit's analysis.

**<u>The Roska Case</u>**

In *Roska*, a social worker, police officer, and other state officials removed a twelve-year-old boy from his home on the suspicion that he was a victim of Munchausen Syndrome by Proxy (MSBP), a condition in which a parent, in this case his mother, was allegedly inflicting physical harm upon him in order to obtain the sympathy of medical personnel. *Roska*, 328 F.3d at 1238. The school district expressed concern to the relevant division of child family services after observing the child's unhealthy appearance, pallid complexion and worsening physical condition; his mother's statements to school officials that her child suffered from a hole in his esophagus, parasites in his intestines; and appendicitis, after which the mother had insisted on the removal of what was apparently a healthy appendix. *Id.* Additionally, it appeared the child was being restrained in a wheelchair while force-fed intravenously despite not being handicapped. *Id*. at 1250. His condition deteriorated to such a degree that school officials expressed concern that he would die if social services did not intervene. *Id.* at 1238.

In response to the concerns, state officials consulted with a Utah assistant attorney general who advised that the facts supported removal of the child from his home. *Id*. The decision to remove the child was made despite an investigator concluding that the child was not "in imminent

---

[22] These cases are relevant to the discussion of the claims relating to the warrantless seizure of the Lowther children.

danger of death." *Id*. Afterwards, social workers and a police officer entered the home without a warrant and without knocking and removed him. *Id*. "Before leaving, they were admonished over the phone by Doctor Gooch [the child's rehabilitation physician] that removal could destroy "this family emotionally and [the child] may never recover." *Id.*

Following his removal, the family brought an action against the officials claiming, in the relevant part, violations of the Fourth Amendment for unreasonably searching Plaintiffs' home and unreasonably seizing their child. *Id.* at 1239.

In analyzing whether the law was clearly established with respect to warrantless searches and seizures, the Court first noted that generally police officers could not enter a home to investigate potential child abuse without a warrant. *Id*. at 1249. County Defendants make much of the Court's ensuing analysis, which included the following:

> On the other hand, we have made certain statements, albeit in *dicta,* that could be construed as drawing distinctions between (1) child-abuse investigations and other types of investigations and (2) social workers and law-enforcement officers.[18] For example, in *Snell v. Tunnell,* in the context of a warrantless search of a house during a child-abuse investigation, we stated: '[W]e do not have occasion to decide whether a search of a private home without a warrant or probable cause violates the fourth amendment. Courts have reached differing results concerning the difficult issue of the scope of the fourth amendment protection in the context of a child abuse investigation.'[19] Further, in *Franz,* we suggested that the Fourth Amendment's strictures might apply differently to social workers … Taken together, *Franz* and *Snell* injected a degree of uncertainty into an otherwise staple rule of Fourth Amendment jurisprudence: absent exigent circumstances, the state may not enter an individual's home without a warrant.[21] In other words, in light of these cases, 'the constitutional question [regarding the warrant requirement] presented by this case is by no means open and shut.'

> *Id.* (internal citations omitted) (footnotes in original).

The Court continued, "Nevertheless, we cannot say that, in light of these cases, a reasonable state actor could conclude that the Fourth Amendment allowed a warrantless home entry and seizure of a child absent something approaching probable cause to believe that: (1) the

child's health or safety was at risk, and (2) this risk was due to the child's presence in the home." *Id.* at 1249–50.

Under the specific circumstances of *Roska*, the Tenth Circuit found that the warrantless entry and removal of the child did not violate a clearly established law because the District Court had concluded, with support from the record, that an objective, reasonable social worker could have believed that there was a *substantial danger* to the child's health and safety; that he could not be protected if left in his parents' care; and that his presence in the home was the reason for "*his particularly troubling and persistent condition*…" *Id.* at 1250 (emphasis in original).

County Defendants therefore argue that *Roska* supports that the law is not clearly established in the context of child abuse investigation. However, this Court notes that in the *Roska* analysis, footnotes 21 and 23 contain important distinctions which include:

> [21]'Our broad language notwithstanding, the circuits are split over the power of a social worker to *inspect* a child without a warrant, not over the power to *enter a home* without a warrant—thus implicating the strong constitutional right against unreasonable intrusions into the home—and *remove a child* without a warrant— thus implicating the parental right to keep the family together' … [and 23] 'Lest this statement be taken out of context, based on our earlier discussion in section II(B)(1), *supra,* henceforth, the law is now clearly established that, absent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody'. (emphasis in original).

*Id*. at 1249-50.

The Court is unconvinced that Mrs. Lowther's purported statement in a separate Children's Court case, which appears to have been offered by counsel[23], that she "allowed" entry into her home addresses the issue of whether her consent was voluntary. As to the issue of consent, the

---

[23] See Doc. 81-1 Ex. 16 Affidavit of Theresa M. Duncan (Mrs. Lowther's attorney in that proceeding) attesting that this statement was proffered by counsel with respect to whether Mrs. Lowther cooperated with CYFD during the initial investigation and was not intended as an admittance or assertion with respect to any alleged Fourth Amendment violations.

Court agrees with Plaintiffs that at the time of this incident the law was clearly established that "a suspect's consent to search may be tainted by a threat of detention that essentially amounts to an arrest if consent is refused. *Eidson*, 515 F.3d at 1146. Nor have County Defendants pled, with respect to Count IV, that exigent circumstances justified a warrantless entry. Based on the foregoing, the Court concludes that a reasonable officer would have understood the actions in question violated a constitutional right. *Lundstrom v. Romero*, 616 F.3d 1108, 1129 (10th Cir. 2010). Therefore**,** the Court finds that County Defendants' warrantless entry violated clearly established law under the Fourth Amendment as it stood on August 30, 2017.[24]

### Standard Summary Judgment Analysis

When a plaintiff meets the two-part test under the qualified immunity analysis, the defendant then bears the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d at 1206. Both parties rely upon the content of the officers' belt tape audio, which necessitates interpretations of sounds absent words, such as the meaning of a creaking door to the Lowther residence, or determinations with respect to the tones of voice used by various individuals. The parties suggest the Court extrapolate meaning from those sounds, the interpretation of which is hotly contested, to render substantive determinations. These are genuine disputes of material fact which the Court feels are more appropriately reserved for the jury.

---

[24] There is a dispute as to whether County Defendants presented, other than for the first time in the Reply brief, that exigent circumstance existed such that warrantless entry was permissible. The Court finds that in addressing Count IV County Defendants did not adequately raise this argument in its initial motion, focusing instead on an argument of consent. The only reference to exigent circumstances the Court found was mere recitation that "it was not clearly established that the CYFD report and information provided by Morales did not support reasonable suspicion that the children were abused or were in 'imminent risk of further abuse to justify entry.' " Doc. 59 at 2. Thus, to the extent that County Defendants subsequently seek to assert exigent circumstances in its Reply brief on this count, the Court disregards the argument.

Therefore, County Defendants' motion for summary judgment on the basis of qualified immunity with respect to Count IV is **denied**.

### Plaintiffs' Cross Motion for Summary Judgment on Count IV is Denied

Plaintiffs claim that County Defendants are liable for the warrantless entry into the Lowther home. They also assert that BSCO is responsible pursuant to municipal liability on the basis that "The belt tape recordings demonstrate that BCSO maintained a 'custom amounting to a widespread practice' that caused its officers to believe parents and caretakers could be arrested from inside their homes if they refused entry during a child welfare check. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) ("[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.") (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993))." Doc. 81 at 46. Plaintiffs allege that Small, Thornton, and Lozano articulated this custom to Mrs. Lowther when they repeatedly threatened to detain or arrest her if she continued to deny entry, and because they purportedly informed both Dr. Lowther and Mrs. Lowther that they performed all child abuse investigations in the same manner. Plaintiffs additionally posit that despite not being present at the time, Wootton should be held liable for the warrantless entry as the supervising detective because he communicated with the officers and relayed instructions while en-route to the Lowther residence.

To demonstrate that BSCO had a customary practice when dealing with child abuse investigations, Plaintiffs "must sufficiently allege that the custom amounts to a widespread, permanent, and well-settled practice with the force of law. *Moss*, 559 F.3d at 1169 (quoting *Melton v. City of Okla. City*, 879 F.2d 706, 724 (10th Cir. 1989), *rev'd in part en banc on other grounds*, 928 F.2d 920, 932 (10th Cir. 1991) )." *N.E.L. v. Douglas County, Colorado*, 740 Fed. Appx. 920,

933 (10th Cir. 2018). However, merely pointing to a few statements made by various officers, which the Court found open to interpretation in light of the context in which they were stated, is insufficient evidence of a widespread practice. *See Id.* ("But a single statement doesn't suffice to allege a continuing, persistent, and widespread county custom.") Nor does the Court feel that adequate facts have been provided to determine whether Wootton personally participated in or supervised the warrantless entry to the extent that he could be held liable. *See Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.1993) (liability of supervisor based on showing that the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance). Therefore, Plaintiffs' cross motion for summary judgment on Count IV is likewise **denied**.

C.    <u>**Count V: County Defendant's Removal of the Lowther Children**</u>

Preliminarily, in their Cross Motion for Partial Summary Judgment and Response to County Defendants Motion for Summary Judgment on Claims I and II (Doc. 81), Plaintiffs include BSCO in its Count V allegations of unlawful removal and seizure of the Lowther Children. However, this is not reflected in the Amended Complaint which only asserts claims against Wootton, Morales, and CYFD. Therefore the Court dismisses this claim to the extent that it is asserted against BSCO.

Plaintiffs claim that Wootton, Morales and CYFD violated their Fourth and Fourteenth Amendment rights in the warrantless removal of the Lowther children without reasonable suspicion that the children were in imminent danger. County Defendants argue that Wootton had an "independent articulable" basis to believe that the Lowther children had been abused; that the same factors which demonstrated reasonable suspicion to detain Dr. and Mrs. Lowther justified the removal of the children; and that the relevant case law holds that this is all that is required to protect potentially abused children. County Defendants also advanced the argument that Wootton

(and Morales) acted in reliance upon New Mexico statute NMSA 1978, Section 32A-4-6 which governs taking children into protective custody. Doc. 59 at 13. However, the Court has not been provided with any evidence that Wootton relied upon this statute and therefore declines to entertain this argument. Regardless, the Court is capable of rendering a determination on this count based upon reasonable suspicion.

Plaintiffs counter that the officers could not have had reasonable suspicion of imminent danger to the children because Dr. Lowther had already been detained in a patrol car. They claim that this made it a factual impossibility that the children were in danger, that County Defendants mischaracterize facts implying that Mrs. Lowther was also suspected of child abuse, and therefore exigent circumstances did not exist. Furthermore, Plaintiffs state that the Tenth Circuit requires the Court to consider whether a warrant could have been obtained prior to removing the children, and that there was adequate time to secure one although County Defendants did not do so. In light of these factors, Plaintiffs aver that County Defendants' actions were objectively unreasonable and illegal. In support of their respective positions both parties rely significantly upon *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 20060), *Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006), and *Roska*[25]. Therefore the Court will address the instant matter subject to the relevant law expounded upon in those cases.

### 1.  Gomes Established the Reasonable Suspicion Standard in the Tenth Circuit

In conducting the analysis it is instructive to recite the facts and review the law of *Gomes* and *Arredondo*. *Gomes* established the "reasonable person" standard through which the Tenth Circuit considers "whether emergency circumstances justify the removal of children without notice or a hearing." *Arredondo v. Locklear*, 462 F.3d at 1298.

---

[25] The Court has already outlined the relevant facts in *Roska*, *supra* I(B) at 22, and thus does not restate them here but instead discusses the case in the context of Count V.

**Background**

In *Gomes* (451 F.3d at 1124), a mother brought her nine-month-old daughter to the pediatrician after she sustained a head injury. An X-ray revealed a skull fracture, the shape of which raised the doctor's concern because it did not suggest to him that it necessarily occurred from a fall from bed, which was the mother's explanation.[26] *Id*. While the doctor ultimately sent the child home with the mother[27], he informed her that he would have to file a report with the state Division of Child and Family Services. *Id*. at 1125.

Initially, the Child and Family Services intake worker designated the situation as a non-emergency; further action was only taken when the mother brought her child in for two successive follow up appointments and asked whether the doctor had already spoken with Child and Family Services. *Id.* After the second follow up, the doctor again spoke with a caseworker.[28] The caseworker consulted with her superiors as well as an assistant attorney general, and due to several factors including, the child's young age and the seriousness of the injury, a home visit was scheduled. The caseworker and a police officer conducted the visit, observed the bed and floor where the mother said the injury occurred, found the explanation "implausible," and immediately removed the child without notice or a hearing. *Id.* at 1126[29]. After four months, the child was returned to the family's custody. *Id*.

**The Gomes Court's Analysis**

The Gomes family instituted a § 1983 action against the relevant state officials asserting a violation of due process rights under the Fourteenth Amendment for the removal of the child

---

[26] The doctor found that Ms. Gomes's explanation of the injury was "possible but suspicious," noting that the fracture was "consistent with a fall on a flat object." *Id*.

[27] He also told the mother that he was comfortable sending the child home with her. *Id*. at 1125.

[28] The doctor again told the intake worker that the mother's explanation was "plausible but suspicious" but that he was still comfortable sending the child home with her mother. *Id*.

[29] A few days after the removal, the same assistant attorney general filed a petition for custody of the child with the appropriate court. *Id*.

without a hearing or notice. *Id.* Preliminarily, the Court acknowledged the importance of parents'

constitutional rights in maintaining custody and control of their children:

> Under the Fourteenth Amendment to the United States Constitution, parents have a protected liberty interest in the care, custody and control of their children. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). That interest is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Id.* (citing *Pierce v. Soc. of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15, (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). As a result, state officials may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law. *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Roska II,* 328 F.3d at 1245.

*Id.* at 1127.

Notably, the Court provided that this right was not absolute, particularly in instances of alleged

child abuse. *Id.* at 1128. Specifically, the Court stated that "States have a *parens patriae* interest

in preserving and promoting children's welfare, including "a 'traditional and transcendent'

interest" in protecting children from abuse. *Id.* (internal citations omitted).

### **Determining Whether Reasonable Suspicion Exists**

The Court articulated an exception to the general rule for removing a child without prior

notice or a hearing in "extraordinary situations" including " '[e]mergency circumstances which

pose an immediate threat to the safety of a child.' *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th

Cir.1997). However, 'the 'mere possibility' of danger is not enough to justify a removal without

appropriate process.' *Roska II,* 328 F.3d at 1245 (quoting *Tenenbaum v. Williams,* 193 F.3d 581,

594 (2d Cir.1999))." *Id.* While there is no absolute definition of what "emergency circumstances"

constitutes, the Court discussed different standards advanced by other circuits and adopted the

majority's approach of a "reasonable suspicion" standard, holding that children may be removed without prior notice and a hearing where there is reasonable suspicion that the immediate safety of the child is at risk. *Id*. at 1128-30 ("we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there.).

In the context of determining whether there is reasonable suspicion of an immediate threat to the safety of a child, the Court provided:

> [W]e must consider "*all relevant circumstances,* including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child." *Kearney,* 329 F.3d at 1295 (emphasis added). Ordinarily, the question of whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child will be an important consideration, and the failure to establish that judicial authorization was impracticable will undermine the contention that emergency circumstances existed. *However, neither this factor, nor any other single factor, is necessarily dispositive*."

*Id*. at 1131. (emphasis added).

### **The Gomes Conclusion**

Conducting a qualified immunity analysis, the Court found that the record supported a constitutional violation because there was insufficient evidence to demonstrate "reasonable and articulable suspicion that the child ha[d] been abused or [was] in imminent peril of abuse." *Id*. at 1135 (noting, *inter alia*, the doctor's observation that the shape of the fracture was "consistent with a fall on a flat object"; that in both calls to the Child and Family Services the doctor stated that he was "comfortable" with the child returning home with her mother; and that the original intake worker who spoke with the doctor felt that the situation was a non-emergency.).

However, on the issue of whether the law was clearly established, the Court determined that the facts provided were sufficient to show that "'officers of reasonable competence could

disagree' as to whether there were emergency circumstances justifying the removal of [the child] without a hearing." *Id*. at 1136 (10th Cir. 2006); *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("if officers of reasonable competence could disagree" [about the lawfulness of the challenged conduct], then "[qualified] immunity should be recognized."). In granting qualified immunity, the Court acknowledged the particularly difficult balancing act social workers face in weighing essential parental rights against the safety of children. *Id*. at 1138 ([s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests. When confronted with evidence of child abuse, they may be required to make on-the-spot judgments on the basis of limited and often conflicting information) (internal citations omitted).

### 2.  **The Arredondo Case**

#### **Background**

*Arredondo*, decided a few months after *Gomes*, affirmed the Court's standard of reasonable suspicion.  In *Arredondo*, a mother brought her eleven-month-old daughter, Jasmine, to the emergency room because she was having difficulty crawling. *Arredondo*, 462 F.3d at 1294.  An X-ray revealed a fracture in Jasmine's arm. *Id*. The mother offered two different explanations for how the injury occurred. *Id.* Multiple hospital personnel felt her explanations were "confusing" and a "red flag" (the doctor found the fracture too high up in the arm to equate to a fall from a bed as the mother alleged). *Id*.  The hospital did not report its suspicion to the New Mexico Children Youth and Family Department (CYFD). *Id*.  Four days later, the mother brought Jasmine to the emergency room again, this time because the child could not put weight on her leg[30]. *Id*. at 1295. The mother attributed this injury to the same fall from bed. *Id*.  Due to the repeat visits to the hospital and the mother's "confusing" explanations, the hospital contacted CYFD. As in *Gomes*,

---

[30] The doctor's notes state that Jasmine had suffered a broken left femur, although the X-rays did not show a fracture.

the original intake worker categorized the issue as a non-emergency. *Id*.  Later, a CYFD social worker and police officer visited the hospital and interviewed hospital personnel who reaffirmed their original concerns. *Id*.

Following the hospital interviews, the officials conducted a home visit. The mother initially refused to speak with them, citing concerns about being on probation, but later permitted entry into the home after speaking with her parole officer. *Id*.  She showed the officials the bed where her daughter allegedly fell from, which was ""2 ½ to 3 feet off the floor." *Id*. The officer decided to remove Jasmine immediately given the two hospital visits, the mother's confusing explanations, and the relatively low distance from the bed to the floor, which the officer deemed unlikely to have caused a broken arm and leg. *Id*.  The officer also wanted to remove Jasmine's five-year-old sister based on training he had received which indicated that where one child is subject to abuse and removed from the home the abuse often transfers to the remaining child. *Id*. at 1296. The social worker disagreed with the detective and refused to take custody of the older child because she did not exhibit any signs of abuse. *Id*.

The investigation continued, and ultimately CYFD decided to remove the older sister as well. *Id*.  However, a few days later, the emergency room doctor notified CYFD that he had misdiagnosed Jasmine's condition, which he now said was due to a septic condition cause by a serious bacterial infection. *Id*. at 1297. He also stated that he no longer had any concern that Jasmine had been subject to abuse or neglect. *Id*. CYFD was initially unconvinced and retained custody of both children, until it reversed course a few weeks later, returning the children to their mother. *Id*.

The family brought suit alleging that the removal of the children without notice and a hearing violated their due process rights. The Defendants argued that they were entitled to qualified

immunity and that there were " 'emergency circumstances which pose an immediate threat to the safety of the child,' *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1245 (10th Cir.2003) (quoting *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997))." *Id.*

### The *Arredondo* Court Found No Constitutional Violation

The Court concluded that even in the light most favorable to Plaintiffs there were no genuine issues of material fact as to whether a constitutional violation had occurred. *Id.* at 1298. Notably, on the issues of reasonable suspicion and whether Defendants had time to secure a warrant prior to removal, the Court clarified:

> Under that standard, state officials must have " '*evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.*' " *Id.* (quoting *Hatch v. Dep't for Children, Youth & Their Families,* 274 F.3d 12, 20 (1st Cir.2001)).  Although we give some consideration to "whether state officials might obtain judicial authorization of the removal without additional risk to the child," *id.* at 1130–31, *we take care not to make this factor the " 'single focus' of the inquiry,"* *id.* at 1130 (quoting *Doe v. Kearney,* 329 F.3d 1286, 1295 (11th Cir.2003)). Among the standards proposed by various courts of appeals, we concluded, this standard best "balances the interests of the parents, the child, and the state."

*Id.* (emphasis added).

The Tenth Circuit held that there had been no constitutional violation even though the officials involved had disagreed as to whether a warrant could have been obtained prior to removal. *Id.* at 1300-01 ("Taking into account 'all relevant circumstances,' one participant's opinion that a court order could have been obtained is insufficient to show that the decision to remove Jasmine from the home immediately falls short of the 'reasonable suspicion' standard."). Therefore, the Court concluded that the available facts, regardless of conflicting opinions by state officials as to the appropriate measures to take, supported that reasonable suspicion existed for the removal of

the children. *Id*. at 1299-1300 ("The fact that [the doctor's] diagnosis ultimately proved incorrect does not render the Defendants' reliance on it unreasonable.").[31]

### The Lowther's Have not Demonstrated a Constitutional Violation

Firstly, the Court must consider whether the facts viewed in the light most favorable to the Lowthers, if true, support a constitutional violation, and determine whether there was reasonable suspicion of emergent circumstances posing immediate threat to the Lowther children warranting removal. *See Hollingsworth,* 110 F.3d at 739.  Although the *Gomes* Court indicated that there is no bright line definition of what constitutes "emergency circumstances," in *W.K. on behalf of A.K. v. Albuquerque Police Dep't Detective Daniel Howie* (2016 WL 9777158, at *6 (D.N.M. June 1, 2016)), the Court set forth that emergency circumstances "have been defined as 'instances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence.' *Taylor v. Evans*, 72 F.Supp.2d 298, 307 (S.D.N.Y. 1999) (citing *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991))."  In this case, unlike *Gomes*, we conclude that the evidence available to the officers and Wootton at the time of the removal was sufficient to create reasonable suspicion that A.L. (and possibly W.L.) had been abused or were in imminent peril of abuse.

### County Defendants had Reasonable Suspicion Justifying Removal of the Lowther Children

Plaintiffs contend that the children were not in any immediate danger, or in danger of abuse, because Dr. Lowther had already been detained in a patrol car outside the home, and thus, it was

---

[31] The Tenth Circuit divided its analysis of Jasmine and her sister's removal, finding that the sister's removal was a "closer" call, but nevertheless concluded that there was reasonable and articulable suspicion that both children were in imminent danger of abuse. *Id*. at 1302. Having determined that no constitutional violation was adequately demonstrated, the Court did not discuss the second prong of qualified immunity as to whether the law was clearly established.

a factual impossibility that they could be in harm's way. Plaintiffs further argue that Mrs. Lowther was not accused of child abuse, and therefore Wootton (and County Defendants) could not have reasonable suspicion of imminent danger meriting a warrantless removal. They make much of the fact that a warrant was not sought prior to the removal, arguing that just as County Defendants were able to later obtain a search warrant that day for the home, they surely could have secured one prior to removing the children.  Plaintiffs rely upon *Roska* (328 F.3d at 1242), which provided:

> Unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home…. the interest of the government in protecting the child must be balanced against the interest of the parents in keeping the family together… Measured against this parental interest, the state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment."

In response, County Defendants argue that their action was warranted due to the seriousness of the allegations, confirmed by A.L.'s teacher DuBoise, and that there was concern for the children's immediate safety because Mrs. Lowther appeared to be under the control of her husband and therefore unable or unwilling to protect them.

The Court is unconvinced by Plaintiffs' arguments. First, the proposition that Dr. Lowther's detainment meant that the children were not in danger is misplaced. Plaintiffs cite to *United States v. Wood* (106 F.3d 942, 946 (10th Cir. 1997)), which ruled that an officer lacked reasonable suspicion in the context of an investigatory detention and search of a vehicle for narcotics during a traffic stop.[32]   The Court finds this case inapposite to the matter at hand. Contrary to Plaintiffs' assertion, whether the Lowther children were actually in imminent danger of abuse is not the relevant question, but rather whether Wootton's decision to remove the children

---

[32] Plaintiffs quote the *Wood* Court's determination that "Common sense and ordinary human experiences are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions. Inchoate suspicions and unparticularized hunches, however, do not provide reasonable suspicion." Doc. 81 at 52.

was justified by the facts at his disposal leading up to the removal. *See W.K. on behalf of A.K.*, 2016 WL 9777158, at \*8.  Second, in *Roska*, the Court took particular issue with the manner of warrantless entry and removal because "Defendants took the time to seek the advice of an Assistant Utah Attorney General before proceeding with the removal; surely they could have taken the time to incur the minimal inconvenience involved in obtaining a warrant." *Roska,* 328 F.3d at 1242.

The facts of the case at hand differ substantially. Here, Wootton was provided with a report from CYFD concerning serious allegations of sexual abuse of A.L. by her father.  This information was provided to CYFD by A.L.'s teacher, who had spoken directly with A.L., where she had articulated the alleged abuse both verbally and with physical hand gestures[33]. Additionally, the report included that A.L had stated that her brother W.L. touched her as well and that he was also subject to abuse. CYFD, through Morales, reached out to DuBoise to confirm the contents of the report. Plaintiffs have not demonstrated that Wootton was not entitled to rely upon this information in forming a plan of action. *See Halley v. Huckaby*, 902 F.3d 1136, 1150 (10th Cir. 2018) (holding that a police officer was not unreasonable in relying upon DHS [Department of Human Services] officials just as much as fellow officers). The initial information available to County Defendants, at the very least, is sufficient " 'evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse." *Arredondo*, 462 F.3d at 1298. Moreover, the Court concludes that the Lowthers' conduct also supports a finding of reasonable suspicion.

### The Lowther's Conduct Objectively Supports Reasonable Suspicion

Upon the officers' arrival at the Lowther residence, Mrs. Lowther answered the door while on the phone with Dr. Lowther. From the outset, Mrs. Lowther relayed to her husband everything

---

[33] For the sake of brevity, the Court will not repeat the totality of the allegations as they have previously been outlined sufficiently in the initial factual background section of this Memorandum.

that the officers were telling her. Among other things, she specifically stated to her husband "I don't know what to do here," after which, at least initially, she denied the officers access and attempted to close the door. She also instructed the children to go to their rooms.[34] She remained on the phone throughout the encounter up until Dr. Lowther's arrival.  During the interaction, she informed the officers that her duty was to her husband. When he arrived, Dr. Lowther also informed the officers that he would not permit anyone into the home. Mrs. Lowther then lied to the officers regarding her knowledge of weapons or firearms in the residence.

Wootton was briefed by Morales and the officers upon his arrival. When he interviewed Mrs. Lowther, she informed him that she originally denied entry to the officers "because he [her husband] told me not to." When Wootton sought to confirm whether Mrs. Lowther had been made aware of the law relating to NMSA 1978 § 30-6-4, she initially stated that she could not have known. However, officers correctly stated to her, in Wootton's presence, that they had informed her of the law.  Confronted with the aforementioned behavior, and with the information provided to him by the officers and Morales, it is not unreasonable that Wootton believed Mrs. Lowther was subject to Dr. Lowther's control.  Plaintiffs have also disregarded the fact that while Mrs. Lowther was not accused of abuse, she was being investigated for lack of supervision.  Plaintiffs rely upon Mrs. Lowther's subsequent Declarations to explain her actions, however, her subjective explanations after the fact are irrelevant to assessing Wootton's conduct at the time of removal under the reasonable suspicion standard.

The Court is also unconvinced by Plaintiffs' argument that County Defendants failure to seek a warrant prior to deciding to remove the children is dispositive. While the Court does

---

[34] In her First Declaration (Doc. 81-1 Ex. 3 ¶ 14), Mrs. Lowther claims that she instructed the children to go to their rooms because of the difficulty of focusing on the officers with the children speaking in the background. The Court again notes that, even if reasonable, Mrs. Lowther's subjective explanation and reasoning is not relevant to determining whether Wootton, when presented with this information, took objectively reasonable action.

consider whether a warrant might have been obtained prior to removal, and while a warrant is certainly desirable, this is but one factor the Courts consider and is neither the sole nor penultimate one. *Arredondo*, 462 F.3d 1292 at 1298.  Taking into account the relevant caselaw and the totality of the circumstances, the Court concludes that Plaintiffs have failed to show that County Defendants' actions were unjustified and without reasonable suspicion.  Accordingly, County Defendants motion for summary judgment on Count V, on the basis of qualified immunity, is **granted**. Plaintiffs' cross motion on Count V is **denied.**

### Clearly Established Law

Even if Plaintiffs were to successfully demonstrate a constitutional violation, their claim fails under the second prong of qualified immunity as to whether the law was clearly established. Under the second prong, we consider whether a reasonable official in these circumstances would understand that the action taken violated Plaintiffs' rights.  As advanced in *Gomes*, " '[T]he salient question ... is whether the state of the law [at the time of the incident] gave the [defendants] fair warning that their conduct was unconstitutional.' *Hope,* 536 U.S. at 741, 122 S.Ct. 2508. Officials who are mistaken about the lawfulness of their conduct may still be entitled to qualified immunity if the mistake is reasonable in light of the applicable law and the facts known to them at the time. *Axson–Flynn v. Johnson,* 356 F.3d 1277, 1300 (10th Cir.2004)." *Gomes*, 451 F.3d at 1136.

Notably, in *Gomes*, the Court provided that qualified immunity should be granted in circumstances whereby, " '… officers of reasonable competence could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized.' *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986). In those instances, the fact that the uncontroverted evidence supports opposite legal conclusions as to the reasonableness of an official's conduct demonstrates that the official has not violated clearly established law." *Id*.

Applying the law to the facts of the instant case, officers of reasonable competence could disagree as to whether emergency circumstances existed justifying the immediate removal of the Lowther children, which supports granting qualified immunity.

**Conclusion**

Generally, "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997). The Court further acknowledges that "[s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests." *Martinez v. Mafchir,* 35 F.3d 1486, 1490 (10th Cir.1994). When confronted with evidence of child abuse, they may be required to make "on-the-spot judgments on the basis of limited and often conflicting information." *Gomes*, 451 F.3d at 1138.  Considering the information at his disposal, Wootton had reasonably articulable evidence that A.L. and W.L. had been abused or were in imminent danger justifying removal at that time. Therefore, Wootton is entitled to qualified immunity from Plaintiffs' claim under Count V.

Finally, Plaintiffs mention BSCO in their allegations under Count V, but do not include them in that count in the Amended Complaint. Doc. 166 at 41. Nevertheless, since the Court has granted qualified immunity to Wootton, BSCO would be entitled to immunity as well. *See Hinton v. City of Elwood, Kan*., 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").

**D.     Count III: Plaintiffs' Claim for Unlawful Detention of Mrs. Lowther**

Plaintiffs contend that County Defendants violated Mrs. Lowther's Fourth Amendment rights for her prolonged detention without reasonable suspicion. Plaintiffs focus on the facts that Mrs. Lowther was ordered to keep her front door open prior to the alleged unlawful entry and then

held in detention "until the investigation was completed approximately twelve hours later," which caused her to believe she was not allowed to cease her interaction with the County Defendants; that she was inside her home at the time and therefore could not be arrested without a warrant; and that County Defendants could physically see that the children were safe. Doc. 81 at 6.  Plaintiffs repeat that Dr. Lowther was already seized and therefore County Defendants could not believe that the children were in immediate danger. *Id*.

County Defendants dispute that Mrs. Lowther was detained at all, but argue, *inter alia*, that reasonable suspicion existed to detain Mrs. Lowther throughout their interaction with her based on the content of the CYFD report; the lack of knowledge as to the extent of her involvement or role in the alleged child abuse; the officers' ensuing communication with her at the home, including for violation of NMSA 30-6-4; and as a result of Wootton's review of the Safehouse interviews "which alerted him to direct victim allegations of physical abuse of the children in which Mrs. Lowther was involved." Doc. 59 at 5.[35]  County Defendants also assert that it was not clearly established that their actions, including any alleged detention, was in violation of constitutional requirements.

### Mrs. Lowther was Subject to a Detention

As an initial matter, that Court finds that Mrs. Lowther was subject to an investigative detention.

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, *in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave*. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

---

[35] County Defendants also claim that probable cause existed to arrest Mrs. Lowther for violation of NMSA 30-6-4, however, Plaintiffs do not allege unlawful arrest and therefore the Court elects not to address the merits of this statement.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (emphasis added).

In the instant action, taking Plaintiffs' allegations as true and viewing the evidence in the light most favorable to Plaintiffs, Mrs. Lowther, among other things, 1) was confronted by four officers at her door requesting access to conduct a welfare check on her children; (2) told multiple times that she could be arrested or detained for denying access to the children, twice in succession immediately prior to entry into the residence; (3) directed that she could not close the door; and (4) informed by one officer that if the investigation were under his control she would already be handcuffed in the back of a patrol car for not immediately allowing them access and that she might want to consider her actions. Considering these facts, the Court concludes that Mrs. Lowther was seized within the meaning of the Fourth Amendment. A reasonable person in her position would not have felt free to leave or terminate the interaction. Therefore, the Court conducts its analysis from the perspective that Mrs. Lowther was subject to an investigative detention and considers whether County Defendants had reasonable suspicion to detain her.

### Constitutional Violation

"[A]n investigative detention must be based upon reasonable suspicion. The court views the totality of the circumstances to see whether the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)." *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007). "[A] *Terry* stop is justified 'if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *Morris v. Noe*, 672 F.3d at 1191–92 (internal citations omitted).

### County Defendants had Reasonable Suspicion to Detain Mrs. Lowther

County Defendants claim entitlement to qualified immunity because there was reasonable suspicion to detain Mrs. Lowther from the outset in light of the content of the CYFD report as well as for her violation of NMSA 1978 § 30-6-4.; pending execution of a search warrant; and while awaiting Safehouse interviews and as a result of the review of those interviews. The Court agrees.[36]

Officers may detain an individual when they have "a particularized and objective basis for suspecting the individual of criminal activity." *Cortez*, 478 F.3d at 1115. Here, the officers had received detailed information regarding alleged sexual abuse of both Lowther children by their father. The report stated that DuBoise had shared A.L.'s behavior with both parents and did not like the manner in which they indicated they would respond to her concerns. As previously discussed, upon arrival at the Lowther residence the officers were denied access to the children by Mrs. Lowther while she was on the phone with Dr. Lowther and relaying the interaction to him. Mrs. Lowther informed the officers that she would not allow them entry, that her duty was to her husband, and sought to send the children to their rooms[37]. Furthermore, "knowingly obstructing, delaying, interfering with or denying access to a law enforcement officer or child protective services social worker in the investigation of a report of child abuse or sexual abuse" is a misdemeanor pursuant to NMSA 1978 § 30-6-4, of which the officers did advise Mrs. Lowther.[38] When he arrived, Wootton, having already received the CYFD report, was briefed by the officers regarding Mrs. Lowther's conduct and the situation as it developed. The Court disagrees with Plaintiffs that just because the officers were able to physically see the children and because Dr.

---

[36] The Court will not restate the relevant constitutional standards, having already outlined them above in relation to the other Counts.
[37] While not dispositive, Mrs. Lowther later told Wootton that she denied entry upon Dr. Lowther's instruction, which militates toward a finding that it was not unreasonable for the officers and Wootton to believe that she was subject to his control and denying access to the children upon his instruction.
[38] The fact that the Court denied qualified immunity with respect to the manner in which County Defendants obtained entry by repeatedly threatening to detain Mrs. Lowther does not make the law itself less relevant for the purposes of considering whether the officers had reasonable suspicion to detain Mrs. Lowther.

Lowther was detained requires the conclusion that the children were safe and unharmed and thus precludes a finding of reasonable suspicion. In light of these facts, as well as those outlined previously, the Court holds that County Defendants[39] have demonstrated reasonable suspicion to believe that child abuse had occurred in the home and, given Mrs. Lowther's conduct, objectively reasonable grounds for perceiving that she was subject to Dr. Lowther's control and interfering with a child welfare check in violation of NMSA 1978 § 30-6-4, thereby permitting them to detain her.

Alternatively, the Court also agrees with County Defendants that they had authority to detain Mrs. Lowther pending execution of a search warrant for the home and pending the Safehouse interviews as reasonably related in scope to the ongoing investigation. The Supreme Court has affirmed that officers have "the authority to detain occupants incident to the execution of a search warrant not only in light of the law enforcement interests at stake but also because the intrusion on personal liberty was limited." *Bailey v. United States*, 568 U.S. 186 (2013). The Court further provided that "Detentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake." *Id*. at 202.

Plaintiffs seek to distinguish the present case from *Bailey*, arguing that in that case the Court considered "whether *after the police had obtained the search warrant*, an occupant of the home who was about a mile away could be detained." Doc. 143 at 15.  Plaintiffs further posit that the case upon which Bailey relies, *Michigan v. Summers*, 452 U.S. 692 (1981), considered the constitutionality of detaining an occupant "at the moment" the search warrant was executed.  They

---

[39] County Defendants argue that only Wootton and Small should be considered in relation to any alleged detainment of Mrs. Lowther, and that the other officers were not involved. Because the Court has concluded reasonable suspicion existed and because the other officers were involved in the interaction with Mrs. Lowther from the outset, it declines to make these distinctions.

claim that because the search warrant here was only authorized at 12:17 a.m. on August 31, 2017, several hours after Mrs. Lowther had been detained, the facts of those cases are not relevant here. Not so. While the facts of those cases may differ, Plaintiffs have not pointed to any caselaw demonstrating that the rule is not applicable to the matter at hand. Therefore, County Defendants were also entitled to detain Mrs. Lowther pending execution of a search warrant of the home. Furthermore, Plaintiffs fail to address County Defendants' argument that Wootton was authorized to detain Mrs. Lowther pending the Safehouse interviews and to continue his inquiry after reviewing their content, which included allegations of physical abuse against both parents[40]. UMF 43. The Court concludes that following the Safehouse interviews, given the disclosures of both Lowther children, Wootton had reasonable suspicion to detain Mrs. Lowther to continue his investigation.

### Clearly Established Law

The Court next considers whether the law was clearly established. Since the Court has already set forth the law for making this determination, it does not repeat it here. Plaintiffs cite to *Cortez* in support of their position that the law was clearly established such that Mrs. Lowther was unlawfully detained for the duration of the investigation. County Defendants argue that Plaintiffs incorrectly cite to the *Cortez* Court's analysis of the use of force and that the facts of the case are not analogous.

### The Cortez Case

In *Cortez*, officers responded to a phone call from a nurse, relaying information she had been told by the mother of a "barely-verbal" two-year-old, who had told the mother that her

---

[40] Plaintiffs dispute County Defendants characterization that the safehouse interviews included disclosures of physical abuse. Having reviewed the safehouse interviews, the Court finds this contradicted by the record. For example, in W.L.'s interview, he stated that he and his sister are spanked on the bottom with a wooden spoon, he is nervous around his mother, and that sometimes, mostly by his father, they are slapped across the face.

babysitter Tina Cortez's boyfriend,[41] Rick Cortez, had "hurt her pee pee." *Cortez v. McCauley*, 478 F.3d at 1116. Acting solely on this information, without interviewing the mother or child, awaiting medical examination results, or conducting any additional investigation, the officers went to the home of Mr. Cortez after midnight and "(1) grabbed Rick Cortez, barefoot and wearing only shorts, and pulled him from the doorway of his home; (2) handcuffed him; (3) advised him of his *Miranda* rights; (4) placed him in the back seat of the locked patrol car; and (5) questioned him while he was in the back seat of the locked patrol car."[42] *Id.* Noting that there were no allegations of wrongdoing against Tina Cortez, the Court analyzed her seizure based on the following facts:

> Tina Cortez (1) was ordered out of her house by the officers; (2) returned to her bedroom (though it is unclear whether she did so after exiting the house in response to the officers' orders, or without exiting the house); (3) was physically separated from her telephone by an officer illuminating the bedroom with a flashlight; (4) was taken by the arm and escorted from her home, (5) was placed in the back seat of a locked patrol car; and (6) was questioned by an officer while in the back seat of the locked patrol car. While in the back seat of the locked patrol car, Tina Cortez was allowed to use an officer's cell phone. The officers seized the keys to the home and locked it. Again we note that all this occurred after midnight.

> *Id*. at 1122–23.

The Court rejected Defendants motion for qualified immunity because there was no showing of exigent circumstances and, with respect to Tina Cortez, "as the existence of neither reasonable suspicion nor 'arguable reasonable suspicion' ha[d] been shown." *Id*. at 1123. Significantly, the Court found fault with the officers' actions because "in the instant case, officers relied, without any investigation, exclusively on the *double-hearsay* statement of a nurse who had *no personal knowledge* of the actual facts" (*Id.* at 1119 (emphasis in original)); the officers "were on notice that this uncorroborated double-hearsay statement was insufficient to establish probable cause, especially given that the officers could easily have interviewed the nurse, Ms. Villegas, or the girl

---

[41] Rick Cortez was actually the babysitter's husband.
[42] The Court will not describe the other violations alleged in *Cortez* as they are irrelevant for the matter at hand.

before moving to arrest Mr. Cortez" (*Id.*); and "No reasonable officer could have believed that the double-hearsay statement of the nurse constituted sufficient facts and circumstances based on reasonably trustworthy information to supply probable cause in these circumstances" (*Id.* at 1121).[43]

Plaintiffs liken Mrs. Lowther's detainment to that of Tina Cortez. Doc. 143 at 14 ("Thus, this case is exactly like *Cortez v. McCauley*, 478 F.3d at 1108.") The Court is unconvinced as both the sequence of events and the source of information markedly differ from *Cortez*. Here, the officers did not arrive in the middle of the night; order Mrs. Lowther from the home; take her by the arm and escort her outside; confiscate her phone; or place and question her inside a locked patrol car. Additionally, the evidence and level of detail the police were provided in *Cortez* is dissimilar to the instant action. Unlike *Cortez*, where the allegations stemmed from the double hearsay report of a nurse allegedly told to her by the mother of a two-year-old child, here the report was generated by CYFD from concerns raised by A.L.'s teacher to whom A.L. had disclosed, in graphic detail, inappropriate sexual conduct with her father (and brother). Morales spoke with DuBoise to corroborate the report. She then provided Wootton with this information. County Defendants then went to the Lowther residence and initiated contact with Mrs. Lowther. Wootton subsequently arrived, was briefed by the officers about ongoing developments including their initial interaction with Mrs. Lowther, spoke with Dr. Lowther and questioned Mrs. Lowther prior to taking further action. For the foregoing reasons the Court concludes that Plaintiffs have failed to cite an apposite case demonstrating that the law was clearly established. Accordingly, County

---

[43] This analysis was conducted with respect to whether there was probable cause to arrest of Rick Cortez, but it may be applied equally to Tina Cortez's detention. Essentially, the Tenth Circuit  did not believe there was sufficient evidence to warrant Rick and Tina Cortez's seizures and the manner in which the officers acted.

Defendants motion for summary judgment with respect to Count III is **granted**, and Plaintiffs'
cross motion is **denied.**

     **E.**    <u>**Count IX: First Amendment Retaliation**</u>

     Plaintiffs allege that Wootton violated Mrs. Lowther's First Amendment rights by taking
the Lowther children into custody in retaliation for Mrs. Lowther requesting an attorney.  In
support of their contention, Plaintiffs point to Morales' Affidavit for an Ex Parte Custody Order
(Doc. 127-1 Ex. A ¶ 10),  in which she states "BCSO then asked to speak to Mrs. Lowther alone.
I went with BCSO and the mother and listened in on their conversation. *It was then that Mrs.
Lowther stated she wanted on attorney.* It was at this point that Detective Wooten [sic] made the
decision to place both children in CYFD's custody." (emphasis added).

     County Defendants argue that Mrs. Lowther did not request an attorney prior to her
interview with Wootton; that she consented to answering his questions just before he informed her
he was taking the children; and that his decision to remove the children was based on reasonable
suspicion that they had been abused.  County Defendants note that relevant belt tape audio supports
that Mrs. Lowther did not ask for an attorney when Wootton interviewed her and claim that in her
Second Declaration (Doc. 122-2 Ex. 2 ¶ 2(d)), Mrs. Lowther clarifies that she did not request an
attorney prior to the removal decision.

     <u>**The Court Will Permit Limited Discovery on this Matter**</u>

     Having reviewed the relevant belt tape audio, the Court acknowledges that Mrs. Lowther
cannot be heard requesting an attorney in the ensuing discussion. However, Morales' affidavit
does provide that Mrs. Lowther requested an attorney and that the decision to remove the children
was made immediately following that discussion. Moreover, the Court does not find Mrs.

Lowther's Declaration as clear-cut as County Defendants intimate. Mrs. Lowther's Declaration provides:

> d. Paragraph 10 [referring to the Morales Affidavit] states that "Mrs. Lowther stated she wanted an attorney. It was at this point that Detective Wooten made the decision to place both children in CYFD's custody. Neither parent was cooperative or would allow us to conduct any interviews with the children." Again, this is false. Though at some point during the time frame BCSO was in my home I remember asking about getting advice from attorney, the audio tapes do not reflect that I made this statement before I was given the 48 hour hold document. And, it is false that I was not cooperative...

Preliminarily, Mrs. Lowther's Declaration is unclear as to whether she is contradicting Morales' statement regarding her request for an attorney when speaking to Wootton or simply attempting to clarify that she requested an attorney prior to receiving the document indicating that her children would be seized. Moreover, County Defendants have not reconciled the audio tapes with the Morales affidavit. Given the lack of clarity and contradictory information, the Court finds that there is a genuine dispute of material fact prohibiting resolution of this claim at this time. Accordingly, County Defendants' motion for summary judgment as to Count IX is **deferred** pending further discovery on this specific matter. *See* Rule 56(d).

### Count VII: Plaintiffs' Claim against BSCO for Illegal Arrest, Entry, and Seizures

Plaintiffs assert liability against BSCO solely under a theory of municipal liability. However, aside from a footnote unclearly incorporating this claim with Count IV (*See* Doc. 81 at 45-46), Plaintiffs fail to provide anything further with respect to Count VII or to expand upon what policies and procedures BSCO had in place such that it should be liable. For the same reasons advanced by the Court in dismissing Plaintiffs' Cross Motion for Summary Judgment on Count IV (*see supra*, I(B) at 25), the Court **grants** County Defendants motion for summary judgment as to Count VII and **denies** Plaintiffs' Cross Motion for summary judgment on this count.

## II.     Plaintiffs' State Law Claims: Counts X, XI, XII, and XIII

Plaintiffs have advanced a series of New Mexico state law claims in addition to their federal claims. County Defendants aver that they are entitled to summary judgment on these claims because the individual officers had reasonable suspicion and/or probable cause to detain Dr. and Mrs. Lowther and reasonable suspicion to place the Lowther children in state custody. They contend that, should the Court find that reasonable suspicion and/or probable cause existed in relation to Plaintiffs' federal claims (Counts I, II, III, and IV), these findings apply equally here to bar Plaintiffs' state law claims under the NMTCA. County Defendants also note that, alternatively, should all federal claims be dismissed, the Court may decline to exercise supplemental jurisdiction over Plaintiffs' state claims including Count XIII for defamation.

Plaintiffs counter that they have presented "more than enough evidence to dispute the reasonableness of the seizures, especially given the limited opportunity for discovery," or, in the alternative, that the record has not been sufficiently developed such that the Court can resolve these claims and therefore summary judgment should dismissed or deferred. Doc. 81 at 64.

### The Court Exercises Supplemental Jurisdiction over Plaintiffs' State Law Claims

Preliminarily, the Court elects to retain supplemental jurisdiction over Plaintiffs' state law claims because not all federal claims have been disposed of in the action. *See* 28 U.S.C. §1367.

### A.      Count X-XII: False Arrest and Imprisonment of the Lowthers

In Counts X, XI, and XII, under the doctrine of respondeat superior, Plaintiffs accuse BSCO of violations of the NMTCA for false arrest and imprisonment of Dr. Lowther, Mrs. Lowther, and the Lowther children respectively. Plaintiffs allege that in all three instances the individual County Defendants knowingly acted without authority. Plaintiffs cite only to *Benavidez v. Shutiva* (2015-NMCA-065, ¶ 13, 350 P.3d 1234) in support of their claims under these counts, without further explanation. County Defendants contend that the officers had reasonable suspicion

50

and/or probable cause to detain or arrest Dr. Lowther and Mrs. Lowther and reasonable suspicion to place the Lowther children in state custody. The Court agrees. Having analyzed the law and relevant evidence the Court finds in County Defendants' favor.

### The Law Regarding False Imprisonment and False Arrest

Under New Mexico Law, as provided in *Santillo v. N.M. Dept. of Pub. Safety* (2007-NMCA-159, ¶ 12, 143 N.M. 84, 88):

> The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so. *Diaz v. Lockheed Elecs.,* 95 N.M. 28, 31–32, 618 P.2d 372, 375–76 (Ct.App.1980) (Sutin, J., specially concurring). A false arrest is merely one way of committing false imprisonment. *See* 32 Am.Jur.2d *False Imprisonment* § 3 (2007); *see also Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ.,* 245 F.Supp.2d 1203, 1211 (D.N.M.2002) ("The torts of false arrest and false imprisonment are similar."). "An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest…

"Probable cause exists when the facts and circumstances within the knowledge of the officers, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. *State v. Cohen,* 1985–NMSC–111, ¶ 36, 103 N.M. 558, 711 P.2d 3." *Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 12, 350 P.3d 1234, 1241. Additionally, an officer's reasonable belief that a detention is necessary to preserve the peace or further an investigation precludes liability for false imprisonment. *Romero v. Sanchez*, 1995-NMSC-028, ¶ 13, 119 N.M. 690, 693–94. "[A] common-law defense to a civil wrongful arrest or a false imprisonment suit also requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." *State v. Johnson*, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 701–02.

### 1.   County Defendants had Probable Cause to Arrest Dr. Lowther

In its Memorandum and Opinion granting summary judgement in favor of County Defendants on Plaintiffs' Counts I and II for Unlawful Detention or Arrest of Dr. Lowther, the Court did not agree with Plaintiffs' contention that Dr. Lowther had been subject to arrest from the outset of his interactions with the officers when he was placed in the back of a patrol car and subsequently handcuffed. *See* Doc. 159. The Court nevertheless concluded that there was probable cause to arrest Dr. Lowther both from the outset of his interaction with the officers as well as following the Safehouse interviews of the Lowther children.

Here, for the same reasons, the Court finds that the officers had probable cause to detain or arrest Dr. Lowther. Specifically, Wootton had been presented with the contents of the CYFD Report, which included that A.L. had disclosed to DuBoise, in graphic detail, inappropriate sexual conduct with her father, which she was able to demonstrate with her hands. Morales spoke with DuBoise regarding the report, and in turn provided the information to Wootton. Upon arrival at the Lowther residence, Wootton was briefed by the officers and Morales, who informed him that the Lowthers had been uncooperative.[44] Moreover, in her Safehouse interview A.L. made a series of disturbing statements regarding interactions with her father which were substantially similar in nature to that which she had allegedly disclosed to DuBoise.

As with Plaintiffs' federal claims, the Court concludes that Dr. Lowther's arrest was supported by probable cause because it was reasonable for the officers to believe that an offense had been committed against the Lowther children. *See Santillo v. N.M. Dep't of Pub. Safety*, 2007–NMCA–159, ¶ 12, 143 N.M. 84, 173 P.3d 6 ("An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the

---

[44] Regardless of Plaintiffs and Defendants' differing characterization of the events, based on the content of the audio tape, Mrs. Lowther initially denied access to the children, and upon his arrival to the home, Dr. Lowther stated to Thornton that "he was not going to let anyone in the house" which inhibited conducting a welfare check on the children.

necessary authority to carry out the arrest). Having reviewed Plaintiffs' 56(d) Declaration, the Court does not agree with Plaintiffs that the facts are insufficiently developed to render a determination with respect to these claims. *See* Doc. 159 at 24-25 (holding that Plaintiffs failed to meet the requisite elements to show how additional discovery would be dispositive in determining the reasonableness of the decision to detain and later arrest Dr. Lowther). Accordingly, County Defendants' motion for summary judgment as to Count X is **granted.**

### B. Counts XI and XII: False arrest and Imprisonment of the Lowthers

In Counts XI and XII, County Defendants contend that the officers had reasonable suspicion and/or probable cause to detain or arrest Dr. and Mrs. Lowther and reasonable suspicion to place the Lowther children in state custody. The Court agrees, having already made these determinations in considering Plaintiffs' federal claims for unlawful detention or arrest of Dr. Lowther under Counts I and II in the Court's prior Memorandum in Opinion (Doc. 159), as well as in the prior discussion under Counts III and V.  In light of the foregoing analysis and considering Plaintiffs' lack of substantive argument on its state law claims, the Court finds that County Defendants are entitled to qualified immunity. Therefore, County Defendants' motion for summary judgment on Counts XI and XII are **granted.**

### C. Count XIII:  Defamation

County Defendants' motion for summary judgment on Plaintiffs' state law defamation claim under Count XIII is **denied**. As the Court has not dismissed all of Plaintiffs' federal claims and has elected to exercise supplemental jurisdiction over Plaintiffs' state law claims, it declines to dispose of this claim, which has not been substantively briefed here by the parties.

### III.    Plaintiffs' Fed. R. Civ. P. 56(d) Declaration.

Plaintiffs included a Rule 56(d) declaration attached as exhibit 15 to their response and cross motion to County Defendants' motion for summary judgment. Rule 56(d) provides:

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Normally, a Rule 56(d) request is treated liberally. *Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990). However, where the summary judgment motion is grounded in the defense of qualified immunity, the Court's otherwise broad discretion under Rule 56(d) is circumscribed. *Lewis v. City of Ft. Collins*, 903 F.2d at 758; *see also Martin v. Cty. of Santa Fe*, 626 Fed.Appx. 736, 740 (10th Cir. 2015) ("Because the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved *prior to discovery*, there is a strong policy justification for staying discovery and for refusing requests for additional discovery once a defendant invokes qualified immunity as a defense." (citation omitted)). The burden is on the nonmovant to show that the additional discovery is necessary. *Martin v. Cty. of Santa Fe* 626 Fed. Appx. at 740.

A party requesting additional discovery under Rule 56(d) "must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (alteration in original) (quotations omitted). When the summary judgment motion is based on qualified immunity, the non-movant's Rule 56(d) affidavit must also "demonstrate a connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion." *Lewis v. City of Ft. Collins*, 903 F.2d at 754 (alteration in original) (quotations omitted).

Plaintiffs assert that they have been prejudiced by the order staying discovery pending resolution of Defendants' motions regarding qualified immunity. Particularly, Plaintiffs claim they have been prohibited from discovering facts relating to the following:

> The (1) First Amendment retaliation claim (where the facts are obviously material and disputed); (2) the conversation that allegedly took place between DuBoise and Morales, (3) the briefings that allegedly took place between Morales and Wootton, Small, Thornton, and Lozano, (4) the full extent of Wootton's personal participation in the unlawful entry decision, (5) whether the County defendants relied on state statute when they conducted the welfare check, and (6) whether the CYFD safety assessment was conducted in accordance with policy.

*See* Doc. 81 at 41.

However, as noted in the Court's prior Memorandum Opinion and Order (Doc. 159) Plaintiffs do not adequately follow the requisite steps to demonstrate that additional discovery is warranted on these matters.  The Court again notes that in the response to County Defendants' motion for summary judgment as well as in their own cross motion for summary judgment, Plaintiffs stated that all the material facts necessary to render a substantive determination were included in the audio belt tapes and Wootton and Morales' Declarations, which were "incontrovertible." Therefore, other than Plaintiffs' claim under the First Amendment for retaliation (Count IX), the Court **denies** Plaintiffs' 56(d) motion.

## CONCLUSION

For the reasons stated above, Plaintiffs' federal claims against the County Defendants set forth in Counts III, V and VII and Plaintiffs' state law claims against BSCO under Counts X, XI, and XII are dismissed. Plaintiffs' federal claim in Count IV and their state law claim under Count XIII remain. As Count VI does not raise claims against County Defendants and has accordingly not been briefed the parties, the Court denies County Defendants' motion on this count. The Court has deferred its determination with respect to Count IX.

**IT IS THEREFORE ORDERED** that County Defendants' Motion for Partial Summary Judgment **(Doc. 59),** is **GRANTED IN PART** with respect to Counts III, V, VII, X, XI, and XII.

**IT IS FURTHER ORDERED** that County Defendants' Motion for Partial Summary Judgment **(Doc. 59),**  is **DENIED IN PART** with respect to IV, VI, and XIII and **DEFERRED** as to Count IX.

**IT IS FURTHER ORDERED** that Plaintiffs' Cross Motion for Partial Summary Judgment **(Doc. 81)** with respect to Counts III, IV, V, and VII is **DENIED.**

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE