## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

ADAM LOWTHER and JESSICA LOWTHER
on behalf of themselves and as next friends
to their minor children, W.L and A.L.,

      Plaintiffs,

vs.                                 Case No. 1:18-cv-00868-KWR-JFR

CHILDREN YOUTH AND FAMILIES DEPARTMENT,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
MARIA MORALES, in her personal capacity acting under
color of state law, JACOB WOOTTON, in his personal
capacity acting under color of state law, CATHERINE SMALLS,
in her personal capacity acting under color of state law,
BRIAN THORNTON, in his personal capacity acting under color
of state law, and MARTIN LOZANO, in his personal capacity
acting under color of state law,

      Defendants.

## <u>AMENDED MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court upon Defendants CYFD and Maria Morales'

Motion for Summary Judgment based on qualified immunity, filed on November 19, 2019.[1] **Doc.**

**106**.  Having reviewed the parties' pleadings and the applicable law, the Court finds that

Defendants' motion is well-taken in part and, therefore, is GRANTED in part and DEFERRED in

part**.**

## BACKGROUND

This case arises from an investigation of alleged child abuse at Plaintiffs' home.

---

[1] The only change the Court has made is removing that Defendant Miles was party to this motion. Miles has not
indicated an intent to join CYFD and Morales' motions.

Plaintiffs claim that Defendants violated their Fourth and Fourteenth Amendment rights by unlawfully removing the Lowther children, A.L. and W.L., on August 30, 2017 during a child welfare check and again on September 6, 2017.

Plaintiffs filed this case under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following claims against the Defendants[2]:

Count I:  Fourth Amendment (Unlawful Seizure and Arrest of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count II:  Fourth Amendment (in the alternative to Count I) (Unlawful Detention of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count III:  Fourth Amendment (Unlawful Detention of Mrs. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count IV:  Fourth Amendment (Unlawful Entry into the Lowther Home) (Defendants CYFD, Morales, Wootton, Small, Thornton, and Lozano);

Count V: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Wootton);

Count VI:  Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Miles);

Count VII: Fourth and Fourteenth Amendments (Illegal Arrest, Entry, and Seizures) (Defendant BSCO);

Count VIII: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendant CYFD);

Count IX: First Amendment (Retaliation against Mrs. Lowther) (Defendant Wootton);

Count X: NMTCA (False Arrest and Imprisonment of Dr. Lowther) (Defendant BSCO);

Count XI: NMTCA (False Arrest and Imprisonment of Mrs. Lowther) (Defendant BSCO);

Count XII: NMTCA (False Arrest and Imprisonment of the Lowther children) (Defendant BSCO);

Count XIII: NMTCA (Defamation of Dr. Lowther) (Defendant BSCO).

---

[2] The following reflects the claims as provided in Plaintiffs' Amended Complaint, Doc. 166, filed April 22, 2020.

This Memorandum addresses Defendants Children Youth and Family Department (CYFD) and Maria Morales' (Morales) (collectively "CYFD Defendants") motion for summary judgment on Plaintiffs' claims under Counts V and VI.

## LEGAL STANDARD

CYFD Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id*. If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendants qualified immunity. *Id.* If the plaintiff meets his or her burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat its claim of qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992). In determining whether summary judgment is appropriate, the Court considers the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Hollander v. Sandoz Pharmaceuticals Corp*., 289 F.3d 1193, 1214 (10th Cir. 2002).

**UNDISPUTED MATERIAL FACTS[34]**

Both parties rely upon the belt tape audio content recorded by Bernalillo County Sheriff's Department's (BSCO) officers at the Lowther residence.  For the purposes of the instant motion, the Court has incorporated the facts set forth by the audio, taking into consideration the parties' disputes regarding the accuracy, materiality or characterization of the content.[5]

### Factual Background

In 2017, the Lowther household had two children, A.L. and W.L., ages four and seven respectively.  In August 2017, A.L. enrolled in Calvary Christian Academy.  W.L. attended a different institution.  A.L.'s kindergarten teacher was Betty DuBoise (DuBoise).  A.L. attended the school for approximately two weeks.  On different occasions, DuBoise informed A.L.'s parents, Dr. and Mrs. Lowther, of inappropriate behavior A.L. had exhibited at school, including touching her private parts and hiking up her dress. Both parents acknowledged that A.L. was having issues which they were trying to address.

On August 30, 2017, at approximately 2:00 p.m., DuBoise anonymously called CYFD and informed an intake worker of her suspicion that A.L. was being sexually abused by Dr. Lowther. CYFD's intake report highlighted the information DuBoise disclosed regarding A.L.'s behavior and what she had told DuBoise, which formed the basis of her concerns. In the pertinent part, the report states:

---

[3] The facts set forth in this section are undisputed unless otherwise noted. Also, references to supporting exhibits are included in the briefs and for ease of reading, are largely omitted here.

[4] Plaintiffs "fully reincorporate" the facts set forth in their prior cross motion for summary judgment (Doc. 81) and rely upon those facts and exhibits cited therein to support their positions in disputing facts asserted here. Accordingly, the Court has included relevant facts from its Memorandum and Opinion Orders relating to that document.

[5] To the extent a party's statement of facts do not contain citations to the record, the Court disregards them.  *See* Fed. R. Civ. P. 56(c)(3) ("*Materials not cited.*  The Court need consider only the cited materials, but it may consider other materials in the record.").  Additionally, the Court may disregard a party's version of the facts which are clearly unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

On 8.25.2017 Source spoke with Adam about behaviors that [A.L.] had been displaying in class. [A.L.] has been touching her private area and hiking up her dress. Adam stated that they have been working with her and that she gets it from watching her 7 year old brother touch himself while sucking his thumb.

On 8.29.2017 Source spoke with Jessica about the behaviors [A.L.] has been displaying. Jessica stated that [A.L.] has been having a hard time and that she would talk with her….

On 8.30.2017 [A.L.] told a male student that he had a penis. Source redirected the children. Source asked [A.L.] how she knew the word. [A.L.] says Adam puts her on his lap when he goes to the bathroom and likes to move her up and down like a horsey. Adam sleeps with her and kisses her on the lips with tongue. Adam touches her on her bottom and puts his finger inside of her. She was able to demonstrate the movement with her hands and fingers. [A.L.] relayed that her brother kisses her with tongue and that her brother touches her as well. [A.L.] said Adam also touches her brother but did not give any detail. [A.L.] stated that this happens all the time. Source asked [A.L.] if she had told Jessica. [A.L.] said Adam told her not to and that it was their secret. Adam told her that Jessica would get mad. Source tried to encourage [A.L.] to speak with Jessica and [A.L.] said Jessica would yell. [A.L] has been demonstrating some behaviors in class since the start of school. She is not listening, talking back, she spit at another girl and has been aggressive toward other children.

**Doc. 106-1 Ex. A.**

Initially, Plaintiffs dispute that the report is accurate or material to the Court's determination and argue that there is no evidence within it indicating that W.L. had allegedly been abused. The Court disagrees with both contentions. Among other things, the report specifies that "[A.L.] relayed that her brother kisses her with tongue and that her brother touches her as well. [A.L.] said Adam also touches her brother but did not give any detail. [A.L.] stated that this happens all the time." Additionally, contrary to Plaintiffs' assertion, the report designated W.L.[6] with the code "AV," meaning "alleged victim." *Id*. The intake report included a Supervisor Narration stating "Emergency. Child made vivid, detailed disclosures alleging abuse by the father toward the children. Mother is allegedly unaware."[7]

---

[6] W.L. is referred to as "Child Lowther" in the Intake report.
[7] Plaintiffs dispute that the report was assigned emergency status as to W.L. and claim they are unable to conduct needed discovery on CYFD's decision to classify the situation as emergency.

At 3:45 p.m. on the same day, CYFD investigator Morales contacted DuBoise to confirm the content of the intake report. Plaintiffs contest this fact, again claiming that there could be no corroboration as to W.L. since it was not alleged that he was abused, he attended a different school, and that due to the Court ordered stay on discovery they lack sufficient knowledge to determine the content of their discussion.  However, the Court finds these facts well supported by the record.[8]

### Initial Contact with the Lowther Household

On August 30, 2017, approximately an hour after receiving the initial report., Morales contacted BSCO to report the allegations and to request assistance in conducting a welfare check of the Lowther children.  Around 3:50 p.m., BSCO dispatched Deputies Small, Thornton, and Lozano to the Lowther residence, with Small as the lead field deputy.  The officers arrived at the Lowther home around 4:05 p.m., where they met Morales and were provided with more detail regarding the nature of the allegations[9].

The deputies knocked on the door and initiated contact with Mrs. Lowther at approximately 4:19 p.m.  Mrs. Lowther was already on the phone with Dr. Lowther when the police arrived and contemporaneously relayed to him the information she was receiving from the officers.[10]  The officers informed her that they were there to conduct a welfare check on the Lowther children because "somebody called and wanted to remain anonymous that they were worried [about the children]."

Mrs. Lowther told the deputies they were not allowed in the house until her husband arrived.  In response, Thornton told her, "So in State of New Mexico, and we're conducting a

---

[8] The exhibits which Plaintiffs contest the validity of here are the same as those which Plaintiffs stated were "incontrovertible" for the purposes of their cross motion for summary judgment with respect to other named Defendants in this action. *See* Doc. 81 at 3.

[9] Plaintiffs claimed the discovery stay has prohibited determining whether Morales briefed the officers and to what extent. The Court finds this fact well supported by the record for the same reasons advanced previously.

[10] The interaction is captured by the officers' various belt tapes. What follows describes Mrs. Lowther's interactions with the officers prior to her husband's arrival.

6

check on children, if you deny us access you can be arrested."  Mrs. Lowther continued to relay

this information to her husband, stating "I don't know what to do here…I don't understand what

is going on." She then informed the officers that her husband was on his way and that they would

need to remain outside the house until he arrived. Mrs. Lowther also instructed the children to go

to their rooms. The deputies acknowledged that waiting for Dr. Lowther was "fine" but instructed

her that she could not close the door, which she again relayed to her husband.

Thornton offered to explain in detail to Mrs. Lowther "what is going on" if she would hang

up the phone, but she declined to do so.  Thornton responded that in that case he would wait for

Dr. Lowther to arrive, but nevertheless did explain in general terms that CYFD received a call

from school and had come to the home with the deputies.

### Dr. Lowther's Arrival at the Residence

At approximately 4:41 p.m. Detective Wootton was dispatched to the Lowther residence

to lead the investigation.  Before arriving, Wootton instructed the officers to detain Dr. Lowther

when he reached the home.  Dr. Lowther arrived at the residence at 4:42 p.m., where he was met

outside the house by Thornton who explained that the deputies were responding to an anonymous

call regarding concern for the welfare of the Lowther children. Dr. Lowther was not permitted to

enter the residence.

After some discussion between Thornton and Dr. Lowther, Morales spoke with Dr.

Lowther, briefly explained that there were allegations of child abuse without indicating against

whom, provided him with a Parents' Guide detailing, among other things, the process if the

children were to be taken into CYFD custody, Dr. Lowther's rights to file a complaint against her,

and told him she would provide more detail once the Detective (Wootton) arrived.

Dr. Lowther informed Thornton that he was "not going to let anybody into the house." Thornton responded, "ok so if that is your choice that is fine, I will have to detain you at that point," explaining that refusing to allow access was obstruction of a child welfare investigation. Thornton indicated he would show Dr. Lowther the relevant law and then placed Dr. Lowther in the back of his patrol car. Thornton then told Dr. Lowther that the complaint was against him specifically. He also took Dr. Lowther's phones due to concerns that there could be evidence on them and went on to explain that NMSA 1978 § 30-6-4 permitted officers to check on children welfare. He later asked Dr. Lowther whether there were any firearms in the home and told him that he appreciated that Dr. Lowther was cooperating.

### The Deputies' Continuing Interaction with Mrs. Lowther

While Dr. Lowther was outside, Small and other deputies continued to speak with Mrs. Lowther at the front door. They explained to her that they were at the home because of "very descriptive" statements A.L. had made to someone at school. They also told Mrs. Lowther that a detective was on the way to the residence. Mrs. Lowther expressed incredulity that this could be happening based on something a four-year-old had said.

Upon Mrs. Lowther's inquiry as to what was happening with her husband, she was told that Dr. Lowther was being detained but was not under arrest. Mrs. Lowther asked what A.L. had said, and one deputy told her that even he did not know. Mrs. Lowther asked, "at what point is the information going to flow?" The deputies explained that more information would be forthcoming once a child therapist had spoken with A.L. In the ensuing discussion, Mrs. Lowther expressed that A.L. "was not unsafe" at which time a deputy told her that if it was his investigation, she would already be in handcuffs in the back of a police car because she was obstructing the officers'

duty to check on the welfare of a child and that she "might want to consider [her] actions."  Mrs. Lowther responded that her "duty was to her husband..."[11]

Following this interaction, Small informed Mrs. Lowther twice that medical personnel would check on the children and that she could either allow them access or be detained.  Mrs. Lowther asked whether the child therapist had arrived. Thornton explained that A.L. would be transported to a safehouse to be interviewed. Mrs. Lowther questioned whether that meant the deputies were going to take A.L., to which an officer replied that no decisions had been made, but that eventually A.L. would be interviewed in a safehouse.  After this exchange Mrs. Lowther allowed the deputies to enter the home and initiate contact with the children.  Plaintiffs admit that contact was established with the children but claim that the document upon which CYFD Defendants' rely, Morales' Case Notes (Ex. H), inaccurately portrays events as they unfolded. Specifically, Plaintiffs dispute Morales' description of her initial contact with Mrs. Lowther that "[Mrs. Lowther] stated that she was on the phone with [Dr. Lowther]. I introduced myself and stated that I was there to ensure the safety of her children and needed seeing her children, I read to her the Parents guide and explained her rights. She refused to allow us to see the children." Plaintiffs argue that this portrayal of events is rebutted by the belt tape audio which shows that Morales remained silent prior to CYFD and BSCO's entry into the home. The Court acknowledges that Morales cannot be heard speaking throughout the initial interaction with Mrs. Lowther, and her case notes are belied by the audio of Wootton's interview of Mrs. Lowther where Morales states that she has yet to inform Mrs. Lowther why she is present.

Next, medical personnel conducted a medical check of the children at approximately 5:13 p.m. While the officers were inside with Mrs. Lowther and the children, Mrs. Lowther lied to the

---

[11] The Court notes that Mrs. Lowther was cut off by the officer prior to finishing her statement.

officers regarding her knowledge of whether there were any weapons or firearms in the home. Ex. G 39:09-39:15; 41:15-41:36.  She subsequently acknowledged the location of the firearms and agreed not to go near them. *See* Doc. 106-1 Ex. F. Plaintiffs dispute this characterization; however, the Court finds this blatantly contradicted by the record.[12]

**Handcuffing of Dr. Lowther**

While the deputies were speaking with Mrs. Lowther leading up to their entry into the home, Dr. Lowther remained in the patrol car speaking with an officer. He asked why he was not permitted into his own house and was told this was due to the complaint being alleged against him specifically, and because the children were in the home.  He was also told that CYFD was investigating whether the allegations "were true or false."  At that time, Small came outside, asked Dr. Lowther to step out of the patrol car, handcuffed him, and placed him back in the vehicle.

**Detective Wootton's Arrival and Interview of Mrs. Lowther**

Detective Wootton arrived at the home around 4:50 p.m.  Upon arrival, he conferred with Morales[13].  A deputy apprised Mrs. Lowther of the detective's arrival and that he was speaking with Morales to form a plan, at which time Mrs. Lowther was inside aiding in collecting the children. Medical personnel examined the children and did not find anything of immediate medical concern. Likewise, Morales did not notice any physical injuries to the children.

Sometime thereafter, Wootton interviewed Mrs. Lowther in the presence of Morales[14]. Wootton first gave her Miranda warnings and asked whether she would be willing to answer his

---

[12]In response to the officer's question of whether there were firearms in the home, Mrs. Lowther initially stated that she "did not know" and then confirmed that there were no weapons "to her knowledge."  However, while outside, Dr. Lowther informed an officer that there were firearms in the home and that Mrs. Lowther knew where they were located, which she subsequently acknowledged. *See* Doc. 127-10, Ex. H at 39:07-39:17; 41:13-41:37. Mrs. Lowther also expressed her regret for lying about her knowledge of weapons in her Second Declaration. *See* Doc. 122-2 Ex. 2 ¶ 2(d).

[13] Wootton's Declaration states that Morales forwarded an email to him with the contents of the CYFD report, and that he was informed by deputies that both Mr. and Mrs. Lowther had been uncooperative.

[14] Officer Thornton was present for at least some of the conversation. It is unclear whether he was there for the duration.

questions. There is a dispute as to whether Mrs. Lowther requested an attorney[15]. She eventually agreed to listen to his questions. He asked her why she had not allowed the officers to enter the home.  Mrs. Lowther told him that she denied the officers entry because she was alone with the children and her husband said "not to let you in." Ex. F Thornton Belt Tape Audio Track 4. Wootton stated that it was his understanding that Mrs. Lowther had been advised that it was a criminal offense to interfere with an investigation regarding child abuse. *Id.*  Mrs. Lowther initially said she "would not have known" or could not recall, but one of the officers present affirmed that they had told her it was an arrestable offense. Mrs. Lowther responded that she had been waiting to hear from her husband.

Stating that she had yet to inform Mrs. Lowther why she was present, Morales provided Mrs. Lowther with further detail relating to the alleged abuse of A.L., which included allegations of sexual molestation, sexual abuse, and lack of supervision.  She also explained that her role in the investigation was to determine whether the allegations were "founded or unfounded." Ex. F Thornton Belt Tape Track 4, 3:54-4:38.  She asked Mrs. Lowther if she had any knowledge why someone might make such an allegation from A.L.'s school.  Mrs. Lowther eventually recalled that A.L.'s teacher had mentioned that A.L. had been "messing with herself" at school, but that she and her husband had tried to get her to stop.  Wootton then informed Mrs. Lowther that because of the nature of the allegations he was removing the children on a 48-hour hold, which would include interviews of both A.L. and W.L. at a safehouse. Plaintiffs contend that "the evidence infers that that Morales told BCSO she had decided to take A.L. and W.L. on a 48-hour hold before officers even entered the home and that the decision was her decision." **Doc. 122 at 9.** Having

---

[15] No such request is captured on the belt audio tapes, however, the Court notes that both Morales' affidavit and Mrs. Lowther's First Declaration indicate that an attorney was requested.  Mrs. Lowther's Second Declaration (Doc. 122 Ex. 2 ¶ d) claims that she recalls asking about obtaining attorney advice at some point while BSCO was inside the home, prior to receiving the 48-hour hold document, and that the audio tapes do not reflect this statement.

reviewed the relevant audio and evidence cited by Plaintiffs in support, the Court disagrees. During Mrs. Lowther's interview, Morales initially states "One other thing, because of this whole situation on…" at which point she is cut off by Mrs. Lowther asking for clarification as to "which situation." Wootton then interjects "So, because of the allegation's ma'am the child, I'm taking the children on a 48-hour hold." **Doc. 81-1 Ex. 7 at 113:22-25-114:1-5**.

At 5:33 p.m., Wootton signed a pre-filled "CYFD Protective Services Division Statement of Reasonable Grounds for Temporary PSD Custody" which provided that pursuant to New Mexico Children's Code (32A-4-6 NMSA 1978), the Lowther children were being placed in CYFD custody. Wootton marked two of the prefilled sections of the form which state: "The parent has been arrested and detained, and there is no caretaker available to assure the child's safety; [and] the child(ren) is in danger from his or her surroundings and removal from those surroundings is necessary to ensure the safety of the child(ren)." Plaintiffs dispute the veracity of Wootton's form, arguing that Mrs. Lowther was not suspected of abuse and available to ensure the safety of the children.[16] In its prior Memorandum Opinion and Order the Court rejected these conclusory statements as absent support in the record and contradicted by the fact that Mrs. Lowther was being investigated for lack of supervision. *See* **Doc. 174**.  Deputies also told Mrs. Lowther than a warrant would be served upon her house that night, and that she could not return to the home pending the search.  Small remained onsite to ensure nothing inside was tampered with.

**Substance of A.L. and W.L. Safehouse Interviews**

---

[16] In disputing these assertions Plaintiffs again cite to their Brief (Doc. 81), and attached exhibits, cross moving for summary judgment against other defendants. Thus, the Court incorporates its findings from those briefs where relevant.

Having determined to remove the children on a 48-hour hold, A.L. and W.L. were transported by Morales to a safehouse and interviewed that night.[17]   Morales watched the interviews and took notes.

During her interview, A.L. stated, among other things, that she got into trouble for touching her privates at school; she sits on her father's lap while he is defecating; her father touches her "pee-pee" and "gina" in the bathroom, which she repeatedly stated was their "secret"; her father kisses her "butt-cheeks"; and takes photographs and videos of her "butt and gina," with his phone, sometimes while she is saying "fuck."

W.L. stated that he and his sister are spanked on the bottom with a wooden spoon; sometimes, mostly by his father, they are slapped across the face; he feels nervous around his mother; he does not feel safe around his father; his father "is real mean and I don't like to be around him a lot…because he hurts me a lot;" and that his father sometimes pushes him "hard down on the ground" which causes him to hit the back of his head.

At 8:52 p.m., having viewed the interviews, Wootton directed the deputies to transport Dr. Lowther and Mrs. Lowther to the BSCO station.  Ultimately, Wootton charged Dr. Lowther with criminal sexual penetration of a minor and criminal sexual contact of a minor.  Mrs. Lowther was told she was free to go.

**Physical Examinations of A.L.**

On August 31st, 2017, Morales took A.L. for a physical examination at the Albuquerque Sexual Assault Nurse Examiners (SANE) Collaborative. CYFD Defendants refer to Exhibit R in support of the results of this examination, including, among other things, that redness around her genitals and a 2mm anal fissure was noted. However, Exhibit R, as attached to the record, does not

---

[17] The Court has reviewed the content of the Safehouse Interviews of A.L. and W.L. What follows is a brief recitation of some of the noteworthy portions of the children's interviews.

include this information. Morales also filled out a "New Mexico Child Safety Assessment" form. The form consists of four parts: Safety Threats; Caregiver Protective Capacities; Safety Threats/Protective Capacities; and Safety Decision and Summary, each with a series of "Yes/No" questions to be filled out by the CYFD agent. **Ex. S.** In the "Safety Decision and Summary" portion, Morales selected the answer which states, "The child(ren) is/are unsafe. One or more safety threats placing the child(ren) in immediate or impending danger of serious harm, were identified. There are not sufficient protective capacities to offset, mitigate and/or control the threat of immediate or impending danger of serious harm." ***Id*. at 6.** There is no specific assessment for each individual child and Morales did not provide any additional information in the "Safety Summary" section. Plaintiffs contend that the assessment was not "accurate, complete, or in compliance with the law." **Doc. 122 at 11 ¶ 28.** Plaintiffs, however, do not provide an adequate explanation why this is the case and the Court rejects Plaintiffs' subsequent arguments which rely generally upon Mrs. Lowther's Second Declaration responding to various Undisputed Material Facts asserted by CYFD Defendants. **Doc. 122-2 Ex. 2.**

The following day, A.L. was taken for a follow-up examination at Para Los Niños, conducted by Shalon M Nienow. Nienow's report included that in the SANE Report she had received "an injury was noted at 12 o'clock on the anus. This finding appeared consistent with tearing and/or bruising." With respect to A.L.'s prior anal injury, Nienow's reexamination found "Normal anal folds. Skin tag at 12 o'clock. Tearing visualized on SANE photographs has resolved with new skin present on right side of anal tag." **Doc. 106-1 Ex. T**. The "Diagnostic Impressions" stated "Normal physical examination today. Previous examination with anal tear present. This finding is consistent with the child's disclosure of anal penetration and constitutes child sexual abuse." *Id*. CYFD Defendants emphasize another part of the "Diagnostic Impressions" report

expressing "significant concern for mother's protective capacity," particularly the portion that states, "Further concerning are [A.L's] previous disclosures that mother had told her not to talk about the abuse. Children who live with caretakers who actively encourage them not to disclose, and who are unsupportive of previous disclosures are at significant risk of recantation as well as subsequent trauma symptoms." **Doc. 106-1 Ex. U**.   However, the Court finds this blatantly contradicted by the record within the same exhibit.   Plaintiffs correctly note that the foregoing is belied by the body of the same report, in the "History Obtained from Child" section which included the opposite information:

> "I asked [A.L.] "has anyone ever told you that it wasn't okay to talk about the bad things that happened?" She said "yes". I asked "who told you that?" She replied "dad". I asked her "What did he say?" [A.L.] stated "he said don't tell other people". I asked her "how did that make you feel?" She noted "bad". I asked [A.L.] "did he say what would happen if you told other people?" She responded "he said he would get in trouble". I asked "has anybody else ever told you that it's not okay to talk about what happened?" *She replied "no. Mom said to tell". I asked "mom said to tell?" [A.L] nodded assent and stated "uh-huh".*

*See Id.* at 1. (emphasis added).

The same day, Mrs. Lowther spoke with Morales and told her that she was unaware of any misconduct by her husband; that she "did not accept the allegation as true regarding my husband because nothing in my 18 years of marriage to him would indicate that he could or would commit any crime" (Doc. 122 Ex. 2 ¶ 2 (e)); and that she wanted A.L. to get therapy immediately because she did not believe her daughter would say such things unless something had happened to her.

### **Development of a Safety Plan and the Second Removal of the Lowther Children**

On September 1, 2017, at a Family Centered Meeting, CYFD developed a safety plan to release the Lowther children from protective custody to safety monitors; the maternal grandparents

Terry and John Borg.[18] The grandparents, Mrs. Lowther, Morales, CYFD Investigations Supervisor Yvonne Meade and In-Home Services (IHS) Supervisor Robin Yoder were present. **Doc. 106-1 Ex. H.** Both parents agreed that the Borgs would act as the safety monitors. On September 4, 2017, a transfer meeting was held which included the same individuals as well as Andrea Miles, the IHS clinician assigned to the case. The next day, at a Preventive Detention Hearing related to Dr. Lowther's criminal charges, which Mrs. Lowther did not attend, Mr. Borg approached Miles and angrily expressed his disbelief of the allegations against Dr. Lowther. **Doc. 106 UMF 36-37**. Miles' report includes the following narrative:

> Following the hearing, I provided Adam Lowther's attorney with my business card and requested that Mr. Lowther contact me Wednesday morning to arrange a meeting. As I turned around, Mr. John Borg came up from his seat, placed his hand on my shoulder and stated "you're our helper, you need to fix this!". I attempted to explain to Mr. Borg that I am not involved with the criminal side of this case, and that my first priority is AL and WL. He went on to express his anger toward the State, saying "they don't have a shred of evidence against my son-in-law, and these allegations are nothing but a bunch of lies". Mr. Borg stated that I need to fix this, that his Grandson, WL has been traumatized because he saw his father in the back of a police car, and that I needed to get these children, as well as himself and his wife Terri [sic] into therapy right away. Ms. Duncan attempted to intervene and calm Mr. Borg down, but he kept raising his voice and insisting that I do something about what just took place. The conversation then spilled out into the hallway.

Doc. 106-1 Ex. Y at CYFD 1775; *See also* Doc. 106-1 Ex. B ¶ 22 (Morales Amended Affidavit for Ex Parte Custody Order).

Plaintiffs dispute CYFD Defendants' characterization of Mr. Borg's behavior as disruptive; contend that Miles' statements describing the event are both hearsay and incompetent testimony[19]; and dispute that these facts are material to the ensuing September 6, 2017 removal since a safety plan was in place and the children were not in imminent danger. The Court rejects

---

[18] Despite CYFD efforts to arrange a phone conference with Dr. Lowther so he could participate, he was unable to attend the meeting.

[19] Miles' statements are not being considered to prove the truth of the matter asserted therein, but for the purpose of showing that Mr. Borg may not be a good safety monitor.

Plaintiffs' arguments as conclusory; Plaintiffs have not provided evidence supporting these assertions.[20]

Following Mr. Borg's conduct, CYFD Defendants held a meeting on September 6, 2017 in which they discussed, with an IHS supervisor, concerns regarding the safety monitors' ability to protect the children; their alleged disbelief of A.L.'s disclosures; and fear that the safety monitors (and Mrs. Lowther) might allow Dr. Lowther access to the children. At that time, CYFD determined that the safety plan could no longer guarantee the protection of the children. Wootton was contacted, and the children were once again taken into custody upon his execution of a Statement of Reasonable Grounds for Temporary Custody.[21] On September 8, 2017, CYFD filed an "Abuse/Neglect Petition" before the Children's Court.[22]  The Children's Court ruling found, *inter alia*, that there was probable cause to believe that the children had been abused or neglected such that custody was necessary and that no other services or efforts would be appropriate "given the paramount concern of the children's safety." **Doc. 106-1 Ex. CC.** Plaintiffs dispute the relevance of any Children's Court determinations because they arose after the removal on September 6, 2017.

### Plaintiffs' Additional Undisputed Material Facts

Plaintiffs include their own "additional undisputed material facts" section in the Response to CYFD Defendants' motion. Preliminarily, Plaintiffs incorporate their asserted facts from their

---

[20] Plaintiffs refer to Mrs. Lowther's Second Declaration to dispute the events relating to Mr. Borg. However, the relevant section merely states "UMF 36 is false and has been addressed in paragraph 2." Paragraph 2 does not provide evidence to dispute what transpired at the hearing but rather claims that she and the grandparents had complied with the conditions established by CYFD. Additionally, Plaintiffs do not dispute UMF 37 that Mr. Borg responded to the conditions of Dr. Lowther's release with anger toward Miles, and therefore it is deemed admitted.

[21] Plaintiffs dispute that Wootton made the determination to place the children on a 48-hour hold, claiming that, pursuant to Morales' affidavit, CYFD Defendants had already decided to remove the children and that it was CYFD that provided Mrs. Lowther with the form for executing a 48-hour hold, not Wootton. Plaintiffs further assert they have been denied meaningful discovery on this matter. *See* Ex. 1 (Plaintiffs' 56 (d) Motion).

[22] An Amended Abuse/Neglect Petition was filed on September 12, 2017. The Children's Court ruling relates to the Amended Petition.

response and cross motion for summary judgment (**Doc. 81**) with respect to other defendants' motion for summary judgment, addressed previously by the Court in its Memorandum and Opinions. **Docs. 174**, **206**. CYFD Defendants' Reply does not respond to Plaintiffs, thus, the Court deems admitted the following facts. [23]

With respect to the initial investigation conducted on August 30, 2017, Morales noted that the children both appeared to be "happy" and "content." **Ex. H at 114-115.** The home was "clean and appropriate," with sufficient food, and a bedroom for each child. *Id*. Morales was present in the home while EMS conducted a physical examination of the children which revealed no visible marks or bruises and good vitals. *Id.* Morales did not apply for a warrant or an *ex parte* custody order prior to removing the children on August 30, instead transporting them to a safehouse for interviews and later to a foster care home.

On August 31, 2017, Mrs. Lowther met with Morales. Mrs. Lowther's Second Declaration alleges that, in that meeting, she told Morales that A.L. had been suffering "significant constipation" in the days before August 30th, and that on August 3rd A.L. succeeded in relieving her bowels, which, in A.L.'s case, results in redness from wiping. **Doc. 122-2 Ex. 2 ¶ h.** The Declaration also claim that Mrs. Lowther "never said she did not believe her daughter." **Doc. 122 at 15 Plaintiffs UMF ¶ F**. However, Plaintiffs also cite to Morales' case notes in support (Doc. 106-1 Ex. B), which contradicts this assertion. Both documents appear to support Plaintiffs' assertion that Mrs. Lowther did state that she wished to obtain psychiatric help for A.L.

When filling out the "New Mexico Child Safety Assessment" form previously described by the Court, Morales did fill in "Yes" for the prefilled statements including that Mrs. Lowther,

---

[23] The Court has only included those facts with support in the record. Some of Plaintiffs' additional undisputed material facts have already been provided in the facts section of this Memorandum; were previously rejected by the Court; are without accurate citation to the record; or are irrelevant to the Court's determination. The Court has omitted those factual assertions here.

identified in the form as "Caretaker One", demonstrates a protective role and responsibilities; has a history of taking action to protect; expresses empathy and sensitivity for the children; and was emotionally and physically able to intervene and protect the children. **Doc. 106-1 Ex. S**.

On September 1, 2017, A.L. was taken for her follow up examination at Para Los Niños, without a warrant or court order. On the same day, Mrs. Lowther and the maternal grandparents entered into a safety plan agreement with CYFD. The relevant documentation of the meeting (**Doc. 106-1 Ex. V**)[24] contains observations that "mom presented well and collective; the grandparents were supportive and provided their opinions." It also noted that Mrs. Lowther and the Borgs agreed to abide by the restrictions discussed by the parties, which included no contact between the children and Dr. Lowther.[25] Mrs. Lowther informed neighbors, friends, and family that Dr. Lowther could not contact the family or enter the residence. Between September 1st and September 6, 2017, no allegations were made that the parties had failed to adhere to the safety plan.  CYFD filed an *ex parte* motion, subsequently amended, for custody of the children in the Children's Court on September 8 and September 12, 2017. The motions stated that the children were taken into custody on September 6, 2017 but did not mention that the children were also taken into custody on August 30, 2017.

## DISCUSSION

### I.   Constitutional Claims against CYFD Defendants

#### A.   Qualified Immunity Standard

CYFD Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate

---

[24] Plaintiffs incorrectly cite to Exhibit U.
[25] Plaintiffs' assertion that Mrs. Lowther "gave CYFD the names of other fictive kin available to serve as safety monitors…" is unsupported by their citations to the record. Mrs. Lowther's Second Declaration claims that at the Family Centered Meeting on September 1, she identified two family friends as possible alternative safety monitors.

clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231; *Romero*, 672 F.3d at 880.

Plaintiffs carry a heavy two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).

For a violation to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quoting *Morris v. Noe,* 672 F.3d 1185, 1196 (10th Cir.2012)). A case need not be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, —— U.S. ——, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs,* 475 U.S. 335 (1986)).

The Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "In determining whether the plaintiff meets the requisite burden, [the Court] ordinarily accept[s] the plaintiff's version of the facts— that is, the facts alleged." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation

marks omitted).  Therefore, the Court first considers whether, viewed in the light most favorable to the Lowthers, CYFD Defendants' conduct violated the Lowthers' constitutional rights.

**B.**     **Count V: Removal of the Lowther Children on August 30, 2017**

Plaintiffs claim that Wootton, Morales and CYFD violated their Fourth and Fourteenth Amendment rights in the warrantless removal of the Lowther children without reasonable suspicion that the children were in imminent danger. Specifically, the Lowthers assert that they were deprived of the liberty interest in familial association when the Lowther children were removed without notice or a hearing. The Court has already addressed this claim with respect to Wootton in its prior Memorandum Opinion and Orders, granting qualified immunity under both the Fourteenth and Fourth Amendments. *See* **Docs. 174, 204**.  Plaintiffs advance substantially similar arguments here, namely that Morales and CYFD's conduct was not objectively reasonable because "there was no evidence to suggest that either child was in imminent danger of harm"; Morales did not conduct an adequate investigation prior to removing the children; and the Lowthers were not afforded notice or a hearing prior to removal of the children. **Doc. 122 at 2-3**. Plaintiffs also request their 56 (d) motion be granted to permit further discovery on these matters.

**The Law Regarding Searches and Seizures**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. Generally, "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) (quoting *Payton v. New York,* 445 U.S. 573, 586 (1980)). The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty or property without due process of law. U.S. CONST. amend. XIV.

CYFD Defendants argue, *inter alia*, that the totality of the circumstances reflect that, at the time of both the August 30 and September 6, 2017 removals, there was reasonable and articulable suspicion that the Lowther children had been abused or were in imminent danger of abuse; that the actions taken were in accordance with state policy and statutory law and within the bounds of the Fourteenth Amendment; and that the Children's Court rulings on the removal of the children, finding probable cause, demonstrate that CYFD Defendants' actions were objectively reasonable.

Plaintiffs counter that CYFD and Morales failed to provide sufficient evidence to support that there was "specific, articulable reason to believe that A.L. was [in] imminent danger at the time of her removal on August 30th"; there is no evidence that a separate analysis was conducted with respect to the removal of W.L. and he was not alleged to have been subject to abuse; that prior to removal Morales had adequate time to conduct a "meaningful investigation" of the claims because Dr. Lowther was detained, but did not do so; that "perhaps most compelling" is the audio evidence which shows that the children were "vivacious and communicative" during the incident; and that Mrs. Lowther was not informed about the allegations for the majority of the encounter. **Doc. 122 at 23.** Thus, Plaintiffs aver that Morales and CYFD's actions were not objectively reasonable.

In support of their position that a constitutional violation took place and that the law was clearly established at the time, Plaintiffs rely upon *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006); *Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003); *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F. 3d 1306 (10th Cir. 1999); and *Hollingsworth v. Hill*, 110 F. 3d 733 (10th Cir. 1997). Particularly, Plaintiffs assert that this case is analogous to *Roska* and in "stark contrast" with *Arredondo*. **Id. at 24**.

1. **The Roska Case**

    **Background**

In *Roska*, a social worker, police officer, and other state officials removed a twelve-year-old boy, Rusty, from his home on the suspicion that he was a victim of Munchausen Syndrome by Proxy (MSBP), a condition in which a parent, in this case his mother, was allegedly inflicting physical harm upon him in order to obtain the sympathy of medical personnel. *Roska*, 328 F.3d at 1238. The school district expressed concern to the relevant division of child family services after observing the Rusty's worsening physical condition including his unhealthy appearance and pallid complexion; his mother's statements to school officials that Rusty suffered from a hole in his esophagus, parasites in his intestines; and appendicitis, after which the mother had insisted on the removal of what was apparently a healthy appendix. *Id.* Additionally, it appeared Rusty was being restrained in a wheelchair while force-fed intravenously despite not being handicapped. *Id.* at 1250. His condition deteriorated to such a degree that school officials expressed concern that he would die if social services did not intervene. *Id.* at 1238.

In response to the concerns, state officials consulted with a Utah assistant attorney general who advised that the facts supported Rusty's removal from his home. *Id.* The decision to remove the child was made despite an investigator concluding that Rusty was not "in imminent danger of death." *Id.* Afterwards, social workers and a police officer entered the home without a warrant and without knocking and removed him. *Id.* "Before leaving, they were admonished over the phone by Doctor Gooch [Rusty's rehabilitation physician] that removal could destroy "this family emotionally and Rusty may never recover." *Id.* Following his removal, the family brought an action against the officials claiming violations of the Fourth and Fourteenth Amendments for

unreasonably entry and seizure of their child without a warrant or a pre-deprivation hearing. *Id.* at 1239.

### **Constitutional Violation under the Fourth Amendment**

In analyzing the law with respect to the Fourth Amendment and warrantless searches and seizures, the Tenth Circuit noted that generally police officers could not enter a home to investigate potential child abuse without a warrant absent an exception to the rule, such as exigent circumstances. *Id*. at 1249. While acknowledging that the defendants reasonably concluded that Rusty's health was at risk, the Court found that the risk was not immediate. *Id*. at 1241. In light of this determination, the Tenth Circuit held:

> [N]o evidence [] could lead a reasonable state actor to conclude that there were exigent circumstances. Although defendants at times assert that a delay to obtain a warrant might have cost Rusty his life, the evidence shows otherwise. Defendants were aware that various doctors had suspected that Rusty was a victim of MSBP for quite some time, and the record indicates that there was nothing particularly unusual about Rusty's condition at the time he was removed. Rusty's attending physician stated on the phone that it would be a mistake to remove him from the home. Because no evidence indicates that Rusty was in immediate threat of death or severe physical harm—indeed, the evidence points to the opposite conclusion— we do not find sufficient exigent circumstances to relieve the state actors here of the burden of obtaining a warrant. *See Coolidge v. New Hampshire,* 403 U.S. 443, 470–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it ... [t]he requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.' ").

*Id*. at 1240–41.

Although the Tenth Circuit found that the defendants' conduct violated the plaintiffs' constitutional rights, it nevertheless granted qualified immunity because it concluded that the warrantless entry and removal of the child did not violate a clearly established law. The Tenth Circuit noted that the District Court had determined, with support from the record, that an

objective, reasonable social worker could have believed that there was a *substantial danger* to the child's health and safety; that he could not be protected if left in his parents' care; and that his presence in the home was the reason for "*his particularly troubling and persistent condition…*" *Id.* at 1250 (emphasis in original).

### Constitutional Violation under the Fourteenth Amendment

In *Roska*, the Plaintiffs contended that they were deprived of their liberty interest in familial association without due process when Rusty was removed without notice or a hearing.  In holding that a constitutional violation had been demonstrated, the Tenth Circuit reiterated that "termination of parental rights impinges upon a liberty interest of which a citizen may not be deprived without due process of law." *Id*. at 1245. The Tenth Circuit continued:

> This circuit has applied *Santosky's* [*v. Kramer* 455 U.S. 745, 753–54 (1982)] holding, however, to the temporary seizures of children and has held that notice and a hearing are required before a child is removed " 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " *Spielman v. Hildebrand,* 873 F.2d 1377, 1385 (10th Cir.1989) (quoting *Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 848, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)). "Valid governmental interests" include "emergency circumstances which pose an immediate threat to the safety of a child." *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997). As the Second Circuit has noted, the "mere possibility" of danger is not enough to justify a removal without appropriate process. *Tenenbaum v. Williams,* 193 F.3d 581, 594 (2d Cir.1999).

*Id*.

With respect to whether the law was clearly established, the Tenth Circuit held that pursuant to *Malik v. Arapahoe County Dep't of Soc. Servs.* (191 F.3d 1306, 1315 (10th Cir.1999) (citations omitted)), "… except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures." While acknowledging that " 'emergency circumstances which pose an immediate threat to the safety of a child' might justify the absence of pre-deprivation procedures,

*Hollingsworth,* 110 F.3d at 739," in this case, the Tenth Circuit concluded that Rusty's health and safety were not in immediate danger and therefore the Defendants' failure to provide any process or seek an *ex parte* order prior to removal put them on notice that their conduct violated the Constitution. *Roska*, 328 F.3d at 1250.

### 2. Gomes Established the Reasonable Suspicion Standard in the Tenth Circuit

*Gomes* established the "reasonable person" standard through which the Tenth Circuit now considers "whether emergency circumstances justify the removal of children without notice or a hearing." *Arredondo v. Locklear*, 462 F.3d at 1298.

### Background

In *Gomes* (451 F.3d at 1124), a mother brought her nine-month-old daughter to the pediatrician after she sustained a head injury. An X-ray revealed a skull fracture, the shape of concerned the doctor because it did not suggest to him that it necessarily occurred from a fall from bed, which was the mother's explanation.[26] *Id*. While the doctor ultimately sent the child home with the mother[27], he informed her that he would have to file a report with the state Division of Child and Family Services. *Id*. at 1125.

Initially, the Child and Family Services intake worker designated the situation as a non-emergency; further action was only taken when the mother brought her child in for two successive follow up appointments and asked whether the doctor had already spoken with Child and Family Services. *Id.* After the second follow up, the doctor again spoke with a caseworker.[28] The caseworker consulted with her superiors as well as an assistant attorney general, and due to several

---

[26] The doctor found that Ms. Gomes' explanation of the injury was "possible but suspicious," noting that the fracture was "consistent with a fall on a flat object." *Id*.
[27] He also told Ms. Gomes that he was comfortable sending the child home with her. *Id*. at 1125.
[28] The doctor again told the intake worker that the mother's explanation was "plausible but suspicious" but that he was still comfortable sending the child home with her mother. *Id*.

factors including, the child's young age and the seriousness of the injury, a home visit was scheduled. The caseworker and a police officer conducted the visit, observed the bed and floor where the mother said the injury occurred, found the explanation "implausible," and immediately removed the child without notice or a hearing. *Id.* at 1126[29]. After four months, the child was returned to the family's custody. *Id.*

### The Gomes Court's Analysis

The Gomes family instituted a § 1983 action against the relevant state officials asserting a violation of due process rights under the Fourteenth Amendment for the removal of the child without a hearing or notice. *Id.* Preliminarily, the Tenth Circuit acknowledged the importance of parents' constitutional rights in maintaining custody and control of their children:

> Under the Fourteenth Amendment to the United States Constitution, parents have a protected liberty interest in the care, custody and control of their children. *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). That interest is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Id.* (citing *Pierce v. Soc. of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15, (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). As a result, state officials may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law. *Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Roska II,* 328 F.3d at 1245.

*Id.* at 1127.

Notably, the Court provided that this right was not absolute, particularly in instances of alleged child abuse. *Id.* at 1128. Specifically, the Court stated that "States have a *parens patriae* interest

---

[29] A few days after the removal, the same assistant attorney general filed a petition for custody of the child with the appropriate court. *Id.*

in preserving and promoting children's welfare, including "a 'traditional and transcendent' interest" in protecting children from abuse. *Id.* (internal citations omitted).

### **Determining Whether Reasonable Suspicion Exists**

The Court articulated an exception to the general rule for removing a child without prior notice or a hearing in "extraordinary situations" including " '[e]mergency circumstances which pose an immediate threat to the safety of a child.' *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997). However, 'the 'mere possibility' of danger is not enough to justify a removal without appropriate process.' *Roska II,* 328 F.3d at 1245 (quoting *Tenenbaum v. Williams,* 193 F.3d 581, 594 (2d Cir.1999))." *Id.* While there is no absolute definition of what "emergency circumstances" constitutes, the Court discussed different standards advanced by other circuits and adopted the majority's approach of a "reasonable suspicion" standard, holding that children may be removed without prior notice and a hearing where there is reasonable suspicion that the immediate safety of the child is at risk. *Id.* at 1128-30 ("we conclude that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there.).

In the context of determining whether there is reasonable suspicion of an immediate threat to the safety of a child, the Court provided:

> [W]e must consider "*all relevant circumstances,* including the state's reasonableness in responding to a perceived danger, as well as the objective nature, likelihood, and immediacy of danger to the child." *Kearney,* 329 F.3d at 1295 (emphasis added). Ordinarily, the question of whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child will be an important consideration, and the failure to establish that judicial authorization was impracticable will undermine the contention that emergency circumstances existed. *However, neither this factor, nor any other single factor, is necessarily dispositive.*"

*Id.* at 1131. (emphasis added).

28

**The Gomes Conclusion**

Conducting a qualified immunity analysis, the Court found that the record supported a constitutional violation because there was insufficient evidence to demonstrate "reasonable and articulable suspicion that the child ha[d] been abused or [was] in imminent peril of abuse." *Id*. at 1135 (noting, *inter alia*, the doctor's observation that the shape of the fracture was "consistent with a fall on a flat object"; that in both calls to the Child and Family Services the doctor stated that he was "comfortable" with the child returning home with her mother; and that the original intake worker who spoke with the doctor felt that the situation was a non-emergency.).

However, on the issue of whether the law was clearly established, the Court determined that the facts provided showed that "'officers of reasonable competence could disagree' as to whether there were emergency circumstances justifying the removal of [the child] without a hearing." *Id*. at 1136 (10th Cir. 2006); *See Malley v. Briggs,* 475 U.S. 335, 341 (1986) ("if officers of reasonable competence could disagree" [about the lawfulness of the challenged conduct], then "[qualified] immunity should be recognized."). In granting qualified immunity, the Court highlighted the particularly difficult balancing act social workers face in weighing essential parental rights against the safety of children. *Id*. at 1138 ([s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests. When confronted with evidence of child abuse, they may be required to make on-the-spot judgments on the basis of limited and often conflicting information) (internal citations omitted).

3. **The Arredondo Case**

**Background**

*Arredondo*, decided a few months after *Gomes*, affirmed the Tenth Circuit's standard of reasonable suspicion.  In *Arredondo*, a mother brought her eleven-month-old daughter, Jasmine,

to the emergency room because she was having difficulty crawling. *Arredondo*, 462 F.3d at 1294. An X-ray revealed a fracture in Jasmine's arm. *Id*. The mother offered two different explanations for how the injury occurred. *Id*. Multiple hospital personnel felt her explanations were "confusing" and a "red flag" (the doctor found the fracture too high up in the arm to equate to a fall from a bed as the mother alleged). *Id*. The hospital did not initially report its suspicion to the New Mexico Children Youth and Family Department (CYFD). *Id*. Four days later, the mother brought Jasmine to the emergency room again, this time because the child could not put weight on her leg[30]. *Id*. at 1295. The mother attributed this injury to the same fall from bed. *Id*. Due to the repeat visits to the hospital and the mother's "confusing" explanations, the hospital contacted CYFD. As in *Gomes*, the original intake worker categorized the issue as a non-emergency. *Id*. Later, a CYFD social worker and police officer visited the hospital and interviewed hospital personnel who reaffirmed their original concerns. *Id*.

Following the hospital interviews, the officials conducted a home visit. The mother initially refused to speak with them, citing concerns about being on probation, but later permitted entry into the home after speaking with her parole officer. *Id*. She showed the officials the bed where her daughter allegedly fell from, which was ""2 ½ to 3 feet off the floor." *Id*. The officer decided to remove Jasmine immediately given the two hospital visits, the mother's confusing explanations, and the relatively low distance from the bed to the floor, which the officer deemed unlikely to have caused a broken arm and leg. *Id*. The officer also wanted to remove Jasmine's five-year-old sister based on training he had received which indicated that where one child is subject to abuse and removed from the home the abuse often transfers to the remaining child. *Id*.

---

[30] The doctor's notes state that Jasmine had suffered a broken left femur, although the X-rays did not show a fracture.

at 1296. The social worker disagreed with the detective and refused to take custody of the older child because she did not exhibit any signs of abuse. *Id.*

The investigation continued, and ultimately CYFD decided to remove the older sister as well. *Id.* However, a few days later, the emergency room doctor notified CYFD that he had misdiagnosed Jasmine's condition, which he now said was due to a septic condition cause by a serious bacterial infection. *Id.* at 1297. He also stated that he no longer had any concern that Jasmine had been subject to abuse or neglect. *Id.* CYFD was initially unconvinced and retained custody of both children, until it reversed course a few weeks later, returning the children to their mother. *Id.*

The family brought suit alleging that the removal of the children without notice and a hearing violated their due process rights. The Defendants argued that they were entitled to qualified immunity and that there were " 'emergency circumstances which pose an immediate threat to the safety of the child,' *Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1245 (10th Cir.2003) (quoting *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997))." *Id.*

### The *Arredondo* Court Found No Constitutional Violation

The Court concluded that even in the light most favorable to Plaintiffs there were no genuine issues of material fact as to whether a constitutional violation had occurred. *Id.* at 1298. Notably, on the issues of reasonable suspicion and whether Defendants had time to secure a warrant prior to removal, the Court clarified:

> Under that standard, state officials must have " '*evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.*' " *Id.* (quoting *Hatch v. Dep't for Children, Youth & Their Families,* 274 F.3d 12, 20 (1st Cir.2001)). Although we give some consideration to "whether state officials might obtain judicial authorization of the removal without additional risk to the child," *id.* at 1130–31, *we take care not to make this factor the " 'single focus' of the inquiry,"* id. at 1130 (quoting *Doe v. Kearney,* 329 F.3d 1286, 1295 (11th Cir.2003)). Among the standards proposed by various courts

of appeals, we concluded, this standard best "balances the interests of the parents,
the child, and the state."

*Id*. (emphasis added).

The Tenth Circuit held that there had been no constitutional violation even though the
officials involved had disagreed as to whether a warrant could have been obtained prior to removal.
*Id.* at 1300-01 ("Taking into account 'all relevant circumstances,' one participant's opinion that a
court order could have been obtained is insufficient to show that the decision to remove Jasmine
from the home immediately falls short of the 'reasonable suspicion' standard."). Therefore, the
Court concluded that the available facts, regardless of conflicting opinions by state officials as to
the appropriate measures to take, supported that reasonable suspicion existed for the removal of
the children. *Id*. at 1299-1300 ("The fact that [the doctor's] diagnosis ultimately proved incorrect
does not render the Defendants' reliance on it unreasonable."). The Tenth Circuit divided its
analysis of Jasmine and her sister's removal, finding that the sister's removal was a "closer" call,
but nevertheless concluded that there was reasonable and articulable suspicion that both children
were in imminent danger of abuse. *Id*. at 1302. Having determined that no constitutional violation
was adequately demonstrated, the Court did not reach the second prong of qualified immunity as
to whether the law was clearly established.

### The Reasonable Suspicion Standard is Applicable under both the Fourth and Fourteenth Amendments

Although Plaintiffs fail to adequately set forth the applicable Fourth Amendment standard
under which they allege a constitutional violation, the Court finds the legal standards similar under
both the Fourteenth and Fourth Amendments.  " 'The key principle of the Fourth Amendment is
reasonableness....Depending on the circumstances, a seizure must be supported by an arrest
warrant, probable cause, or reasonable suspicion to detain and question an individual.'" " *Halley*

*v. Huckaby*, 902 F.3d 1136, 1145 (10th Cir. 2018), <u>cert. denied,</u> <u>Huckaby v. Halley</u>, 139 S. Ct. 1347, 203 L. Ed. 2d 570 (2019).

### The Halley Case

In *Halley*, a minor child was seized at school by police officers after the Oklahoma Department of Humans Services (DHS) received an anonymous call expressing concern for the child's safety due to his father's history of drug use and prior arrest record. *Halley v. Huckaby*, 902 F.3d at 1142. DHS designated the report as a low priority, which allowed for several days to respond to the call. *Id*. Ultimately, officials agreed that the child should be picked up at school and removed to a DHS safe house for an interview. *Id*. Although the child said that he did not want to leave school, he was removed by a police officer and interviewed in a DHS safehouse. *Id*. at 1143. The interview did not yield any evidence of abuse. *Id*. ("Left with only the uncorroborated and anonymous tip, DHS did not proceed any further."). The plaintiffs subsequently brought suit under 42 U.S.C. § 1983, claiming, in the relevant portion, unlawful seizure of the child without his parents' permission in violation of his Fourth Amendment rights. The district court denied summary judgment on the basis of qualified immunity and the defendants appealed.

In addressing the Fourth Amendment violation, the Tenth Circuit considered the plaintiffs' argument that there was no legal basis for the child's seizure because there was no reasonable ground for suspecting that he was in imminent danger.

### Constitutional Violation

Preliminarily, the Tenth Circuit noted that "The parties agree the Fourth Amendment required the officials in this case to have reasonable suspicion of imminent abuse in order to seize [the child]" *Id*. at 1146. Importantly, in an ensuing footnote, the Court discussed the parties' reliance upon *Gomes*:

> Some of the parties cite to *Gomes v. Wood*, 451 F.3d 1122, 1130 (10th Cir.2006), as the source of this standard, but *Gomes* is not a Fourth Amendment case. In *Gomes*, we held that *procedural due process* (not the Fourth Amendment) requires social workers to have "reasonable suspicion of an immediate threat to the safety of the child" in order to seize a child without judicial authorization. *Id.* at 1130; *see Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir.2006) (applying this rule). *But even though Gomes did not establish a Fourth Amendment rule, its holding hews close to Fourth Amendment doctrine, and is therefore instructive.*

*Id.* (emphasis added).

Upon review of the record, the Court affirmed denial of qualified immunity because the facts of the case did not support that a reasonable officer could find that the child was in imminent danger. *Id.* at 1145-46.

The Court continued, pointing out factual issues with the case:

> First, the phone call to DHS was anonymous and lacked detail. It is, of course, possible for an anonymous call to support a reasonable suspicion of an imminent threat. But the call here was too vague to do so. The caller did not say that [the child] was suffering abuse at the hands of his father, or that abuse was likely to happen soon. Instead, the caller only expressed concern because [the child's] father was a drug abuser who had been arrested for possessing drugs and a firearm. This was not enough for a reasonable officer to suspect [the child] was in imminent danger.

*Id.* at 1146.

### Clearly Established Law[31]

On the clearly established prong, the Court held that the relevant defendants failed to demonstrate that their conduct was objectively reasonable. *Id.* at 1151. Notably, the Court provided the caveat that, "Had the officials held an incorrect but objectively reasonable suspicion that [the child] was subject to an imminent threat, qualified immunity would apply. But in the absence of reasonable suspicion, we agree with the district court that a reasonable jury can find [Defendants] violated the Fourth Amendment." *Id.* at 1153.

---

[31] As Halley was decided after the events of the subject action, it cannot stand for clearly established law. The Court includes this brief discussion for background purposes only.

### Other Circuits Analyze claims under the Fourth and Fourteenth Amendments under the Same Reasonable Suspicion Standard

The Ninth Circuit has reached a similar conclusion on the appropriate standard. In *Keates v. Koile* (883 F.3d 1228, 1236–37 (9th Cir. 2018)), the Circuit Court explained the coalescence of the legal standard under the Fourteenth and Fourth Amendments for removal of children:

> Despite the different constitutional source of the right, we have held that "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children." *Wallis*, 202 F.3d at 1137 n.8.
>
> We have woven these constitutional threads into a discrete constitutional right in cases where state officials remove children from parents without consent or due process. Our cases hold that the Fourteenth, First, and Fourth Amendments provide a guarantee "that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107–09 (9th Cir. 2001). Officials may not remove children from their parents without a court order unless they have "information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (internal quotation marks omitted). Such "reasonable cause" arises, for example, where there is evidence of imminent abuse after sufficient investigation.

### The Lowthers Have not Demonstrated a Constitutional Violation

Firstly, the Court must consider whether the facts viewed in the light most favorable to the Lowthers, if true, support a constitutional violation, and determine whether there was reasonable suspicion of emergent circumstances posing immediate threat to the Lowther children warranting removal. *See Hollingsworth,* 110 F.3d at 739.  Although the *Gomes* Court indicated that there is no bright line definition of what constitutes "emergency circumstances," in *W.K. on behalf of A.K. v. Albuquerque Police Dep't Detective Daniel Howie* (2016 WL 9777158, at *6 (D.N.M. June 1, 2016)), the Court set forth that emergency circumstances "have been defined as 'instances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence.'

*Taylor v. Evans*, 72 F.Supp.2d 298, 307 (S.D.N.Y. 1999) (citing *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991))."  In this case, unlike *Gomes* or *Halley*, we conclude that the evidence available to CYFD and Morales at the time of the removal was sufficient to create reasonable suspicion that A.L. and W.L. had been abused or were in imminent danger of abuse.

### CYFD and Morales had Reasonable Suspicion Justifying Removal of the Lowther Children on August 30, 2017

Plaintiffs insist that the children were not in immediate danger or in danger of abuse because Dr. Lowther had already been detained in a patrol car and Mrs. Lowther was not accused of child abuse.  Plaintiffs largely rely upon *Roska* (328 F.3d at 1242), which provides:

> Unless the child is in imminent danger, there is no reason that it is impracticable to obtain a warrant before social workers remove a child from the home…. the interest of the government in protecting the child must be balanced against the interest of the parents in keeping the family together… Measured against this parental interest, the state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment."

In response, CYFD and Morales posit that the decision to remove the children was made by Wootton, not CYFD, and that, nevertheless, the information CYFD had at the time supported reasonable suspicion of an immediate threat to the children.

As previously discussed, the Court finds that Wootton, not Morales or CYFD, made the decision to remove the children on August 30, 2017, and is unconvinced by Plaintiffs' arguments. The germane question before the Court is not whether the Lowther children were actually in imminent danger of abuse, which Plaintiffs focus upon, but rather whether CYFD and Morales' conduct was justified by the facts at their disposal leading up to the removal. *See W.K. on behalf of A.K.*, 2016 WL 9777158, at *8.  As provided by *Gomes* and *Arredondo*, the Court utilizes a reasonable suspicion standard in making this determination.

Plaintiffs liken the instant action to *Roska* and claim the action is nothing like *Arredondo*. Plaintiffs assert that in *Roska*, there were no facts suggesting the child was in immediate danger although he was in the custody of his mother, who was the alleged abuser. Plaintiffs argue that if *Roska* did not justify removal pursuant to the law, then the instant action certainly does not. In seeking to differentiate *Arredondo*, Plaintiffs assert that, in that case, CYFD had "specific, articulable and objective evidence from referrals made by an emergency department" specifying the nature of the child's injuries and that the injuries to that child were "serious, and due to the young age of the child, there was no way to know whether mother may have been responsible for the injuries." **Doc. 122 at 26**. Thus, Plaintiffs contend that "*Roska* and *Arredondo* provide a clear path to deny qualified immunity based on the facts here where there is a total absence of articulable facts to suggest that the children were in any danger at the point in which the removal occurred." *Id*.  The Court disagrees.

In *Roska*, the Court took particular issue with the manner of warrantless entry and removal, holding that "Defendants took the time to seek the advice of an Assistant Utah Attorney General before proceeding with the removal; surely they could have taken the time to incur the minimal inconvenience involved in obtaining a warrant." *Roska,* 328 F.3d at 1242. This is dissimilar from the instant action, in which the investigation commenced shortly after receipt of the information. Furthermore, in Rusty's case, the Defendants were aware of doctors' suspicion that he was the victim of MSBP for quite some time and were told by Rusty's attending that it would be a mistake to remove him. *Id*. at 1240-41. The facts are therefore not analogous to the instant action. Here, there was no prior knowledge of the alleged abuse of the Lowther children; the report was designated an emergency; no physician familiar with the family situation advised against removal; and Mrs. Lowther appeared uncooperative and lied about her knowledge of firearms in the home.

Plaintiffs overemphasize the question of imminent danger in determining whether there were "emergency circumstances" warranting removal of children without consideration of other factors. As provided in *Arredondo*, in establishing whether reasonable suspicion justified removal of children from a home, state officials must have " 'evidence giving rise to a reasonable and articulable suspicion *that the child has been abused or is in imminent peril of abuse*.' " *Arredondo*, 462 F.3d at 1294. Based upon the evidence at their disposal at the time of the welfare check, the Court concludes that CYFD and Morales had articulable facts of abuse or imminent peril of abuse rising to the level of reasonable suspicion such that the immediate removal of the children was justified, excusing the need for a warrant or a pre-deprivation hearing.

Plaintiffs cite to "The New Mexico Child Safety Assessment" conducted by Morales to support their position that removal was unnecessary, because it identifies Mrs. Lowther as having a protective capacity. **Doc. 106-1 Ex. S**. However, the assessment was completed subsequent to the removal, and the form also includes that Mrs. Lowther does not recognize threats; cannot articulate a plan sufficient to protect the children; the caregiver(s) will not provide supervision necessary to protected the children from present or impending danger of serious harm; the children are fearful of being harmed by people frequenting the home; and sexual abuse/exploitation is suspected and circumstances suggest that the children may be in present or impending danger of serious harm. *Id*.

 On balance, the facts at hand weigh in favor of finding reasonable suspicion for removal of the Lowther children. CYFD and Morales were provided with information containing serious allegations of ongoing sexual abuse of A.L. by her father, including that "this happens all the time". This information was provided to CYFD by A.L.'s teacher, DuBoise, who had spoken directly

with A.L., when she articulated the alleged abuse both verbally and with physical hand gestures[32]. Upon receipt of the information, the report was designated as an emergency by the relevant CYFD intake official. Despite Plaintiffs' misplaced insistence that there "is not even a scintilla of evidence to support the removal of W.L.", the report included that A.L had stated that her brother W.L. touched her as well and that he was also subject to abuse by Dr. Lowther. Moreover, the Court concludes that the Lowthers' conduct during the welfare check also supports a finding of reasonable suspicion.

### The Lowther's Conduct Objectively Supports Reasonable Suspicion

Plaintiffs have suggested that the most compelling evidence may be the BSCO officers' belt tape audio. The Court agrees but finds that this evidence favors CYFD and Morales. Upon the officers' arrival at the Lowther residence, Mrs. Lowther answered the door while on the phone with Dr. Lowther. From the outset, Mrs. Lowther relayed to her husband everything that the officers were telling her. Among other things, she told to her husband "I don't know what to do here," after which, at least initially, she denied the officers access and attempted to close the door. She also instructed the children to go to their rooms.[33] She remained on the phone throughout the encounter up until Dr. Lowther's arrival. During the interaction, Mrs. Lowther informed the officers that her duty was to her husband. When he arrived, Dr. Lowther told the officers that he would not permit anyone into the home. Notably, Mrs. Lowther also lied to the officers regarding her knowledge of weapons or firearms in the residence.

---

[32] For the sake of brevity, the Court will not repeat the totality of the allegations as they have previously been outlined sufficiently in the factual background section of this Memorandum.

[33] In her First Declaration (Doc. 81-1 Ex. 3 ¶ 14), Mrs. Lowther claims that she instructed the children to go to their rooms because of the difficulty of focusing on the officers with the children speaking in the background. The Court notes that, even if reasonable, Mrs. Lowther's subjective explanation and reasoning is not relevant to determining whether Morales (and CYFD), when presented with this information, took objectively reasonable action.

Morales briefed the officers and later, Wootton, upon his arrival. When Wootton interviewed Mrs. Lowther in the presence of Morales, Mrs. Lowther informed him that she originally denied entry to the officers "because he [her husband] told me not to." When Wootton sought to confirm whether Mrs. Lowther had been made aware of the law relating to NMSA 1978 § 30-6-4, she initially said that she could not have known. However, officers correctly stated to her that they had informed her of the law.  Confronted with the aforementioned behavior, and with the information provided to him by the officers and Morales, it is not unreasonable that Wootton believed Mrs. Lowther was uncooperative and subject to Dr. Lowther's control. ***See* Doc. 106-1 Ex. K Declaration of Detective Jacob Wootton ¶ 21**.  Plaintiffs have disregarded the fact that while Mrs. Lowther was not accused of abuse, she was being investigated for lack of supervision. Plaintiffs reliance upon Mrs. Lowther's Declarations to explain her conduct, containing subjective explanations after the fact, are irrelevant to assessing Defendants' conduct at the time of removal under the reasonable suspicion standard.

Finally, the Court notes that the failure to seek a warrant prior to deciding to remove the children is not dispositive. While the Court does consider whether a warrant might have been obtained prior to removal, and while a warrant is certainly desirable, this is but one factor the Courts consider and is neither the sole nor penultimate one. *Arredondo*, 462 F.3d at 1298.  Based on the totality of the circumstances, the Court concludes that Plaintiffs have failed to show that CYFD and Morales' actions were objectively unreasonable or without reasonable suspicion. Accordingly, CYFD and Morales' motion for summary judgment as to Count V, under both the Fourth and Fourteenth Amendments, on the basis of  qualified immunity, is granted.

### **Plaintiffs have not cited to Clearly Established Law**

Even assuming, *arguendo*, that Plaintiffs successfully demonstrated a constitutional violation, their claim fails under the second prong of qualified immunity as to whether the law was clearly established.  Under the second prong, we consider whether a reasonable official in these circumstances would understand that the action taken violated Plaintiffs' rights.  As advanced in *Gomes*, " '[T]he salient question ... is whether the state of the law [at the time of the incident] gave the [defendants] fair warning that their conduct was unconstitutional.' *Hope,* 536 U.S. at 741, 122 S.Ct. 2508. Officials who are mistaken about the lawfulness of their conduct may still be entitled to qualified immunity if the mistake is reasonable in light of the applicable law and the facts known to them at the time. *Axson–Flynn v. Johnson,* 356 F.3d 1277, 1300 (10th Cir.2004)." *Gomes*, 451 F.3d at 1136.

With respect to the Fourteenth Amendment Plaintiffs accurately cite to *Malik v. Arapahoe County Dept. of Soc. Services*, 191 F.3d 1306, 1315 (10th Cir. 1999) to show the law is clearly established law that, "except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures. *See Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Spielman v. Hildebrand,* 873 F.2d 1377, 1385 (10th Cir.1989) (holding removal of children from parental custody requires pre-deprivation notice and a hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event")." "Accordingly, the state's interest in the health and welfare of its children constrains a parent's liberty interest in the custody, care, and management of [his or her] children. Thus, in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order." *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). While this is clearly established law,

and is cited in Plaintiffs' other proffered cases, the facts of the instant action bring it within the ambit of the emergency circumstances exception articulated in those same cases, which excuses a court order or pre-deprivation hearing.

Notably, in *Gomes*, the Court provided that qualified immunity should be granted in circumstances whereby, " '… officers of reasonable competence could disagree' about the lawfulness of the challenged conduct, then '[qualified] immunity should be recognized.' *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986). In those instances, the fact that the uncontroverted evidence supports opposite legal conclusions as to the reasonableness of an official's conduct demonstrates that the official has not violated clearly established law." *Id*. Applying the law to the facts here, officials of reasonable competence could disagree as to whether emergency circumstances existed justifying the immediate removal of the Lowther children, which supports granting qualified immunity.

### Reliance Upon State Statute

CYFD and Morales proffer the secondary argument that the Court should evaluate relevant New Mexico state statutes and regulations in determining the objective reasonableness of their conduct and the constitutionality of removal of the Lowther children, which they claim weighs in favor of granting qualified immunity. **Doc. 106 at 16.** Plaintiffs argue that, while this is generally true, CYFD and Morales failed to adhere to the statutory law thereby vitiating their position. **Doc. 122 at 31-32**.

"In considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question. Of course, an officer's reliance on an authorizing statute does not render the conduct per se reasonable." *Roska*, 328 F.3d at 1251–52 (citations

omitted). "[I]n considering the relevance of a statute under a qualified-immunity analysis, the appropriate inquiry is not whether a reasonable state officer could have concluded that the statute authorized the unconstitutional conduct in question. Rather, a court must consider whether reliance on the statute rendered the officer's conduct "objectively reasonable," considering such factors as: (1) the degree of specificity with which the statute authorized the conduct in question; (2) whether the officer in fact complied with the statute; (3) whether the statute has fallen into desuetude; and (4) whether the officer could have reasonably concluded that the statute was constitutional." *Id*. at 1253.

### **The New Mexico Abuse and Neglect Act**

The New Mexico Abuse and Neglect Act (NMSA 1978 § 32A-4-1 *et seq.*,) ("The Act") governs reporting child abuse and the relevant investigatory procedures. The Act provides:

> [E]very person, including. . . a school teacher; a school official; a social worker acting in an official capacity. . .who knows or has a reasonable suspicion that a child is an abused or neglected child shall report the matter immediately to: (1) a local law enforcement agency; (2) the department. . .The recipient of a of a report . . . . shall take immediate steps to ensure prompt investigation of the report. The investigation shall ensure that immediate steps are taken to protect the health or welfare of the alleged abused or neglected child, as well as that of any other child under the same care who may be in danger of abuse or neglect.

NMSA 1978, § 32A-4-3(A), (C).

The Act describes circumstances when a child may be taken into custody by the department:

> A. A child may be held or taken into custody:
> (1) by a law enforcement officer when the officer has evidence giving rise to reasonable grounds to believe that the child is abused or neglected and that there is an immediate threat to the child's safety; provided that the law enforcement officer contacts the department to enable the department to conduct an on-site safety assessment to determine whether it is appropriate to take the child into immediate custody, except that a child may be taken into custody by a law enforcement officer without a protective services assessment being conducted if:
> (a) the child's parent, guardian or custodian has attempted, conspired to cause or caused great bodily harm to the child or great bodily harm or death to the child's sibling; … or

43

(f) the child is in imminent risk of abuse[.]

*Id*. at § 32A-4-6.

The Act next instructs the social services department how to proceed when a child is taken

into custody:

> B. When an alleged neglected or abused child is delivered to the department, a
> department caseworker shall review the need for placing the child in custody and
> shall release the child from custody unless custody is appropriate or has been
> ordered by the court.…
> D. Reasonable efforts shall be made to prevent or eliminate the need for removing
> the child from the child's home, with the paramount concern being the child's health
> and safety. In all cases when a child is taken into custody, the child shall be released
> to the child's parent, guardian or custodian, unless the department files a petition
> within two days from the date that the child was taken into custody.

NMSA 1978 § 32A-4-7.

"This 'need' for removal from custody is similar in nature to the 'reasonable suspicion' standard

adopted by the Tenth Circuit in *Gomes v. Wood*, 451 F.2d. at 1129." *W.K. on behalf of A.K. v.*

*Albuquerque Police Dep't Detective Daniel Howie*, 2016 WL 9777158, at *8.

### New Mexico Administrative Code: 8.10.3 Protective Services Investigation (et seq.)

CYFD and Morales aver that their conduct was sanctioned by The Act, and that in

evaluating the need to remove the Lowther children, CYFD acted in accordance with the New

Mexico Administrative Code ("The Code") governing CYFD investigations. The Code

emphasizes that "The safety of the child is the overriding concern throughout the casework

relationship with the family. If the safety of the child is ever in conflict with the preservation of a

family unit, the child's need for protection always takes precedence. PSD [protective services

division] shall request immediate assistance from law enforcement if necessary to assess and

secure the safety of the child." NMAC § 8.10.3.10 (A).

Pursuant to The Code, the requisite procedure for investigating child abuse and neglect is as follows: 1) When CYFD receives a report alleging child abuse or neglect, intake services must first determine whether the report falls within the defined parameters of abuse or neglect and whether an investigation is warranted (NMAC § 8.10.2.8); (2) intake services gathers information from the party reporting the abuse, including from those wishing to remain anonymous, to conduct a screening process and assign a priority level to the report (NMAC § 8.10.2.13), which is then reviewed by a supervisor prior to assigning a caseworker (§ 8.10.2.10); and (3) CYFD shall cross-report all reports to the appropriate law enforcement agency (§ 8.10.2.10 (A)). The level of priority assigned to the report determines the time period in which CYFD must initiate "face-to-face" contact with the alleged victim. "An emergency report requires than an investigation be initiated within three hours of the SCI supervisor's screening decision." (§ 8.10.3.9 (B) (1)). Finally, while instructing that "[CYFD] shall make reasonable efforts to maintain the family unit and prevent the removal of a child from his or her home, as long as the child's safety is assured," The Code provides that "When a law enforcement agency seeks to place a child in the custody of [protective services division], then the [protective services division] worker shall obtain a statement of reasonable grounds for temporary protective services division custody from the law enforcement officer making the request. (§ 8.10.3.16 (A), (G)).

CYFD and Morales claim that these statutory regulations sanctioned the manner in which they conducted the investigatory process and implemented the removal of the Lowther children. Plaintiffs contend that the existence of and compliance with state statutes is not relevant to determining whether a federal constitutional law is established but concede that it may be a factor in judging whether a state actor's actions were objectively reasonable. They further aver that there

45

are no statutes authorizing CYFD and Morales' actions and claim that they did not comply with the statutes and regulations which they identified as authorizing their conduct.

In support of their arguments, Plaintiffs proffer a series of quotes they purport are regulations contained in NMAC § 8.10.3, which they allege CYFD and Morales violated. *See* **Doc. 122 at 32**.  The Court has extensively reviewed the NMAC and researched the citations upon which Plaintiffs rely. However, these are not within the Code or any other regulation the Court could identify. The Court was able to locate one of Plaintiffs' quotes within a 2016 Request for Proposal, CYFD Manual (RFP# 16-690-16-13379), but this is not an administrative regulation.

Reviewing the facts in the light most favorable to Plaintiffs, Morales received a report alleging sexual abuse of the Lowther children. The report was screened by intake services and designated an emergency report by a supervisor.  In accordance with statutory regulations, Morales cross-reported the report to the appropriate law enforcement agency, BSCO, and spoke with A.L.'s teacher to corroborate the content.  Morales and the officers, within the time frame proscribed by statute for an emergency report, went to the Lowther household to initiate face-to-face contact with the alleged victims. As the Court has previously detailed, based upon what transpired upon arrival at the Lowther residence, Wootton decided to remove the children on a 48-hour hold.  Plaintiffs have failed to substantiate their arguments that Morales and CYFD violated state regulations by citing to actual administrative codes. The Court has considered the factors advanced in *Roska*, and holds that (1) there is sufficient specificity within the foregoing statutory authority authorizing CYFD and Morales' conduct; (2) CYFD and Morales in fact complied with the statute; (3) there is no evidence that the statute has fallen into desuetude; and (4) CYFD and Morales could have reasonably concluded that the statute was constitutional. *Roska*, 328 F.3d at 1253.  Accordingly,

the Court concludes that CYFD and Morales' actions on August 30, 2017 were in keeping with relevant statutory authority.

## II.   **Plaintiffs' Fed. R. Civ. P. 56(d) Declaration**

Plaintiffs included a Rule 56(d) declaration attached as Exhibit 1 to their response to CYFD Defendants' motion for summary judgment.  Rule 56(d) provides:

> [I]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Normally, a Rule 56(d) request is treated liberally. *Lewis v. City of Ft. Collins*, 903 F.2d 752, 758 (10th Cir. 1990). However, where the summary judgment motion is grounded in the defense of qualified immunity, the Court's otherwise broad discretion under Rule 56(d) is circumscribed. *Lewis v. City of Ft. Collins*, 903 F.2d at 758; *see also Martin v. Cty. of Santa Fe*, 626 Fed.Appx. 736, 740 (10th Cir. 2015) ("Because the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved *prior to discovery*, there is a strong policy justification for staying discovery and for refusing requests for additional discovery once a defendant invokes qualified immunity as a defense." (citation omitted)). The burden is on the nonmovant to show that the additional discovery is necessary. *Martin v. Cty. of Santa Fe*, 626 Fed. Appx. at 740.

A party requesting additional discovery under Rule 56(d) "must specify (1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (alteration in original) (quotations omitted). When the summary judgment motion

47

is based on qualified immunity, the non-movant's Rule 56(d) affidavit must also "demonstrate a connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion." *Lewis v. City of Ft. Collins*, 903 F.2d at 754 (alteration in original) (quotations omitted).

Plaintiffs assert that they have been prejudiced by the order staying discovery pending resolution of Defendants' motions regarding qualified immunity. Plaintiffs claim they have been prohibited from discovering facts relating to the following:

> The (1) factual basis for the removals of the Lowther children on 8/30 and 9/6 other than that which is documented in CYFD's files via Morales' affidavit and case notes; (2) the conversation that allegedly took place between Morales, her supervisors and law enforcement, (3) the facts known to and the evaluative process taken by Morales, other CYFD personnel and Wootton at the time of the removals, (4) respective characterization by Morales and Miles that Mrs. Lowther and Mr. Borg were "uncooperative", (5) and to what degree CYFD individuals and Wootton personally participated in the determination precipitating the 48-hour holds on the children.

*See* **Doc. 122-1 Ex. 1**.

**<u>The Court Denies the 56 (d) Motion with respect to the removal on August 30, 2017</u>**

Plaintiffs fail to follow the requisite steps pursuant to the Rule to demonstrate that additional discovery is warranted with respect to the removal on August 30, 2017. Plaintiffs have not delineated the probable facts available, what steps have been taken to obtain those facts, or how more time allowed will them to obtain facts to rebut the summary judgment motion. In the response to CYFD Defendants' motion for summary judgment as well as in Plaintiffs' prior cross motion for summary judgment, Plaintiffs stated that all the material facts necessary to render a substantive determination were included in the audio belt tapes and Wootton and Morales' Declarations, which were "incontrovertible." Having examined the record and undisputed facts, even in the light most favorable to Plaintiffs, the Court concludes that summary judgment should

be granted as to Defendants on Count V.  Therefore, the Court denies Plaintiffs' 56(d) motion with respect to this count.

### The Court Grants Plaintiffs' 56(d) Motion with respect to Count VI for the removal on September 6, 2017

Count VI presents a closer question for the Court, where Plaintiffs allege violations of the Fourth and Fourteenth Amendment against CYFD Defendants for the second removal of the Lowther children on September 6, 2017, following Mr. Borg's outburst at Dr. Lowther's hearing.

Generally, "Once the qualified immunity defense has been raised, the Court must not let a plaintiff use discovery as a fishing expedition to flesh out the merits of his claim." *Martin v. City of Albuquerque*, 219 F. Supp. 3d 1081, 1090–91 (D.N.M. 2015).  Nevertheless, "qualified immunity does not shield government officials from all discovery but only from discovery which is either avoidable or overly broad. *Garrett v. Stratman,* 254 F.3d at 953 (alterations omitted)(internal quotation marks omitted)(quoting *Maxey v. Fulton,* 890 F.2d at 282). 'Thus, where the claim turns at least partially on a factual question for which the district court needs more facts to answer, courts should allow discovery, but limit the discovery to allow the plaintiff to uncover only the necessary facts to decide the immunity claim.' *Herrera v. Santa Fe Pub. Sch.,* 2012 WL 6846393, at *8." *Martin v. City of Albuquerque*, 219 F. Supp. 3d 1081, 1090–91 (D.N.M. 2015).

Pursuant to NMSA 1978 § 32A-4-7 (D):

> *Reasonable efforts shall be made to prevent or eliminate the need for removing the child from the child's home*, with the paramount concern being the child's health and safety. In all cases when a child is taken into custody, the child shall be released to the child's parent, guardian or custodian, unless the department files a petition within two days from the date that the child was taken into custody. (emphasis added).

CYFD Defendants claim that following Mr. Borg's reaction to Dr. Lowther's hearing and his interaction with IHS clinician Miles, where he allegedly angrily expressed disbelief of the accusations against his son in law, CYFD became concerned about the ability and willingness of the maternal grandparents and Mrs. Lowther to protect the children and keep them from their father. CYFD Defendants assert that, "During a meeting with the In-Home Services caseworker and supervisor, along with Ms. Morales and her supervisor, CYFD determined that the safety plan was no longer effective to protect the children from abuse and/or neglect." **Doc. 106 at 7, UMF 39**. CYFD Defendants state that Wootton was contacted following this determination, and he decided to take the children into custody after executing a "Statement of Reasonable Grounds for Temporary Custody." ***Id***. **at UMF 40**. However, viewing the facts in the light most favorable to Plaintiffs: Mrs. Lowther was not present at the hearing when Mr. Borg angrily expressed his opinion that the allegations against his son in law were without merit; Mrs. Lowther was not provided with an opportunity to discuss the situation or CYFD's concerns afterwards, before the children were removed; there had been no allegations that Mrs. Lowther or the Borgs violated the safety plan in the days prior to the removal; Mrs. Lowther had not refused, as CYFD alleged, to identify other prospective friends or family members willing to serve as alternative safety monitors; and Mrs. Lowther had previously included local family friends Jeff Williams and Aimee Rivera on her family tree during the family-centered-meeting on September 1, 2017, who may have been used as alternate safety monitors.

As stated by the Tenth Circuit in "*Roska II*" (437 F.3d 964, 972 (10th Cir. 2006)), regarding provisions similar to NMSA 1978 § 32A-4-7 (D), these statutory prescriptions are not "a mere technicality." Even if Mr. Borg did not believe the allegations it does not necessarily follow as a

matter of course that he, Mrs. Borg or Mrs. Lowther would not adhere to the requirements presented by CYFD as a safety monitor.

Based upon the record as provided, which does not include details regarding the scope of CYFD's discussion during its meeting on September 6, 2017 prior to deciding to remove the children; what, if any, alternative, preventive efforts were considered; or the extent of Wootton's involvement in the determination to remove the children, the Court feels that it lacks sufficient evidence to render a qualified immunity determination. Accordingly, the Court grants Plaintiffs' 56 (d) motion and will permit limited discovery into these matters solely to the extent that they relate to the removal of the Lowther children on September 6, 2017.

## CONCLUSION

The Court acknowledges that "[s]ocial workers face extreme difficulties in trying simultaneously to help preserve families and to serve the child's best interests." *Martinez v. Mafchir,* 35 F.3d 1486, 1490 (10th Cir.1994). When confronted with evidence of child abuse, they may be required to make "on-the-spot judgments on the basis of limited and often conflicting information." *Gomes*, 451 F.3d at 1138. Generally, "considerable deference should be given to the judgment of responsible government officials in acting to protect children from perceived imminent danger or abuse." *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997). Considering the information at their disposal, CYFD, Morales (and Wootton) had reasonably articulable evidence that A.L. and W.L. had been abused or were in imminent danger of abuse justifying removal on August 30, 2017. Therefore, CYFD and Morales are entitled to qualified immunity under Count V. The Court defers its determination with respect to the removal on September 6, 2017, as the Court requires further information before deciding the question of

qualified immunity. *See Martin v. City of Albuquerque*, 219 F. Supp. 3d 1081, 1090 (D.N.M. 2015).

**IT IS THEREFORE ORDERED** that CYFD Defendants' Motion for Summary Judgment (**Doc. 106**), is **GRANTED IN PART** with respect to Count V and **DEFERRED** as to Count VI.

**IT IS SO ORDERED.**

_____

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE