## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

ADAM LOWTHER and JESSICA LOWTHER
on behalf of themselves and as next friends
to their minor children, W.L and A.L.,

      Plaintiffs,

vs.                                                                    Case No. 1:18-cv-00868-KWR-JFR

CHILDREN YOUTH AND FAMILIES DEPARTMENT,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
MARIA MORALES, in her personal capacity acting under
color of state law, JACOB WOOTTON, in his personal
capacity acting under color of state law, CATHERINE SMALLS,
in her personal capacity acting under color of state law,
BRIAN THORNTON, in his personal capacity acting under color
of state law, and MARTIN LOZANO, in his personal capacity
acting under color of state law,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court upon Defendants' CYFD and Maria Morales

Motion to Dismiss, or in the alternative, Motion for Summary Judgment based on Collateral

Estoppel, filed on February 14, 2020. **Doc. 138**.  Having reviewed the parties' pleadings and the

applicable law, the Court finds that Defendants' motion is **NOT WELL-TAKEN** and, therefore,

is **DENIED**.

## BACKGROUND

This case arises from an investigation of alleged child abuse at Plaintiffs' home.  Plaintiffs

claim that Defendants violated their Fourth and Fourteenth Amendment rights by unlawfully

removing the Lowther children, A.L. and W.L., on August 30, 2017 during a child welfare check and again on September 6, 2017.

Plaintiffs filed this case under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following claims against the Defendants[1]:

Count I:  Fourth Amendment (Unlawful Seizure and Arrest of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count II:  Fourth Amendment (in the alternative to Count I) (Unlawful Detention of Dr. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count III:  Fourth Amendment (Unlawful Detention of Mrs. Lowther) (Defendants Wootton, Small, Thornton, and Lozano);

Count IV:  Fourth Amendment (Unlawful Entry into the Lowther Home) (Defendants CYFD, Morales, Wootton, Small, Thornton, and Lozano);

Count V: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Wootton);

Count VI:  Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendants CYFD, Morales, and Miles);

Count VII: Fourth and Fourteenth Amendments (Illegal Arrest, Entry, and Seizures) (Defendant BSCO);

Count VIII: Fourth and Fourteenth Amendments (Illegal Seizure of the Lowther Children) (Defendant CYFD);

Count IX: First Amendment (Retaliation against Mrs. Lowther) (Defendant Wootton);

Count X: NMTCA (False Arrest and Imprisonment of Dr. Lowther) (Defendant BSCO);

Count XI: NMTCA (False Arrest and Imprisonment of Mrs. Lowther) (Defendant BSCO);

Count XII: NMTCA (False Arrest and Imprisonment of the Lowther children) (Defendant BSCO);

Count XIII: NMTCA (Defamation of Dr. Lowther) (Defendant BSCO).

---

[1] The following reflects the claims as provided in Plaintiffs' Amended Complaint, Doc. 166, filed April 22, 2020.

This Memorandum addresses Defendants' Children Youth and Family Department (CYFD), Maria Morales (Morales) (collectively "CYFD Defendants") motion to dismiss, alternatively, for summary judgment based on collateral estoppel on Plaintiffs' remaining claims, Counts IV and VIII.[2]

## LEGAL STANDARD

Rule 12(b)(6) permits the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive a motion to dismiss, the complaint must have sufficient factual matter that if true, states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). As such, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). All well-pleaded factual allegations are "viewed in the light most favorable to the nonmoving party." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014). In ruling on a motion to dismiss, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555.

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully. *Id.*

---

[2] Pursuant to Plaintiffs' Amended Complaint (Doc. 166) Defendant Andrea Miles was added to the Complaint. There has been no indication from Defendants of their intent to include Miles within this Motion and thus she will not be considered.

(citing *Twombly*, 550 U.S. at 556); see also *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."). "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). The degree of specificity "depends on context". *Id*. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### Summary Judgment Standard

A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co*., 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

### UNDISPUTED MATERIAL FACTS[34]

Both parties rely upon the belt tape audio content recorded by Bernalillo County Sheriff's Department's (BSCO) officers at the Lowther residence. For the purposes of the instant motion, the Court has incorporated the facts set forth by the audio, taking into consideration the parties' disputes regarding the accuracy, materiality or characterization of the content.[5]

### **Factual Background**

---

[3] The facts set forth in this section are undisputed unless otherwise noted. Also, references to supporting exhibits are included in the briefs and for ease of reading, are largely omitted here.

[4] Plaintiffs refer the Court to "undisputed material facts" set forth in their prior cross motion for summary judgment (Doc. 81) and rely upon those facts and exhibits cited therein to support their position here. Accordingly, the Court has included relevant facts from its Memorandum and Opinion Orders relating to that document.

[5] To the extent a party's statement of facts do not contain citations to the record, the Court disregards them. *See* Fed. R. Civ. P. 56(c)(3) ("*Materials not cited.* The Court need consider only the cited materials, but it may consider other materials in the record."). Additionally, the Court may disregard a party's version of the facts which are clearly unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

In 2017, the Lowther household had two children, A.L. and W.L., ages four and seven respectively.  A.L.'s kindergarten teacher was Betty DuBoise (DuBoise).  On August 30, 2017, at approximately 2:00 p.m., DuBoise anonymously called CYFD and informed an intake worker of her suspicion that A.L. was being sexually abused by Dr. Lowther. CYFD's intake report highlighted the information DuBoise disclosed regarding A.L.'s behavior and what she had told DuBoise, which formed the basis of her concerns. In the pertinent part, the report states:

> On 8.25.2017 Source spoke with Adam about behaviors that [A.L.] had been displaying in class. [A.L.] has been touching her private area and hiking up her dress. Adam stated that they have been working with her and that she gets it from watching her 7 year old brother touch himself while sucking his thumb.
> On 8.29.2017 Source spoke with Jessica about the behaviors [A.L.] has been displaying. Jessica stated that [A.L.] has been having a hard time and that she would talk with her….
> On 8.30.2017 [A.L.] told a male student that he had a penis. Source redirected the children. Source asked [A.L.] how she knew the word. [A.L.] says Adam puts her on his lap when he goes to the bathroom and likes to move her up and down like a horsey. Adam sleeps with her and kisses her on the lips with tongue. Adam touches her on her bottom and puts his finger inside of her. She was able to demonstrate the movement with her hands and fingers. [A.L.] relayed that her brother kisses her with tongue and that her brother touches her as well. [A.L.] said Adam also touches her brother but did not give any detail. [A.L.] stated that this happens all the time. Source asked [A.L.] if she had told Jessica. [A.L.] said Adam told her not to and that it was their secret. Adam told her that Jessica would get mad. Source tried to encourage [A.L.] to speak with Jessica and [A.L.] said Jessica would yell. [A.L] has been demonstrating some behaviors in class since the start of school. She is not listening, talking back, she spit at another girl and has been aggressive toward other children.

**Doc. 106-1 Ex. A.**

Initially, Plaintiffs dispute that the report is accurate or material to the Court's determination and argue that there is no evidence within it indicating that W.L. had allegedly been abused. The Court disagrees with both contentions. Among other things, the report specifies that "[A.L.] relayed that her brother kisses her with tongue and that her brother touches her as well. [A.L.] said Adam also touches her brother but did not give any detail. [A.L.] stated that this

happens all the time." Additionally, contrary to Plaintiffs' assertion, the report designated W.L., referred to as "Child Lowther" in the report, with the code "AV," meaning "alleged victim." *Id*. The intake report included a Supervisor Narration stating "Emergency. Child made vivid, detailed disclosures alleging abuse by the father toward the children. Mother is allegedly unaware."[6]

At 3:45 p.m. on the same day, CYFD investigator Morales contacted DuBoise to confirm the content of the intake report. Plaintiffs contest this fact, again claiming that there could be no corroboration as to W.L. since it was not alleged that he was abused, he attended a different school, and that due to the Court ordered stay on discovery they lack sufficient knowledge to determine the content of their discussion. However, the Court finds these facts well supported by the record.[7]

### Initial Contact with the Lowther Household

On August 30, 2017, approximately an hour after receiving the initial report., Morales contacted BSCO to report the allegations and to request assistance in conducting a welfare check of the Lowther children. Around 3:50 p.m., BSCO dispatched Deputies Small, Thornton, and Lozano to the Lowther residence to conduct a welfare check. The officers arrived at the Lowther home around 4:05 p.m., where they met Morales and were provided with more detail regarding the nature of the allegations.

The deputies knocked on the door and initiated contact with Mrs. Lowther at approximately 4:19 p.m. Mrs. Lowther was already on the phone with Dr. Lowther when the police arrived and contemporaneously relayed to him the information she was receiving from the officers.[8] The officers informed her that they were there to conduct a welfare check on the Lowther children

---

[6] Plaintiffs dispute that the report was assigned emergency status as to W.L. and claim they are unable to conduct needed discovery on CYFD's decision to classify the situation as emergency.

[7] The exhibits which Plaintiffs contest the validity of here are the same as those which Plaintiffs stated were "incontrovertible" for the purposes of their cross motion for summary judgment with respect to other named Defendants in this action. *See* Doc. 81 at 3.

[8] The interaction is captured by the officers' various belt tapes. What follows describes Mrs. Lowther's interactions with the officers prior to her husband's arrival.

because "somebody called and wanted to remain anonymous that they were worried [about the children]."

Mrs. Lowther told the deputies they were not allowed in the house until her husband arrived. In response, Thornton told her, "So in State of New Mexico, and we're conducting a check on children, if you deny us access you can be arrested." Mrs. Lowther continued to relay this information to her husband, stating "I don't know what to do here…I don't understand what is going on." She then informed the officers that her husband was on his way and that they would need to remain outside the house until he arrived. Mrs. Lowther also instructed the children to go to their rooms. The deputies acknowledged that waiting for Dr. Lowther was "fine" but instructed her that she could not close the door, which she again relayed to her husband.

Thornton offered to explain in detail to Mrs. Lowther "what is going on" if she would hang up the phone, but she declined to do so. Thornton responded that in that case he would wait for Dr. Lowther to arrive, but nevertheless did explain in general terms that CYFD received a call from school and had come to the home with the deputies.

### Dr. Lowther's Arrival at the Residence

At approximately 4:41 p.m. Detective Wootton was dispatched to the Lowther residence to lead the investigation. Before arriving, Wootton instructed the officers to detain Dr. Lowther when he reached the home. Dr. Lowther arrived at the residence at 4:42 p.m., where he was met outside the house by Thornton who explained that the deputies were responding to an anonymous call regarding concern for the welfare of the Lowther children. Dr. Lowther was not permitted to enter the residence.

After some discussion between Thornton and Dr. Lowther, Morales spoke with Dr. Lowther, briefly explained that there were allegations of child abuse without indicating against

whom, provided him with a Parents' Guide detailing, among other things, the process if the children were to be taken into CYFD custody, Dr. Lowther's rights to file a complaint against her, and told him she would provide more detail once the Detective (Wootton) arrived.

Dr. Lowther informed Thornton that he was "not going to let anybody into the house." Thornton responded, "ok so if that is your choice that is fine, I will have to detain you at that point," explaining that refusing to allow access was obstruction of a child welfare investigation. Thornton indicated he would show Dr. Lowther the relevant law and then placed Dr. Lowther in the back of his patrol car. Thornton then told Dr. Lowther that the complaint was against him specifically. He also took Dr. Lowther's phones due to concerns that there could be evidence on them and went on to explain that NMSA 1978 § 30-6-4 permitted officers to check on children welfare.  He later asked Dr. Lowther whether there were any firearms in the home and told him that he appreciated that Dr. Lowther was cooperating.

**The Deputies' Continuing Interaction with Mrs. Lowther**

While Dr. Lowther was outside, Small and other deputies continued to speak with Mrs. Lowther at the front door.  They explained to her that they were at the home because of "very descriptive" statements A.L. had made to someone at school.  They also told Mrs. Lowther that a detective was on the way to the residence.  Mrs. Lowther expressed incredulity that this could be happening based on something a four-year-old had said.

Upon Mrs. Lowther's inquiry as to what was happening with her husband, she was told that Dr. Lowther was being detained but was not under arrest.  Mrs. Lowther asked what A.L. had said, and one deputy told her that even he did not know.  Mrs. Lowther asked, "at what point is the information going to flow?" The deputies explained that more information would be forthcoming once a child therapist had spoken with A.L.  In the ensuing discussion, Mrs. Lowther expressed

that A.L. "was not unsafe" at which time a deputy told her that if it was his investigation, she would already be in handcuffs in the back of a police car because she was obstructing the officers' duty to check on the welfare of a child and that she "might want to consider [her] actions."  Mrs. Lowther responded that her "duty was to her husband..."[9]

Following this interaction, Small informed Mrs. Lowther twice that medical personnel would check on the children and that she could either allow them access or be detained.  Mrs. Lowther asked whether the child therapist had arrived. Thornton explained that A.L. would be transported to a safehouse to be interviewed. Mrs. Lowther questioned whether that meant the deputies were going to take A.L., to which an officer replied that no decisions had been made, but that eventually A.L. would be interviewed in a safehouse.  After this exchange Mrs. Lowther allowed the deputies to enter the home and initiate contact with the children.  Plaintiffs admit that contact was established with the children but claim that the document upon which CYFD Defendants' rely, Morales' Case Notes (Ex. H), inaccurately portrays events as they unfolded. Specifically, Plaintiffs dispute Morales' description of her initial contact with Mrs. Lowther that "[Mrs. Lowther] stated that she was on the phone with [Dr. Lowther]. I introduced myself and stated that I was there to ensure the safety of her children and needed seeing her children, I read to her the Parents guide and explained her rights. She refused to allow us to see the children." Plaintiffs argue that this portrayal of events is rebutted by the belt tape audio which shows that Morales remained silent prior to CYFD and BSCO's entry into the home. The Court acknowledges that Morales cannot be heard speaking throughout the initial interaction with Mrs. Lowther, and her case notes are belied by the audio of Wootton's interview of Mrs. Lowther where Morales states that she has yet to inform Mrs. Lowther why she is present.

---

[9] The Court notes that Mrs. Lowther was cut off by the officer prior to finishing her statement.

Next, medical personnel conducted a medical check of the children at approximately 5:13 p.m. While the officers were inside with Mrs. Lowther and the children, Mrs. Lowther lied to the officers regarding her knowledge of whether there were any weapons or firearms in the home. Ex. G 39:09-39:15; 41:15-41:36.  She subsequently acknowledged the location of the firearms and agreed not to go near them. *See* Doc. 106-1 Ex. F. Plaintiffs dispute this characterization; however, the Court finds this blatantly contradicted by the record.[10]

**Handcuffing of Dr. Lowther**

While the deputies were speaking with Mrs. Lowther leading up to their entry into the home, Dr. Lowther remained in the patrol car speaking with an officer. He asked why he was not permitted into his own house and was told this was due to the complaint being alleged against him specifically, and because the children were in the home.  He was also told that CYFD was investigating whether the allegations "were true or false."  At that time, Small came outside, asked Dr. Lowther to step out of the patrol car, handcuffed him, and placed him back in the vehicle.

**Detective Wootton's Arrival and Interview of Mrs. Lowther**

Detective Wootton arrived at the home around 4:50 p.m.  Upon arrival, he conferred with Morales[11].  A deputy apprised Mrs. Lowther of the detective's arrival and that he was speaking with Morales to form a plan, at which time Mrs. Lowther was inside aiding in collecting the children. Medical personnel examined the children and did not find anything of immediate medical concern. Likewise, Morales did not notice any physical injuries to the children.

---

[10]In response to the officer's question of whether there were firearms in the home, Mrs. Lowther initially stated that she "did not know" and then confirmed that there were no weapons "to her knowledge."  However, while outside, Dr. Lowther informed an officer that there were firearms in the home and that Mrs. Lowther knew where they were located, which she subsequently acknowledged. *See* Doc. 127-10, Ex. H at 39:07-39:17; 41:13-41:37. Mrs. Lowther also expressed her regret for lying about her knowledge of weapons in her Second Declaration. *See* Doc. 122-2 Ex. 2 ¶ 2(d).

[11] Wootton's Declaration states that Morales forwarded an email to him with the contents of the CYFD report, and that he was informed by deputies that both Mr. and Mrs. Lowther had been uncooperative.

Sometime thereafter, Wootton interviewed Mrs. Lowther in the presence of Morales[12]. Wootton first gave her Miranda warnings and asked whether she would be willing to answer his questions. There is a dispute as to whether Mrs. Lowther requested an attorney[13]. She eventually agreed to listen to his questions. He asked her why she had not allowed the officers to enter the home. Mrs. Lowther told him that she denied the officers entry because she was alone with the children and her husband said "not to let you in." Ex. F Thornton Belt Tape Audio Track 4. Wootton stated that it was his understanding that Mrs. Lowther had been advised that it was a criminal offense to interfere with an investigation regarding child abuse. *Id.* Mrs. Lowther initially said she "would not have known" or could not recall, but one of the officers present affirmed that they had told her it was an arrestable offense. Mrs. Lowther responded that she had been waiting to hear from her husband.

Stating that she had yet to inform Mrs. Lowther why she was present, Morales provided Mrs. Lowther with further detail relating to the alleged abuse of A.L., which included allegations of sexual molestation, sexual abuse, and lack of supervision. She also explained that her role in the investigation was to determine whether the allegations were "founded or unfounded." *Id.* at 3:54-4:38. She asked Mrs. Lowther if she had any knowledge why someone might make such an allegation from A.L.'s school. Mrs. Lowther eventually recalled that A.L.'s teacher had mentioned that A.L. had been "messing with herself" at school, but that she and her husband had tried to get her to stop. Wootton then informed Mrs. Lowther that because of the nature of the allegations he was removing the children on a 48-hour hold, which would include interviews of both A.L. and

---

[12] Officer Thornton was present for at least some of the conversation. It is unclear whether he was there for the duration.
[13] No such request is captured on the belt audio tapes, however, the Court notes that both Morales' affidavit and Mrs. Lowther's First Declaration indicate that an attorney was requested. Mrs. Lowther's Second Declaration (Doc. 122 Ex. 2 ¶ d) claims that she recalls asking about obtaining attorney advice at some point while BSCO was inside the home, prior to receiving the 48-hour hold document, and that the audio tapes do not reflect this statement.

W.L. at a safehouse. Plaintiffs contend that "[t]he evidence infers that that Morales told BCSO she had decided to take A.L. and W.L. on a 48-hour hold before officers even entered the home and that the decision was her decision." **Doc. 153 at 6 ¶ 12.** Having reviewed the relevant audio and evidence cited by Plaintiffs in support, the Court disagrees. During Mrs. Lowther's interview, Morales initially states "One other thing, because of this whole situation on…" at which point she is cut off by Mrs. Lowther asking for clarification as to "which situation." Wootton then interjects "So, because of the allegation's ma'am the child, I'm taking the children on a 48-hour hold." **Doc. 81-1 Ex. 7 at 113:22-25-114:1-5**.

At 5:33 p.m., Wootton signed a pre-filled "CYFD Protective Services Division Statement of Reasonable Grounds for Temporary PSD Custody" which provided that pursuant to New Mexico Children's Code (32A-4-6 NMSA 1978), the Lowther children were being placed in CYFD custody. Wootton marked two of the prefilled sections of the form which state: "The parent has been arrested and detained, and there is no caretaker available to assure the child's safety; [and] the child(ren) is in danger from his or her surroundings and removal from those surroundings is necessary to ensure the safety of the child(ren)."   Deputies also told Mrs. Lowther than a warrant would be served upon her house that night, and that she could not return to the home pending the search.

### Substance of A.L. and W.L. Safehouse Interviews

Having determined to remove the children on a 48-hour hold, A.L. and W.L. were transported to a safehouse and interviewed that night.[14]  Morales watched the interviews and took notes. Plaintiffs admit that the children were interviewed, but dispute the materiality of this fact with respect to Defendants' motion relating to the removals of the children on August 30 and

---

[14] The Court has reviewed the content of the Safehouse Interviews of A.L. and W.L. What follows is a brief recitation of some of the noteworthy portions of the children's interviews.

September 6th, 2017 "since the children had a parent and safety monitor available to care for them and were not in imminent danger of harm" **Doc. 153 at 6 ¶ 15.**[15] In its prior Memorandum Opinion and Order the Court rejected these conclusory statements as absent support in the record and contradicted by the fact that Mrs. Lowther was being investigated for lack of supervision. *See* **Doc. 174**.

During her interview, A.L. stated, among other things, that she got into trouble for touching her privates at school; she sits on her father's lap while he is defecating; her father touches her "pee-pee" and "gina" in the bathroom, which she repeatedly stated was their "secret"; her father kisses her "butt-cheeks"; and takes photographs and videos of her "butt and gina," with his phone, sometimes while she is saying "fuck."

W.L. stated that he and his sister are spanked on the bottom with a wooden spoon; sometimes, mostly by his father, they are slapped across the face; he feels nervous around his mother; he does not feel safe around his father; his father "is real mean and I don't like to be around him a lot…because he hurts me a lot;" and that his father sometimes pushes him "hard down on the ground" which causes him to hit the back of his head.[16]

At 8:52 p.m., having viewed the interviews, Wootton directed the deputies to transport Dr. Lowther and Mrs. Lowther to the BSCO station.  Ultimately, Wootton charged Dr. Lowther with criminal sexual penetration of a minor and criminal sexual contact of a minor.  Mrs. Lowther was allowed to leave and was not charged with a crime.

---

[15] In disputing these assertions Plaintiffs again cite to their Brief (Doc. 81), and attached exhibits, cross moving for summary judgment against other defendants. Thus, the Court incorporates its findings from those briefs where relevant.

[16] Plaintiffs dispute the facts and materiality of the allegations regarding the substance of A.L. and W.L.s' interviews. However, the UMF's they cite to in support from their cross motion for summary judgment (Doc. 81 UMFs 53 and 54) do no support their position. UMF 53 relates to the DA's declination to prosecute, which is irrelevant to analyzing the constitutionality of the officers' conduct at the time of removal. UMF 54 simply provides the time of W.L.'s interview and his age.

### Physical Examinations of A.L.

On August 31st, 2017, Morales took A.L. for a physical examination at the Albuquerque Sexual Assault Nurse Examiners (SANE) Collaborative. CYFD Defendants refer to Exhibit B (Doc. 105-1) in support of the results of this examination, including, among other things, that A.L. "disclosed full penetration to genitals and anal area by her father and was told by her father that it was their secret," and that redness around her genitals and a 2mm anal fissure were noted. However, Plaintiffs correctly note that Exhibit B does not include this information.

Morales filled out a "New Mexico Child Safety Assessment" form. The form consists of four parts: Safety Threats; Caregiver Protective Capacities; Safety Threats/Protective Capacities; and Safety Decision and Summary, each with a series of "Yes/No" questions to be filled out by the CYFD agent. **Doc. 106-1 Ex. S.** In the "Safety Decision and Summary" portion, Morales selected the answer which states, "The child(ren) is/are unsafe. One or more safety threats placing the child(ren) in immediate or impending danger of serious ham, were identified. There are not sufficient protective capacities to offset, mitigate and/or control the threat of immediate or impending danger of serious harm." ***Id*. at 6.** There is no specific assessment for each individual child and Morales did not provide any additional information in the "Safety Summary" section. Plaintiffs contend that the assessment was not "accurate, complete, or in compliance with the law." **Doc. 153 at 7 ¶ 23.** Plaintiffs, however, do not provide an adequate explanation why this is the case and the Court rejects Plaintiffs' subsequent arguments which rely generally upon Mrs. Lowther's Second Declaration responding to various Undisputed Material Facts asserted by CYFD Defendants. **Doc. 122-2 Ex. 2.**

The next day, A.L. was taken for a follow-up examination at Para Los Niños, conducted by Shalon M Nienow. Nienow's report included that in the SANE Report she had received "an

injury was noted at 12 o'clock on the anus. This finding appeared consistent with tearing and/or bruising." With respect to A.L.'s prior anal injury, Nienow's reexamination found "Normal anal folds. Skin tag at 12 o'clock. Tearing visualized on SANE photographs has resolved with new skin present on right side of anal tag." **Doc. 106-1 Ex. T**. The "Diagnostic Impressions" stated "Normal physical examination today. Previous examination with anal tear present. This finding is consistent with the child's disclosure of anal penetration and constitutes child sexual abuse." *Id*. CYFD Defendants emphasize another part of the "Diagnostic Impressions" report expressing "significant concern for mother's protective capacity," particularly the portion that states, "Further concerning are [A.L's] previous disclosures that mother had told her not to talk about the abuse. Children who live with caretakers who actively encourage them not to disclose, and who are unsupportive of previous disclosures are at significant risk of recantation as well as subsequent trauma symptoms." *Id.* **at Ex. U**. However, the Court finds this blatantly contradicted by the record within the same exhibit. Plaintiffs correctly posit that the foregoing is belied by the body of the same report, in the "History Obtained from Child" section which included the opposite information:

> "I asked [A.L.] "has anyone ever told you that it wasn't okay to talk about the bad things that happened?" She said "yes". I asked "who told you that?" She replied "dad". I asked her "What did he say?" [A.L.] stated "he said don't tell other people". I asked her "how did that make you feel?" She noted "bad". I asked [A.L.] "did he say what would happen if you told other people?" She responded "he said he would get in trouble". I asked "has anybody else ever told you that it's not okay to talk about what happened?" *She replied "no. Mom said to tell". I asked "mom said to tell?" [A.L] nodded assent and stated "uh-huh".*

> *See Id*. at 1. (emphasis added).

The same day, Mrs. Lowther spoke with Morales and told her that she was unaware of any misconduct by her husband; that she "did not accept the allegation as true regarding my husband

because nothing in my 18 years of marriage to him would indicate that he could or would commit any crime" (Doc. 122 Ex. 2 ¶ 2 (e)); and that she wanted A.L. to get therapy immediately because she did not believe her daughter would say such things unless something had happened to her.

### Development of a Safety Plan and the Second Removal of the Lowther Children

On September 1, 2017, at a Family Centered Meeting, CYFD developed a safety plan to release the Lowther children from protective custody to safety monitors; the maternal grandparents Terry and John Borg.[17] The grandparents, Mrs. Lowther, Morales, CYFD Investigations Supervisor Yvonne Meade and In-Home Services (IHS) Supervisor Robin Yoder were present. **Doc. 106-1 Ex. H.** Both parents agreed that the Borgs would act as the safety monitors. On September 4, 2017, a transfer meeting was held which included the same individuals as well as Andrea Miles, the IHS clinician assigned to the case. The next day, at a Preventive Detention Hearing related to Dr. Lowther's criminal charges, which Mrs. Lowther did not attend, Mr. Borg approached Miles and angrily expressed his disbelief of the allegations against Dr. Lowther. **Doc. 138 UMF 30-31**. Miles' report includes the following narrative:

> Following the hearing, I provided Adam Lowther's attorney with my business card and requested that Mr. Lowther contact me Wednesday morning to arrange a meeting. As I turned around, Mr. John Borg came up from his seat, placed his hand on my shoulder and stated "you're our helper, you need to fix this!". I attempted to explain to Mr. Borg that I am not involved with the criminal side of this case, and that my first priority is AL and WL. He went on to express his anger toward the State, saying "they don't have a shred of evidence against my son-in-law, and these allegations are nothing but a bunch of lies". Mr. Borg stated that I need to fix this, that his Grandson, WL has been traumatized because he saw his father in the back of a police car, and that I needed to get these children, as well as himself and his wife Terri [sic] into therapy right away. Ms. Duncan attempted to intervene and calm Mr. Borg down, but he kept raising his voice and insisting that I do something about what just took place. The conversation then spilled out into the hallway.

Doc. 106-1 Ex. Y at CYFD 1775; *See also* Doc. 106-1 Ex. B ¶ 22 (Morales Amended Affidavit for Ex Parte Custody Order).

---

[17] Despite CYFD efforts to arrange a phone conference with Dr. Lowther so he could participate, he was unable to attend the meeting.

Plaintiffs dispute CYFD Defendants' characterization of Mr. Borg's behavior as disruptive; contend that Miles' statements describing the event are both hearsay and incompetent testimony[18]; and dispute that these facts are material to the ensuing September 6, 2017 removal since a safety plan was in place and the children were not in imminent danger. The Court rejects Plaintiffs' arguments as conclusory; Plaintiffs have not provided evidence supporting these assertions.[19]

Following Mr. Borg's conduct, CYFD Defendants held a meeting on September 6, 2017 in which they discussed, with an IHS supervisor, concerns regarding the safety monitors' ability to protect the children; their alleged disbelief of A.L.'s disclosures; and fear that the safety monitors (and Mrs. Lowther) might allow Dr. Lowther access to the children. At that time, CYFD determined that the safety plan could no longer guarantee the protection of the children.[20] Wootton was contacted, and the children were once again taken into custody upon his execution of a Statement of Reasonable Grounds for Temporary Custody.[21] On September 8, 2017, CYFD filed an "Abuse/Neglect Petition" before the Children's Court.[22]  The Children's Court ruling found,

---

[18] Miles' statements are not being considered to prove the truth of the matter asserted therein, but for the purpose of showing that Mr. Borg may not be a good safety monitor.

[19] Plaintiffs refer to Mrs. Lowther's Second Declaration to dispute the events relating to Mr. Borg. However, the relevant section merely states "[Doc. 106] UMF 36 is false and has been addressed in paragraph 2." Paragraph 2 does not provide evidence to dispute what transpired at the hearing but rather claims that Mrs. Lowther and the grandparents had complied with the conditions established by CYFD. Additionally, Plaintiffs do not dispute that Mr. Borg responded to the conditions of Dr. Lowther's release by stating the allegations were lies, and therefore it is deemed admitted.

[20] Plaintiffs dispute that CYFD's employee's concerns were objectively reasonable "or based on the facts and evidence." **Doc. 153 at 9 ¶ 32.** They also contend that the stay of discovery has prevented investigation of what the "determination" by CYFD constituted. The Court has granted Plaintiffs' prior 56(d) with respect to this issue**. *See Doc. 209.***

[21] Plaintiffs dispute that Wootton made the determination to place the children on a 48-hour hold, claiming that, pursuant to Morales' affidavit, CYFD Defendants had already decided to remove the children and that it was CYFD that provided Mrs. Lowther with the form for executing a 48-hour hold, not Wootton. Plaintiffs further assert they have been denied meaningful discovery on this matter. *See* Ex. 1 (Plaintiffs' 56 (d) Motion).

[22] An Amended Abuse/Neglect Petition was filed on September 12, 2017. The Children's Court ruling relates to the Amended Petition.

*inter alia*, that there was probable cause to believe that the children had been abused or neglected such that custody was necessary; that the maternal grandparents did not believe A.L.'s disclosures; that Mrs. Lowther was unable or unwilling to take steps to protect the children; and that no other services or efforts would be appropriate "given the paramount concern of the children's safety." **Doc. 106-1 Ex. CC.** Plaintiffs admit the Order does contain this information but dispute the relevance of the Children's Court determination because it was not a final judgment and did not address Plaintiffs' constitutional claims.

During the custody hearing on September 18, 27-28, 2017, counsel for Dr. and Mrs. Lowther presented evidence and challenged the Amended Affidavit for *Ex Parte* Custody Order. On October 6, 2017, the Second Judicial District Court, Children's Division entered a Temporary Custody Hearing Order. **Doc. 105-1 Ex. T.** The Order concluded that Dr. Lowther could not have contact with his children because there was "ample evidence in the record to find probable cause" that Dr. Lowther had sexually abused A.L., physically and emotionally abused A.L and W.L., and that W.L. had made several disclosures of such abuse during his safe house interview. ***Id.*[23]** CYFD Defendants further state that the Children's Court found probable cause to believe that Mrs. Lowther "was negligent in protecting her daughter…did not employ any protective measures and repeatedly said that she knew that [Dr.] Lowther did not do it…[and] that the [Mrs. Lowther] should have known about the allegations of physical and emotional abuse because she was the children's main caregiver." **Doc. 138 at 8 ¶ 41.** Plaintiffs dispute these characterizations of the Order. The Court notes that the Order does include that there is probable cause that Mrs. Lowther failed to protect her children. However, CYFD Defendants have failed to attach the Order in its

---

[23]Plaintiffs again admit the Order is accurately quoted by Defendants but disputes the relevance of any Children's Court determination because it was not a final judgment and did not address Plaintiffs' constitutional claims.

entirety, omitting page 4. *See* **Doc. 105-1 Ex T.** Thus, the Court cannot ascertain the remaining

content of the Order with respect to Mrs. Lowther, which is cut off at the end of page 3.

On November 7, 2017, the Children's Court entered an Order Sustaining Custody Order in

Part, again sustaining its previous probable cause findings, but returning custody of the children

to Mrs. Lowther. *Id*. **at Ex U.**

### Plaintiffs' Additional Undisputed Material Facts

Plaintiffs include their own "additional undisputed material facts" section in the Response

to CYFD Defendants' motion. CYFD Defendants' Reply does not address this, thus, the Court

deems admitted the following facts:[24]

A. On September 13, 2017, the Children's Division of the Second Judicial District Court
(Children's Court) entered a Notice of Adjudicatory Hearing to be conducted on November 7,
2017. *See* Exhibit A to this Response.

B. On October 3, 2017, the Children's Court entered a Notice of Hearing for an Adjudicatory
Hearing to be conducted on November 30, 2017. *See* Exhibit B to this Response.

C. On October 5, 2017, the Children's Court entered a Notice of Adjudicatory Hearing to be
conducted on November 7, 2017. *See* Exhibit C to this Response.

D. On November 6, 2017, Shona Zimmerman, the court appointed guardian ad litem, sent an email
to CYFD's counsel and the Lowthers' counsel notifying them that she was "recommending W.L.
and A.L. be returned to the legal custody of their mother pending adjudication." *See* Exhibit D to
this Response.

E. On December 18, 2017, the Children's Court entered a Notice of Hearing for an Adjudicatory
Hearing to be conducted February 20-21, 2018. *See* Exhibit E to this Response.

F. On January 31, 2018, the Children's Court entered an Order Allowing Dr. Lowther to Attend
Therapeutic Reintegration Sessions. *See* Exhibit F to this Response.

G. On February 12, 2018, the Children's Court entered a Notice of Hearing to conduct an
Adjudicatory Hearing on April 2 and 4, 2018. *See* Exhibit G to this Response.

H. On March 23, 2019, the Children's Court entered a Stipulated Order of Dismissal. That Order
states, "This cause is dismissed with legal and physical custody of the children remaining with
Jessica Lowther until a notarized written recommendation for additional contact or reunification

---

[24] The Court has retained Plaintiffs' numbering and format for ease of reading. **Doc. 162, Exs. A-I.**

is received from A Child's Voice (to include children's individual therapist and family therapist) and at that point legal and physical custody will be reinstated to both Respondents." *See* Exhibit H to this Response.

I. On April 30, 2018, Dr. Lowther's counsel, Marc Lowry, filed a Notice of Filing providing the Children's Court with notarized letters from the therapists at A Child's Voice, recommending reunification of the family." There are two attached letters from therapists at A Child's Voice. The first letter is from Mr. Dubach dated April 28, 2018. He reports on the treatment sessions. The second letter is from Andrew Gallegos "recommending that Adam Lowther be permitted to reunite with his family[.]"

## DISCUSSION

### I.    Collateral Estoppel

CYFD Defendants request the Court take judicial notice of the Second Judicial District of New Mexico, Children's Division's orders and dismiss the remaining counts, IV and VIII, against CYFD and Morales pursuant to the doctrine of collateral estoppel. They claim that those orders' findings of probable cause that the Lowther children were at risk of harm from Dr. Lowther and that Mrs. Lowther was unable or unwilling to protect them "bars Plaintiffs from relitigating the issues decided therein…" such that the Court should dismiss Plaintiffs' § 1983 constitutional claims relating to the warrantless seizure of the Lowther children. **Doc. 138 at 14-15.** Plaintiffs counter that the requisite elements of collateral estoppel under New Mexico law have not been established to preclude those claims. **Doc. 153 at 2.**

### A.    The Law Regarding Collateral Estoppel

Collateral estoppel is used to "bar the relitigation of ultimate facts or issues actually and necessarily decided in the prior suit by a valid and final judgment," and to prevent repeated litigation of the same issues under "the guise of different causes of action." *Reeves v. Wimberly*, 1988-NMCA-038, ¶ 6, 107 N.M. 231, 233, 755 P.2d 75, 77.  There are four elements the moving party must establish to demonstrate the doctrine applies: "(1) the parties are the same or in privity

with the parties in the original action; (2) the subject matter or cause of action in the two suits are different; (3) the ultimate facts or issues were actually litigated; and (4) the issue was necessarily determined." *Id.* at ¶ 8; *Shovelin v. Cent. New Mexico Elec. Co-op., Inc.*, 1993-NMSC-015, ¶ 10, 115 N.M. 293, 297, 850 P.2d 996, 1000. "Collateral estoppel should be applied only where the trial judge determines that its application would not be fundamentally unfair. The party against whom it is invoked must have had a full and fair opportunity to litigate the issue or issues." *Reeves v. Wimberly*, 1988-NMCA-038, ¶ 14. The movant bears the burden of establishing a prima facie showing. "Once a prima facie showing is made, the burden shifts to the party opposing collateral estoppel to show that the party was not afforded a full and fair opportunity to litigate the issue in the prior proceeding.". *Larsen v. Farmington Mun. Sch.*, 2010-NMCA-094, ¶ 9, 148 N.M. 926, 929, 242 P.3d 493, 496 (citing *DeLisle v. Avallone,* 117 N.M. 602, 605, 874 P.2d 1266, 1269 (Ct.App.1994).).

Ultimately, the decision whether collateral estoppel should be applied is at the trial court's discretion. *See Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1146 (D.N.M. 2014) (citing *Shovelin,* 1993–NMSC–015, 115 N.M. 293, 299, 850 P.2d 996, 1002.). Having considered the parties' arguments and relevant New Mexico law, the Court declines to apply collateral estoppel. The Court finds that CYFD Defendants have not satisfied their burden of proving all of the elements of the collateral estoppel test, specifically, the third and fourth elements.

**Application of the Elements of Collateral Estoppel**

**1.  Difference of subject matter or cause of action in the two suits**

Plaintiffs concede that the subject matter and causes of action are different, and thus the second element of collateral estoppel is a non-issue. *See* **Doc. 153 at 2 fn. 1.**

**2.  Privity**

22

Citing to multiple cases from other jurisdictions, Plaintiffs argue that Morales is not in privity with CYFD "merely because she conducted the investigation on CYFD's behalf." **Doc. 153 at 23.** CYFD Defendants counter that Morales clearly falls within the definition of a party in privity with CYFD, but that this determination is irrelevant for the purpose of defensive collateral estoppel, because "CYFD Defendants are not the party to be estopped." **Doc. 160 at 7.**

Under New Mexico law, privity in defensive collateral estoppel requires that the movant, in this case CYFD Defendants, demonstrate that the nonmovant, Plaintiffs, were a party in the prior Children's Court proceedings. *Silva v. State*, 1987-NMSC-107, ¶ 11, 106 N.M. 472, 476, 745 P.2d 380, 38 ("…[W]e hold that the doctrine of defensive collateral estoppel may be applied when a defendant seeks to preclude a plaintiff from relitigating an issue the plaintiff has previously litigated and lost regardless of whether defendant was privy to the prior suit."); *Shovelin v. Cent. New Mexico Elec. Co-op., Inc.*, 1993-NMSC-015, ¶ 10 **("**Before collateral estoppel is applied to preclude litigation of an issue, however, the moving party must demonstrate that (1) the party to be estopped was a party to the prior proceeding"). There is no dispute that Plaintiffs were party to the Children's Court hearings. Thus, Morales' status is not relevant. Accordingly, the Court holds that the element of privity has been met.

### 3. Whether the ultimate facts or issues were actually litigated

#### The Parties' Assertions

CYFD Defendants aver that the third element of collateral estoppel, that the issues were actually litigated, is present because the Children's Court hearings and related orders considered the issue of whether there was probable cause to remove the children from the Lowther's custody. **Doc. 138 at 19-20.** Particularly, CYFD Defendants note that BSCO found reasonable suspicion to remove the children on August 30, 2017 and that the Children's Court subsequently held that there

was probable cause to remove them again on September 6, 2017, pursuant to relevant criteria set forth in NMSA 1978, § 32A-4-18(C).[25] CYFD Defendants argue that the Lowthers were represented by counsel at the September 18, 27-28, 2017 hearings and had the opportunity to present evidence, provide testimony and cross-examine witnesses.[26] *Id*. at 21. They posit that because the Lowther's Complaint alleges that CYFD did not have reasonable suspicion that the children were in imminent danger when they were seized on August 30 and September 6, 2017, a lower threshold than probable cause, the fact that the Children's Court found "ample evidence" of probable cause for temporary custody necessarily precludes the Lowther's § 1983 constitutional claims. *Id*. at 22-23.

In response, Plaintiffs claim that they were unable to fully litigate their current claims because the issues before the Children's Court were not the same as those asserted in their Complaint. ("[b]ecause constitutional defenses are not permitted to be raised as a matter of law, it is legally impossible for these issues to have been 'fully litigated'.") **Doc. 153 at 17-18.** They also assert that the custody hearings' findings are not the "legal equivalent" of a determination regarding whether CYFD and Morales had lawful authority to enter the Lowther residence without a warrant and seize the children on two separate occasions.[27] *Id.* at 21. Plaintiffs also note that the Temporary Custody Hearing Order (**Doc. 105-1 Ex. B**) does not make express findings as to

---

[25] NMSA 1978, § 32A-4-18(C) governs custody hearings and the circumstances whereby return of custody to the parent or guardian should be denied. This includes instances where: 1) the child is suffering from an illness or injury, and the parent, guardian or custodian is not providing adequate care for the child; (2) the child is in immediate danger from the child's surroundings and removal from those surroundings is necessary for the child's safety or well-being; (3) the child will be subject to injury by others if not placed in the custody of the department; (4) there has been an abandonment of the child by the child's parent, guardian or custodian; or (5) the parent, guardian or custodian is not able or willing to provide adequate supervision and care for the child.

[26] CYFD Defendants specify that Morales appeared as a witness and was subject to hours of testimony and cross examination, and that the same evidence provided in the instant motions was proffered at the hearings including, among other things, the safe house interviews, physical exam reports from SANE and Para Los Niños. **Doc. 138 at 21.**

[27] Plaintiffs provide a short list of legal questions which they argue are not addressed by the Children's Court rulings. *See* Doc. 153 at 21.

whether the Lowther children were in imminent danger or explain its evaluation pursuant to the criterion in NMSA §32A-4-18(C), but rather focuses upon the extent of Mrs. Lowther's protective capabilities.  In reply, CYFD Defendants counter that it is "immaterial" that the Children's Court did not address probable cause as it relates specifically to Plaintiffs' § 1983 claims:

> The New Mexico Court of Appeals has reaffirmed the New Mexico Supreme Court holding that "[t]he doctrine of collateral estoppel applies. . . if the '[prior proceeding] affords opportunity for presentation of evidence and argument substantially similar in form and scope to judicial proceedings.'" *See Larsen v. Farmington Mun. Schools,* 2010-NMCA-094, ¶ 9, 148 N.M. 926. In short, probable cause is probable cause, whether determined in the context of a statutory scheme or for purposes of determine the constitutionality of the actions by a state actor.

**Doc. 160 at 12.**

### Plaintiffs' Constitutional Issues have not been fully litigated

The Court is unconvinced by CYFD Defendants' arguments. In *Larsen*, the New Mexico Court of Appeals found that the parties and issues in the preceding arbitration and civil court case were substantially the same and that the plaintiff had adequate opportunity to proffer evidence, cross examine witnesses, and provide testimony. *Larsen v. Farmington Mun. Sch.*, 2010-NMCA-094, ¶ 10, 148 N.M. 926, 929, 242 P.3d 493, 496. Moreover, the Court of Appeals stated that "Plaintiff's only argument seems to be that the nearly five-year delay between his discharge and the arbitration hearing denied him due process and entitles him to damages. Plaintiff does not contend on appeal that he suffered any prejudice from the delay or that he was denied the opportunity to litigate his claim." *Id.* at ¶ 11. The Court of Appeals further emphasized the weakness of the plaintiff's arguments, which consisted mostly of alleged procedural errors, and that, defendants having shown a *prima facie* case for collateral estoppel, the plaintiff failed to meet his burden of establishing that he was not granted a full and fair opportunity to litigate his claims. *Id.*

Here, the Court finds more merit to Plaintiffs' arguments. The custody hearings relate specifically to a determination of whether the Lowther children should remain within the custody of the state and the *ex parte* orders do not provide sufficient legal analysis such that the constitutional claims in Plaintiffs' Complaint should be precluded. Determining that issue is not the same, for instance, as the issue of whether there was probable cause for a warrantless entry at the time of the removal of the Lowther children. Therefore, the Court concludes that Plaintiffs are entitled to the opportunity to fully litigate their constitutional claims regarding probable cause at the time of the removal and seizure of the children despite the Children's Court findings. *See Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs*., 809 F. Supp. 2d 754, 772–73 (N.D. Ohio 2011), *aff'd and remanded*, 724 F.3d 687 (6th Cir. 2013) (a finding of probable cause for the issuance of an ex parte emergency order for custody is not identical to a finding that exigent circumstances justified the failure to secure an order prior to the seizure. *Cf. United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984) (holding that existence of probable cause for a warrant cannot excuse failure to secure a warrant prior to entry into home to arrest suspect where there was no exigent circumstances). Consequently, the magistrate never addressed the issue here—whether defendants were justified in executing a seizure without a prior court order and in the absence of exigent circumstances.); *See, e.g., Anderson-Francois v. County of Sonoma*, 415 Fed. Appx. 6, (9th Cir. 2011) (holding that the "judge conducting the detention hearing made no findings about the propriety of the warrantless removal. Accordingly, the issue that Anderson–Francois seeks to litigate in federal court is not identical to any issue decided at the detention hearing.") (internal citation omitted); *Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 545 (E.D.N.Y. 2013) (under factually similar circumstances, holding that collateral estoppel was not applicable because the

family court order did not explicitly address whether there was a basis to remove the child before holding a hearing).

By way of comparison, the Court has already extensively reviewed and rendered judgment upon several of Plaintiffs' constitutional claims relating to both CYFD Defendants and other defendants in the instant action, resulting in memorandum and opinions exceeding one-hundred and sixty pages. While this is not intended to indicate that length equates to appropriate judicial assessment, CYFD Defendants would have the Court eschew discussion of the merits of Plaintiffs' constitutional issues based on a series of temporary custody hearings and *ex parte* orders, one of which has not been provided to the Court in complete form, and containing very little in the way of legal discussion. Furthermore, in its prior Memorandum and Opinion with respect to CYFD Defendants' Motion for Summary Judgment on the basis of qualified immunity, the Court granted Plaintiffs' 56(d) motion for limited discovery relating to the second removal of the Lowther children on September 6, 2017. ***See* Doc. 209 at 49-51.** Thus, from the Court's perspective the matter is not closed such that summary judgment or dismissal should be granted. While the Court is cognizant of the utility of the doctrine of collateral estoppel in supporting judicial economy, to render judgment upon Plaintiffs' civil action based solely on the content of the Children's Court orders would not provide Plaintiffs with a full and fair opportunity to be heard.

### 4. The Issue was not necessarily determined

Plaintiffs argue that the Children's Court custody hearings and resultant ex parte orders are not final judgments within the meaning of collateral estoppel. *See Reeves v. Wimberly*, 1988-NMCA-038, ¶ 6, 107 N.M. 231, 233, 755 P.2d 75, 77 ("Collateral estoppel works to bar the relitigation of ultimate facts or issues actually and necessarily decided in the prior suit by a valid and final judgment"). Plaintiffs claim that an examination of the Children's Court procedural

history reveals that it never completed its adjudicatory hearings and therefore never rendered a final judgment, ultimately dismissing the inquiry pursuant to a stipulated order of dismissal executed by the parties. **Doc. 153 at 16.** In support, Plaintiffs cite persuasive authority which, under largely similar facts, held that although the state juvenile court found removal of the children was necessary because it subsequently dismissed the case it had not rendered a final judgment such that collateral estoppel applied. *Parkes v. County of San Diego*, 345 F. Supp. 2d 1071, 1081–82 (S.D. Cal. 2004); *See also State ex rel. Children, Youth & Families Dept. v. Melvin C.*, 2015-NMCA-067, ¶ 11, 350 P.3d 1251, 1254 (detailing the process of custody hearings and holding that "if during that custody hearing, it finds probable cause to believe the child has been abused or neglected, the court determines custody of the child pending an adjudicatory hearing on the merits of the petition."). Here, there was no final adjudicatory hearing

Restatement (Second) of Judgments § 13 (1982) provides that "…[F]or purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." CYFD Defendants do not directly address *Parkes* but, citing this definition and referring to *Parkinson v. Sanderson* (2019 WL 4935513) argue that Plaintiffs are relying upon mere technicalities in an attempt to evade preclusion, and that the Children's Courts three determinations of probable cause "are sufficiently firm to be afforded preclusive effect." **Doc. 160 at 5, 14.**

The Court finds Plaintiffs' arguments and caselaw more persuasive. Notably, the ruling in *Parkinson* is distinguishable. In that action, which involved allegations of Fourth Amendment violations relating to a traffic stop, not removal of children, the Utah District Court reached its conclusion on collateral estoppel for reasons this Court finds inapplicable:

Because Utah does not require that a "final judgment" dispose of a case or any part of a case for issue preclusion to apply—and includes any sufficiently firm prior adjudication of an issue—Mr. Parkinson's claim that the state court's finding concerning the legality of the traffic stop does not constitute a "final judgment" lacks merit…. In Mr. Parkinson's case, the state court issued a substantive ruling on the legality of the traffic stop based on the relevant law and the facts before it. Thus the state court's determination that the Officers had probable cause to conduct the traffic stop reflects a final adjudication on the merits for purposes of issue preclusion. See Cook, 547 F. App'x at 860 ("The state court ruling [on the motion to suppress in a case later dismissed] was a final adjudication on the merits for purposes of issue preclusion because it rendered a substantive ruling on the merits of the constitutional issues presented, based on the relevant law applied to the facts of the claims.") Therefore, the undersigned finds the final element of the issue preclusion test satisfied in this case"

Here, CYFD Defendants have not evinced that New Mexico law does not require a final judgment for collateral estoppel to apply. They also did not dispute Plaintiffs' "additional undisputed material facts" regarding the sequence of events in the Children's Court, ending in dismissal of the case and return of custody to Mrs. Lowther. Nor, as previously highlighted, does the Court believe that the Children's Court provided a substantive ruling on Plaintiffs' constitutional issues, focusing instead on the question of the immediate custody of the Lowther children, absent extensive legal analysis. Accordingly, the Court does not find those rulings sufficiently determinative and declines to apply collateral estoppel to Plaintiffs' remaining claims.

## CONCLUSION

For the foregoing reasons the Court denies CYFD Defendants' motion to dismiss or for summary judgment on the basis of collateral estoppel.

**IT IS THEREFORE ORDERED** that CYFD Defendants' Motion to Dismiss or in the Alternative for Summary Judgment on the basis of collateral estoppel **(Docs. 137, 138),** is **DENIED.**

**IT IS SO ORDERED.**

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE